**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| SHERRY BLACKBURN, WILLIE ROSE, | : | |
| ELWOOD BUMBRAY, GEORGE HENGLE, | : | |
| REGINA NOLTE, JO ANN FALASH, | : | Case No. 3:22-cv-146 (DJN) |
| JOHN TUCKER, and EMILY MURPHY: | : | |
| *on behalf of themselves and all individuals* | : | |
| *similarly situated,* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| A.C. ISRAEL ENTERPRISES, INC., | : | |
| d/b/a INGLESIDE INVESTORS, RICHARD | : | |
| INVESTORS, LLC, GREG WARNER, | : | |
| FERRELL CAPITAL, LLC, SEVILLE, LTD., | : | |
| MONU JOSEPH, JOSEPH INVESTMENT, LLC, | : | |
| JOSEPH NPA INVESTMENT, LLC, | : | |
| E OPPORTUNITIES, LLC, SKYE, LLC, | : | |
| CABBAGE CITY, LLC, | : | |
| KAI INVESTMENTS, LLC, BENJAMIN | : | |
| GRAVLEY, SIGNAL LIGHT, LLC, | : | |
| HYMKEN, LP, GEORGE KELLNER, | : | |
| KELLNER CAPITAL LP, AMIT RAIZADA, | : | |
| SPECTRUM BUSINESS VENTURES, INC., | : | |
| and RAIZADA GROUP, LLLP, | : | |
| | : | |
| Defendants. | : | |

_____:

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Sherry Blackburn, Willie Rose, Elwood Bumbray, George Hengle, Regina Nolte,

Jo Ann Falash, John Tucker, and Emily Murphy, *on behalf of themselves and all individuals*

*similarly situated*, by counsel, and for their First Amended Complaint against Defendants, they

allege as follows:

1

## INTRODUCTION

1.     Four plaintiffs to this lawsuit are parties in *Hengle v. Asner*, No. 3:19-cv-250 (E.D. Va.) (Novak, J.), which has been pending before this Court since April 9, 2019. In that case, those Plaintiffs sued the tribal officials of the Habematolel Pomo of Upper Lake (the "Tribe"), a federally recognized Native American tribe, as well as two of their non-tribal business partners who created, developed, aided, and abetted a usurious lending scheme that offered illegal loans with unconscionable interest rates often exceeding an APR of 900%. That litigation culminated in a nationwide class settlement requiring the repayment of $39 million dollars by several non-tribal individuals, as well as the cancellation of more than $450 million dollars of loans by the tribal lending entities. The Court granted preliminary approval of the settlement on May 12, 2022. *Hengle v. Asner*, No. 3:19-cv-250, ECF No. 209. And while that settlement involved several key participants in the scheme, other major participants could not be identified until discovery commenced in December 2021.

2.     As this Court is aware, this litigation involves the tribal lending business model— "the most recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012). Under this model, non-tribal payday lenders and their business partners used Native American tribes to originate illegal loans in order to facilitate a dubious and legally incorrect claim that the loans were subject to tribal law and tribal sovereign immunity, not the protections created by state usury and licensing laws. But as the Fourth Circuit held in the related litigation: "substantive state law applies to off-reservation conduct," such as online loans marketed, collected, and paid by consumers in Virginia. *Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021). And "although the Tribe itself

cannot be sued for its commercial activities," its members, officers, and business partners "can be." *Id*.

3.     Through the *Hengle* litigation, it was determined that additional business partners and investors knowingly aided, funded, facilitated, and participated in the usurious lending scheme at issue in this case. As a result of this conduct, Plaintiffs allege that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which was expressly enacted "to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452, § 1. Together with the defendants in *Hengle* and others, Defendants knowingly maintained an interest in, participated in the operation of, reinvested in, and conspired with other members of the enterprise to profit from the usurious loans.

4.     Plaintiffs also assert class common law claims for unjust enrichment and civil conspiracy. Because the enterprise's loans exceeded the usury laws permitted by the laws of all Plaintiffs' respective home states, such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. *See* Va. Code § 6.2-1541; Ind. Code § 24-4.5-7-111; Wis. Stat. § 138.06; Cal. Fin. Code § 22750; Ohio Rev. Code § 1321.02. Accordingly, Plaintiffs seek to recover all amounts paid on their and other class members' loans, as well as their costs and attorneys' fees.

## JURISDICTION

5.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

6.     This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised

anywhere in the United States so long as it does not violate the Fifth Amendment. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997). Because Defendants are all residents of the United States and received millions of dollars from loans made in Virginia, the Court has personal jurisdiction over them under the Fifth Amendment.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in Virginia, including in this District and Division. Venue is also proper in this Court pursuant to 28 U.S.C. § 1965(a) because Defendants transacted their affairs in Virginia through their participation in a conspiracy and receipt of millions of dollars from loans made in Virginia. In addition, venue is proper in this District and Division under the "ends of justice" because the Court has personal jurisdiction over all Defendants and is already familiar with the legal issues and facts raised in this civil action.

## PARTIES

8.      Plaintiff Sherry Blackburn is a natural person and resident of this Division.

9.      Plaintiff Willie Rose is a natural person and resident of this District.

10.     Plaintiff Elwood Bumbray is a natural person and resident of this District.

11.     Plaintiff George Hengle is a natural person and resident of this Division.

12.     Plaintiff Regina Nolte is a natural person and resident of Indiana.

13.     Plaintiff Jo Ann Falash is a natural person and resident of Wisconsin.

14.     Plaintiff John Tucker is a natural person who is currently residing in Louisiana to help care for a family member. At all times relevant hereto, Plaintiff Tucker resided in California.

15.     Plaintiff Emily Murphy is a natural person and resident of Ohio.

16.     A.C. Israel Enterprises, Inc. d/b/a Ingleside Investors is "a financial holding company representing the investment interests of the Israel family."[1] As explained in more detail below, Ingleside Investors knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme through a $4,000,000.00 investment in NPA Investors, LLC, which was an affiliate of National Performance Agency, LLC ("NPA"). As explained in more detail below, NPA was a payday lending company that offered short-term, high-interest loans since the 1990s. Around 2012, NPA shifted its payday lending business to the tribal lending model. As part of this process, NPA initiated agreements with the Tribe to craft, develop, and implement the usurious lending scheme at issue in this case, which resulted in the creation of Golden Valley Lending, Inc. ("Golden Valley"), Silver Cloud Financial, Inc. ("Silver Cloud"), and Mountain Summit Financial, LLC ("Mountain Summit"). Ingleside Investor's $4,000,000.00 investment and proceeds stemming therefrom were knowingly used as the capital to make the illegal loans to consumers through agreements between NPA and the Tribe's entities. And after the "sale" of NPA to the Tribe, Ingleside Investors continued to knowingly aid, facilitate, abet, and profit from the scheme through a promissory note to NPA in an amount over $64,100,000.00, as well as a series of other interrelated agreements that gave NPA significant influence and control over the lending operations.

17.     Upon information and belief, Defendant Richard Investors, LLC is a wholly-owned subsidiary of Ingleside Investors. Through Richard Investors, Ingleside Investors made its investment in NPA.

18.     Defendant Greg Warner is the president of Ingleside Investors. As the firm's president, Warner oversees all aspects of its investment and operating activities, including its

_____

[1] *See* Ingleside Investors, *Home*, http://www.inglesidellc.com (last visited on March 9, 2022).

investment activities with NPA. Upon information and belief, Warner participated in Ingleside Investors' decision to invest in NPA, knowing that those funds would be used to support its usurious lending activities. Further, Warner knowingly maintained Ingleside Investors' investment despite his knowledge that it aided, abetted, and supported the usurious lending scheme.

19.     Upon information and belief, at all times relevant hereto, Warner received updates from NPA's management related to its investment, distributions, and litigation surrounding the illegality of the lending product. Warner was also involved and participated in the design of the initial structure of the scheme.

20.     Defendant Ferrell Capital, Inc., is a "family office" created to "manage the financial, business and personal affairs of the Ferrell family," including its investments in "real estate, banking," and "private equity." As explained in more detail below, Ferrell Capital knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme through a $1,500,000.00 investment in NPA. This $1,500,000.00 investment and proceeds stemming therefrom were knowingly used as the capital to make the illegal loans to consumers through agreements between NPA and the Tribe's entities. And after the "sale" of NPA to the Tribe, Ferrell Capital continued to knowingly aid, facilitate, abet, and profit from the scheme through a promissory note to NPA in an amount over $64,100,000.00, as well as a series of other interrelated agreements that gave NPA significant input and control over the lending operations.

21.     Upon information and belief, Defendant Seville, LTD is a wholly-owned subsidiary of Ferrell Capital. Through Seville, Ferrell Capital made its investment in NPA.

22.     Defendant Monu Joseph is a resident of California. Joseph is the president, manager, and partial owner of several different entities that invested in NPA, including but not limited to Joseph Investment, LLC and Joseph NPA Investment, LLC. As explained in more detail

below, Joseph knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme through substantial investments in NPA and its affiliates. Joseph's investment was knowingly used as the capital to make the illegal loans to consumers through agreements between NPA and the Tribe's entities. And after the "sale" of NPA to the Tribe, Joseph and his investment companies knowingly continued to aid, facilitate, and profit from the scheme through a promissory note to NPA in excess of $64,100,000.00, as well as a series of other interrelated agreements that gave NPA (and its closely held investors) significant input and control over the lending operations. Joseph was also involved and participated in the design of the initial structure of the scheme.

23.     Defendant Joseph Investment, LLC, is one of the companies used by Monu Joseph to make the substantial investment in NPA. After the "sale" of NPA to the Tribe, Joseph Investments knowingly continued to aid, facilitate, and profit from the scheme through a promissory note to NPA in an amount over $64,100,000.00, as well as a series of other interrelated agreements that gave NPA (and its closely held investors) significant input and control over the lending operations.

24.     Upon information and belief, Defendant Joseph NPA Investment, LLC is one of the companies used by Monu Joseph to make an initial investment in NPA. Upon information and belief, Joseph NPA Investment's management (primarily Monu Joseph) decided to invest in NPA, knowing that those funds would be used to support its usurious lending activities and knowingly maintained their investment despite its knowledge that it aided, abetted, and supported the usurious lending scheme.

25.     Upon information and belief, Defendant E Opportunities, LLC is one of the companies used by Monu Joseph to make an initial investment in NPA. Upon information and belief, E Opportunities knowingly aided, maintained an interest in, funded, and profited from the

usurious lending scheme through a $4,505,000.00 investment in NPA. This $4,505,000.00 investment was knowingly used as the capital to make the illegal loans to consumers through agreements between NPA and the Tribe's entities. E Opportunities' management (primarily Monu Joseph) decided to invest in NPA, knowing that those funds would be used to support its usurious lending activities and knowingly maintained its investment despite their knowledge that it aided, abetted, and supported the usurious lending scheme.

26.    Defendant Skye, LLC is a limited liability company with a principal place of business at 13006 Russell Street, Overland Park, Kansas 66209. As explained in more detail below, Skye knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme through a $1,000,000.00 investment in NPA. This $1,000,000.00 investment was knowingly made as the capital to fund the illegal loans to consumers through agreements between NPA and the Tribe's entities. And after the "sale" of NPA to the Tribe, Skye continued to knowingly aid, facilitate, abet, and profit from the scheme through a promissory note to NPA in an amount over $64,100,000.00, as well as a series of other interrelated agreements that gave NPA significant input and control over the lending operations.

27.    Defendant Cabbage City, LLC is a limited liability company with a principal place of business at 4510 Belleview Avenue, Suite 300, Kansas City, Missouri 64111. As explained in more detail below, Cabbage City knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme through a $4,870,000.00 investment in NPA. This $4,870,000.00 investment was knowingly as the capital used to make the illegal loans to consumers through agreements between NPA and the Tribe's entities. And after the "sale" of NPA to the Tribe, Cabbage City continued to knowingly aid, facilitate, abet, and profit from the scheme

through a promissory note to NPA in an amount over $64,100,000.00, as well as a series of other interrelated agreements that gave NPA significant input and control over the lending operations.

28.     Defendant Kai Investments, LLC is a limited liability company organized under the laws of Delaware. As explained in more detail below, Kai Investments knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme through a $800,000.00 investment in NPA. This $800,000.00 investment was knowingly used as the capital to make the illegal loans to consumers through agreements between NPA and the Tribe's entities. And after the "sale" of NPA to the Tribe, Kai Investments continued to knowingly aid, facilitate, abet, and profit from the scheme through a promissory note to NPA in an amount over $64,100,000.00, as well as a series of other interrelated agreements that gave NPA significant input and control over the lending operations.

29.     Defendant Benjamin Gravley is a natural person and resident of Arizona. Gravley is the sole owner of Signal Light, as well as its controlling principal/manager. Gravley is also the former president of Kellner Capital, LP. As the manager for Signal Light, LLC, and president of Kellner Capital, Gravley personally participated in and oversaw those entities' decisions to enter into a partnership with the Tribe to fund and profit from its usurious lending scheme. Because Gravley was personally involved in the initiation, development, management, oversight, and facilitation of the partnership, he is personally liable to consumers. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2018 WL 485963, at *11 (C.D. Cal. Jan. 19, 2018) (finding a lending business owner liable for a $10.2 million-dollar judgment because "he directly participated in and had the ability to control" the deceptive acts).

30.     Defendant Signal Light, LLC is a limited liability company with a principal place of business in Arizona. As explained in more detail below, Signal Light is a private investment

company that knowingly aided, maintained an interest in, funded and profited from one of the Tribe's usurious lending entities, Majestic Lake Financial, LLC. Among other things, Signal Light provided a secured promissory note to Majestic Lake's parent company, Tribal Lending Enterprise, Inc., in the amount of $1,500,000.00, which was used to make the illegal loans to consumers. In addition to providing the *startup* capital to fund the loans, Signal Light agreed "to commit capital . . . up to a Twenty-Five Million Dollars ($25,000,000)" to acquire "participation interests" in the *originated* loans originated by Majestic Lake. Signal Light had the right to acquire "no less than 75% and no more than 99%" of "the face value of the principal amount of a loan. Signal Light received the gross profit from these loans, including the usurious interest. This structure essentially provided Majestic Lake with a revolving line of credit to fund and grow a multi-million-dollar lending portfolio.

31.     Defendant Hymken, LP is a Delaware limited partnership. According to a verified complaint submitted by George Kellner, the primary purpose of Hymken was to invest in interests in the unsecured high-rate installment loans offered by the Tribe. Upon information and belief, Hymken knowingly made its investment in the usurious lending scheme through an investment in Signal Light.

32.     Defendant Kellner Capital LP is a limited partnership with a principal place of business in New York. According to its website, Kellner Capital is one of "Wall Street's longest running hedge funds."[2] Upon information and belief, Kellner Capital (through affiliates) knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme through Signal Light's partnership with the Tribe. Upon information and belief, Kellner Capital

---

[2] *See* Kellner Capital, *Home*, available at: http://www.kellnercap.com/ (last visited on March 9, 2022).

funded a substantial portion of Signal Light's promissory note and the participation interests, and it received the proceeds (albeit indirectly through its holding of other companies involved).

33.     Defendant George Kellner is a natural person and resident of New York. George Kellner is the managing partner of Kellner Capital. According to a verified complaint submitted by George Kellner, he personally invested in Hymken and those funds were then used to provide capital to Signal Light to purchase the participation interests in the usurious lending scheme.

34.     Defendant Amit Raizada is a natural person and resident of Florida. Amit Raizada is one of the former managers of National Performance Agency, LLC and owned a significant portion of the company. As detailed below, Raizada was instrumental in the creation, implementation, and development of the tribal lending scheme, including through the recruitment of investors and the providing of infrastructure, including the employees at Spectrum Business Ventures. Raizada also received a substantial amount of the revenue generated by the scheme, which was paid to his wholly owned company, the Raizada Group.

35.     Defendant Spectrum Business Ventures, Inc. ("SBV") is a corporation organized under the laws of Florida. At all times relevant hereto, Raizada was the chief executive officer of SBV, as well as its sole director. Upon information and belief, SBV is wholly owned by Raizada (or companies owned by him). As detailed in a letter authored by Raizada, SBV (through Raizada and others) helped raise capital for the tribal lending scheme, charging 5% (at a minimum) of the investment amount as a fee for the services. According to his letter, SBV and Raizada raised at least $28.5 million for the scheme.

36.     Defendant Raizada Group, LLLP f/k/a Raizada Group, LP is a limited partnership formed under the laws of Florida. Raizada Group is the vehicle through which Amit Raizada owned his interest in NPA. As explained in more detail below, Raizada Group knowingly aided,

maintained an interest in, funded, and profited from the usurious lending scheme through its significant ownership interest in NPA. And after the "sale" of NPA to the Tribe, Raizada Group knowingly continued to aid, facilitate, and profit from the scheme through a promissory note to NPA in excess of $64,100,000.00, as well as a series of other interrelated agreements that gave NPA (and its closely held investors) significant input and control over the lending operations.

## FACTUAL BACKGROUND

A.     **State usury and licensing laws protect consumers from usurious loans.**

37.    "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

38.    Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including Virginia, Indiana, Wisconsin, California, and Ohio, *i.e.*, the home states of each of the Plaintiffs where they applied for, received, and repaid their loans.

### 1.     Virginia

39.    Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984). The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *See, e.g.*, *id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

40.     In accordance with this policy, Virginia's general usury statute—absent certain exceptions not applicable in this case—provides that "no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code § 6.2-303(A).

41.     In addition to the general usury laws embodied in Virginia's chapter entitled "Interest and Usury," Virginia's legislature has enacted the Consumer Finance Act ("CFA"), which is "part of a comprehensive statutory, financial, and regulatory structure dating back to at least 1918," when it was known as the Small Loan Act. *Commonwealth v. NC Fin. Sols. of Utah, LLC*, 100 Va. Cir. 232, at *5 (2018).

42.     The legislature enacted this statute because "the conduct of such business has long been the cause of general complaint and of much hardship and injustice to borrowers, and there is no regulation or provision of law which has proved effective for the protection of borrowers and for the punishment of usurious money lenders." *Id*. (quoting 1918 Va. Acts, ch. 402.); *see also Sweat v. Commonwealth*, 152 Va. 1041, 1057 (1929) (explaining that legislature enacted the Act in response "money loan sharks and salary-buyers").

43.     Unlike the general usury statutes, the CFA "requires all who engage in the business of making noncommercial personal loans in Virginia to be licensed, and therefore regulated and supervised by the [Secretary of the Commonwealth]." *NC Fin. Sols. of Utah, LLC*, 100 Va. Cir. 232, at *6 (citing Va. Code § 6.2-1501(A)).

44.     "The Legislature intended such lenders be subject to distinct scrutiny, including examination of their affairs and records no less than once every three years." *Id*. (citing Va. Code § 6.2-1531).

45.     Critically, "[n]o distinction is made in the statute between domestic or foreign-based lending entities," *id*., such as tribal lenders.

46.     If a person violates the interest rate cap, the CFA imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

### 2.     Indiana

47.     Like Virginia, Indiana's lending and usury protections are a part of Indiana's clearly delineated public policy against usurious loans and predatory lending. Indeed, "Indiana's first usury statutes were passed before the turn of the 20th century . . . ." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009).

48.     In 2002, Indiana's Small Loans Act was enacted to specifically respond to the growth of predatory payday lenders similar to NPA. *Id.*

49.     As the Court of Appeals of Indiana has observed, some lenders believe that they may "ignore the historically moral and practical foundations for usury statutes and charge any amount of interest that the so-called payday loan 'free market' will bear." *Id.* at 1062.

50.     Such contracts, however, are unenforceable because of "public policy considerations." *Id.*

51.     Consistent with this, a usurious loan violates Indiana law if: (1) it is made without the license required by Indiana law; (2) it is made in excess of Indiana's interest rate caps for licensed lenders, which varies from 10% to 15% for loans of less than $550; *or* (3) it was made in excess of Indiana's general usury cap on consumer loans, which prohibits a finance charge in excess of 25%.

### 3.    Wisconsin

52.    Wisconsin's "[u]sury laws are for the benefit of the public generally and, specifically, for the benefit of the individual borrower." *Williams v. Sec. Sav. & Loan Ass'n*, 120 Wis. 2d 480, 484 (Wis. Ct. App. 1984); *see also State v. J. C. Penney Co.*, 48 Wis. 2d 125, 153, (Wis. 1970) ("While it is true that usury laws provide specific remedies for the borrower, it seems beyond question that they are enacted for the benefit of the public generally. If so, the state certainly has an interest in seeing that the law is not continually violated.").

53.    Consistent with this, Wisconsin has enacted a statute that expressly provides that a "person may not originate or service a payday loan involving a Wisconsin resident without first having obtained" a license from the Wisconsin Division of Banking. Wis. Stat. § 138.14(2).

54.    This statute also makes clear that it applies to "all payday loans made to a Wisconsin resident, regardless of whether the loan is made by face-to-face contact, mail, telephone, Internet, or any other means." *Id*.

55.    Absent a license, a person may not charge interest on a loan in excess of 12% to a Wisconsin resident. Wis. Stat. § 138.05(1)(a).

56.    If a person charges interest in violation of Wisconsin's 12% interest rate cap, the loan is unenforceable, and the victim may recover "the amount of interest, principal, and charges paid on such loan or forbearance but not more than $2,000 of principal . . . ." Wis. Stat. § 138.06(3).

### 4.    California

57.    Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872.  Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

58.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

59.     Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

60.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.*

61.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

62.     In addition to its general usury law, the loans at issue in this case violated California's Financing Law's laws because they were made without a license and imposed interest rates far greater than those permitted by California law.

63.     As a result, California law renders the entire contract "void," including the "right to collect or receive any principal, charges, or recompense in connection with the transaction." Cal. Fin. Code § 22750.

64.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, or deceptive business practices.  Cal. Bus. & Prof. Code § 17200.

16

### 5.    Ohio

65.    "The [legislature's] right to regulate the rate of interest by law is as old as government itself." *Wessell v. Timberlake*, 116 N.E. 43, 46 (Ohio 1916).

66.    Ohio law generally caps interest rates at 8% per annum.   Ohio Rev. Code § 1343.01(A).

67.    Lenders licensed under the Small Loans Law may charge interest rates exceeding 8% APR for loans of $5,000 or less.  Ohio Rev. Code § 1321.02.  For loans between $1,000 and $5,000, licensees may charge interest rates no greater than 28% APR on the first $1,000 and 22% on amounts of the principal exceeding $1,000.  Ohio Rev. Code § 1321.13(A).  Defendants were never licensed to lend in Ohio.

68.    Any lender who charges interest rates in excess of those provided by law "shall forfeit to the borrower twice the amount of interest contracted for."  Ohio Rev. Code § 1321.14(D).

69.    Lenders licensed under Ohio's Short-Term Loans Law may charge interest rates no greater than 28% APR on loans of $500 or less.  Ohio Rev. Code § 1321.35–40.  Licensees must be located in Ohio.  Ohio Rev. Code § 1321.36.

70.    Any interest charged in excess of 28% APR on loans of $500 or less is deemed an unfair or deceptive business practice in violation of Ohio's Consumer Sales Practices Act.  Ohio Rev. Code §1321.44(A).  A short-term borrower injured by excessive interest rates "shall have a cause of action and be entitled to the same relief available to a consumer under [the CSPA]."  Ohio Rev. Code §1321.44(A).

71.    Ohio's Consumer Sales Practices Act allows injured borrowers to "recover [their] actual economic damages plus an amount not exceeding five thousand dollars in noneconomic damages."  Ohio Rev. Code § 1345.09(A).

**B.      Overview regarding the creation of the tribal lending business model.**

72.      Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

73.      Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[3] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

74.      Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

---

[3] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

75.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

76.     Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[4] Others, attempted to evade the law through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

77.     In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. Martin & Schwartz, *supra* at 759.

78.     For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

79.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id.*

80.     Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id.*

---

[4] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* 17–22 (2001), *available at* http://www.consumerfed.org/pdfs/paydayreport.pdf.

81.     Callaway is one of several attorneys who represented the payday lenders in these transactions; another is Jennifer Weddle of Greenberg Traurig.

82.     On the other side of the table was Robert Rosette and representatives of his law firm, Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022).

83.     Robert Rosette is a well-known attorney who represents tribes willing to engage in the tribal business model.

84.     Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received a nominal amount of the proceeds from the loans.

85.     Between 2008 and 2016, Rosette represented the Habematolel Pomo of Upper Lake, including its tribal lending entities.

86.     Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

87.     Over the past several years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id.*[5]

---

[5] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192,

88. In addition, there have been multiple class actions and government enforcement actions that have returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *See generally Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495, Dkt. 141 (E.D. Va. Dec. 13, 2019) (order granting final approval of the class settlement); *see also* David Ress, *Historic settlement sees online lenders wiping out $380 million in debt. Virginians led the way*, The Virginian Pilot (Dec. 12, 2019), *available at* https://www.pilotonline.com/business/consumer/dp-nw-online-lender-settlement-20191212-n7khtxn7tbbsbauzirehwmpgly-story.html; Press Release, Office of Att'y Gen., Ga., *Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender* (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40-million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs).

89. Two prominent perpetrators also were recently convicted and sentenced to prison for their roles.[6]

90. Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

---

at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

[6] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

C.      **Overview of National Performance Agency, LLC.**[7]

91.     As detailed in a presentation book for investors, National Performance Agency, LLC ("NPA") was a closely held company "created in 2011 by a group of accomplished, experienced operators *and investors*." Ex. 1 at 2688 (emphasis added).

92.     Headquartered in Kansas City, the company specialized "in short-term consumer finance," *i.e.*, payday loans. *Id.*

93.     Before the formation of NPA, Joshua Landy—one of its founders and its president—"started several consumer finance companies" that "offered short term micro-finance consumer loans to customers," including National Opportunities Unlimited, Inc., which provided high-interest loans over the internet. *Id.*

94.     Mr. Landy's high-interest lending company was extremely successful between 2004 and 2011. This success, in part, was driven by the "availability and consumer comfort with the internet," which allowed Mr. Landy "to capitalize on this new medium to identify, assess, fund, and manage short term consumer loans." *Id.*

95.     In order to grow its portfolio and profits, Landy and his friend and business partner, Amit Raizada, sought to partner with additional individuals.

96.     Following "an extensive due diligence of financial performance, technology infrastructure, management capabilities, and an analysis of regulatory and compliance aspects," Mr. Landy sold a 70% interest in his payday lending business to a group of private investors, including but not limited to Defendants Ingleside Investors, Richard Investors, LLC, Ferrell

---

[7] As will be detailed below, Defendants Gravley, Signal Light, and Kellner Capital were not investors in NPA. None of the allegations in Parts C or D pertain to them.

Capital, LLC, Seville, LTD., E-Opportunities, LLC, Skye, LLC, Cabbage City, LLC, and Kai Investments (collectively, the "NPA Investors").

97.     The sale "was led by Spectrum Business Ventures," a company primarily owned and managed by Amit Raizada, who also owned a significant stake in NPA. *Id.*

98.     To facilitate the sale and scheme, Landy, Raizada, Scott Asner, and others formed "NPA Investors, LP," which was the vehicle through which they received the proceeds generated by the usurious loans.

**D.     Following regulatory crackdowns, NPA shifts its business to tribal lending.**

99.      Shortly after the sale, NPA "adjusted its business model," and "gradually eliminated making loans" through "Delaware entities, and chose a different path." Ex. 1 at 2688.

100.     There were "two key considerations" for this new path: (1) "growth was inhibited by limitations that restricted the number of states in which NPA could offer loans," and (2) "a fluid and somewhat aggressive regulatory environment placed the long term viability of the existing business model into question." *Id.* at 2688–89.

101.     Thus, after consultation with, input from, and agreement by the NPA Investors, NPA's business plan was to use the "sovereign model," and "[e]stablish multiple . . . tribal relationships" to continue its lending. Ex. 2 at 755.

102.     NPA intended to utilize "the sovereign model for lending in a number of situations," including to allow NPA to "begin lending into states in which" it did not "currently operate[]" and to "migrate loans" from its Delaware lending entities. *Id.*

103.     As part of this new path—after consultation with and input from NPA Investors—NPA (primarily through Landy and Raizada) "assessed numerous tribes" to use as the conduit for its high-interest loans. Ex. 1 at 2689.

104.     Ultimately, NPA initiated a partnership with the Habematolel Pomo of Upper Lake on or around July 2012.

105.     Through this partnership, NPA and its wholly owned affiliates provided the following: (1) funding for the loans; (2) management and servicing of the loans; (3) a call center for customer support and processing of the loans; and (4) marketing for the loans.

106.     In other words, NPA provided the Tribe with a turnkey lending operation, and in exchange, the Tribe created a tribal entity to serve as the conduit for the loans.

107.     Consistent with the structure described above, Golden Valley was established in August 2012, and consumers were able to obtain loans from the website, www.goldenvalleylending.com, as early as August 29, 2012.

108.     According to its website, Golden Valley provided short-term loans of "up to $1,000," and borrowers could be "approved in seconds."

109.     On its homepage, the website stated that "GOLDENVALLEYLENDING.COM IS A WEBSITE OWNED AND OPERATED BY GOLDEN VALLEY LENDING, WHICH IS A TRIBAL LENDING ENTITY WHOLLY OWNED AND OPERATED BY THE HABEMATOLEL POMO OF UPPER LAKE, CALIFORNIA . . . AND IS OPERATING WITHIN THE TRIBE'S RESERVATION."[8]

110.     Consistent with this, Golden Valley's website and lending agreements claimed that its address was 635 East Highway 20, Upper Lake, California 95485.

---

[8] The Wayback Machine, a digital archive containing the histories of billions of websites, first captured a snapshot of Golden Valley's website on June 10, 2013. *See* Wayback Machine, Archive of Golden Valley Lending, *available at* https://web.archive.org/web/2013-0610153342/http://www.goldenvalleylending.com/.

111.    Around this same time, in March 2012, Silver Cloud was established, and consumers were able to obtain a loan from its website, www.silvercloudfinancial.com, as early as June 8, 2013.

112.    Silver Cloud's website largely mirrored the website of Golden Valley, including the advertised loan amounts and misrepresentations that Silver Cloud was "wholly owned and operated" by the Tribe and operated "within the Tribe's reservation."[9]

113.    After launching Silver Cloud, Defendants established Mountain Summit in August 2012, and consumers were able to obtain a loan from its website, www.mountainsummitfinancial.com, as early as January 6, 2014.

114.    Mountain Summit's website largely mirrored the websites of Golden Valley and Silver Cloud, including the advertised loan amounts and misrepresentations that Sliver Cloud was "wholly owned and operated" by the Tribe and operated "within the Tribe's reservation."[10]

E.    **The tribal entities are a front for NPA's usurious lending activities.**

115.    Although the entities claimed to be "wholly owned and operated" by the Tribe within its reservation, the Tribe's role was a front—non-tribal outsiders handled every material aspect of the lending activities from Overland Park, Kansas, the hotbed of the online payday lending industry. *See generally* Al Jazeera America, *When Tribes Team Up With PayDay Lenders, Who Profits?* (June 17, 2014).

116.    Indeed, when investigative journalists went to visit the reservation, they observed that the tribal entities' "one-story office just off California's Highway 20 doesn't look like much," certainly not what you would expect of "four thriving financial enterprises." *Id.*

_____

[9] The first available snapshot of Silver Cloud's website is June 8, 2013.

[10] The first available snapshot of Mountain Summit's website is January 6, 2014.

117.   To that end, the journalists further observed that "little of the revenue that flows through these tribal businesses ends up in the rancheria or benefiting tribal members, as attested by the cluster of rundown houses nearby, where some members live." *Id.*

118.   And interviews with tribal members confirmed that "none of them had any jobs related to payday lending." *Id.*

119.   Instead, nearly all activities performed on behalf of Golden Valley, Silver Cloud, and Mountain Summit were performed by owners and employees of non-tribal companies, primarily NPA and its affiliated companies.

120.   These employees—located at 7201 W. 110th Street, Suite 210, Overland Park, Kansas 66210—handled the day-to-day operations of Golden Valley, Silver Cloud, and Mountain Summit, including underwriting, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management.

121.   By way of example, NPA and Silver Cloud entered into a "Services Agreement" dated July 21, 2012, whereby it agreed to provide "expert advice on technological issues in setting up Silver Cloud operations." Ex. 3 at 2263.

122.   Pursuant to this Services Agreement, NPA provided the following services: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. *Id.* at 2264–65.

123.    Additionally, nearly all of the revenue went to non-tribal outsiders, such as the Defendants, primarily through the use of "Participation Agreements."

124.    Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 2 at 755 (explaining various "structural approaches to tribal deals," including a participation model "in which NPA purchases 99% in the loans the tribe makes.").

125.    The participation model, in other words, entitled NPA and its affiliated companies entitled to nearly all of the income and any profits from the loans while, at the same time, disguising its role and creating the façade that the loans were from a tribal government.

## F.    Raizada's significant contributions to NPA's scheme.

126.    Between July 2012 and July 24, 2013—*i.e.*, during the negotiation and implementation of the tribal lending partnership—Amit Raizada was one of the managers of NPA and controlled a seat on its management board. As such, Raizada was closely involved in NPA's operations, including its creation, development, implementation, and ongoing operation of the tribal lending partnership.

127.    Amit Raizada was also a majority owner of NPA, albeit through several different companies affiliated with him, including the Raizada Group.

128.    As Amit explained in an email to an NPA employee in response to an email regarding operations:

> I hope you clearly under that [redaction] *I own the company*, I have heard that you have been struggling with that concept. Bob manages the financials and you need to start reporting to Bob otherwise it may be best that you work on companies unrelated to SBV assets. Bob has managed multi-billion dollar organizations for decades and over a billion of my own assets. . . . hope you understand *that we own 70% of the business* and loyalty needs to be to both [redaction]/SBV equally. . . . From now on if you get instructions from

either [redaction]/me (or my office) I would suggest following them or finding a career outside my assets.

Ex. 4 at JL000038 (emphasis added).[11]

129.    Raizada was also the primary person responsible for recruiting investors to participate in the scheme.[12] By way of example, Raizada recruited and facilitated a multi-million dollar investment by Richard Moseley, who was convicted of and sentenced to 10 years in jail for illegal payday lending.

130.    Raizada's substantial contributions to the scheme are summarized in a letter sent by him to another member of NPA. In this letter—in defending the fees that SBV earned for activities performed on behalf of NPA—Raizada noted various contributions to the payday lending scheme, including: (1) raising capital for loans made through the tribe (as detailed below); (2) obtaining "a $30,000 expense account per month" to facilitate the scheme; (3) raising "$4M for a new, very profitable portfolio structure" involving the tribe; (4) raising an additional "$15M for a new, very profitable portfolio structure" involving the tribe; (5) giving NPA "20,000 leads for free," which were used to solicit borrowers for loans; (6) administrative reporting and financial support from SBV's employees, including Raizada; and (7) helping build the team who managed and oversaw the payday lending scheme. Ex. 6 at JL000101-102.

---

[11] Plaintiffs did not redact any of the documents filed with this First Amended Complaint. Instead, under the Settlement Agreement in *Hengle*, the use of documents is conditioned upon the parties' agreement to redact certain portions of documents or the filing of them under seal.

[12] Raizada was expelled from management because he (through SBV) repeatedly billed NPA's affiliates for lavish expenses incurred when soliciting investment in the scheme. For example, in October 2012, Raizada spent and was reimbursed almost $200,000 for expenses incurred at night clubs in Las Vegas. Ex. 5 at JL000064-65. Over these two days, Raizada was recruiting investors to provide additional capital for the tribal lending scheme. Such conduct was not an isolated incident, but part of his ongoing responsibilities. *See* Ex. 13 at JL000034 (email from Amit indicating that "my meeting[s] are going very well. I expect to be able to grow the participation model with 3rd party very fast along with getting our 10-12m portfolio up[.]").

131.     These actions were directly taken by Raizada, in his capacity as the chief executive officer of SBV and as an owner of NPA (albeit indirectly through various entities).

132.     And although Raizada was expelled as a manager on or around September 2013, he retained his ownership interest in NPA and its affiliated companies through the Raizada Group, which entitled him to significant distributions as detailed below.

**E.     Allegations Regarding the NPA Investor Defendants, including their knowledge of and facilitation of the usurious lending scheme.**

133.     Although Landy and Raizada were the architects and primary beneficiaries of the scheme, the NPA Investors and their management teams *knowingly* aided, abetted, and facilitated the scheme—primarily by providing: (1) substantial capital to fund the loans to consumers; (2) their input, influence, and consent on decisions relating to the portfolios; and (3) rolling over profits in the scheme for reinvest and growth of the portfolios.

134.     More specifically, with full knowledge that it would be used to facilitate the high-interest loans, Ingleside Investors invested $4,000,000.00 in NPA to be used in connection with its usurious lending scheme. In exchange, Ingleside Investors received a fixed return of 20% APR on the invested funds, as well as fixed percentage of the revenue based on their investment—all of which was paid via the illegal amounts collected from consumers.

135.     At all times relevant hereto, Defendant Warner was the president of Ingleside Investors. As the firm's president, Warner oversees all aspects of the firm's investment and operating activities, including its investment activities with NPA.

136.     Upon information and belief, Ingleside Investors' management (including Warner) decided to invest in NPA, knowing that those funds would be used to support its usurious lending activities and knowingly maintained their investment despite their knowledge that it aided, abetted, and supported the usurious lending scheme.

137.    Upon information and belief, Warner participated in Ingleside Investors' decision to invest in NPA, knowing that those funds would be used to support its usurious lending activities. Further, Warner knowingly maintained Ingleside Investors' investment despite their knowledge that it aided, abetted, and supported the usurious lending scheme.

138.    Similarly, with full knowledge that it would be used to facilitate the high-interest loans, E Opportunities invested $4,505,000.00 in NPA to be used in connection with the usurious lending scheme. In exchange, E Opportunities received a fixed return of 20% APR on the invested funds, as well as fixed percentage of the revenue based on their investment—all of which was paid via the illegal amounts collected from consumers.

139.    Upon information and belief, E Opportunities was a pooled investment fund created, overseen, and managed by Monu Joseph. Upon information and belief, E Opportunities' management (primarily Monu Joseph) decided to invest in NPA, knowing that those funds would be used to support its usurious lending activities, and it knowingly maintained its investment despite knowledge that it aided, abetted, and supported the usurious lending scheme.

140.    In addition to E Opportunities, Joseph is the president, manager, and partial owner of several different entities that invested in NPA, including but not limited to Joseph Investment, LLC and Joseph NPA Investment, LLC.

141.    Similarly, Seville invested $1,500,000.00 in NPA to be used in connection with the usurious lending scheme. In exchange, Seville received a fixed return of 20% APR on the invested funds, as well as fixed percentage of the revenue based on their investment—all of which was paid via the illegal amounts collected from consumers.

142.    Upon information and belief, Seville is a wholly owned subsidiary and shell company created by Ferrell Capital for the purpose of making its investment in NPA. Upon

information and belief, and despite the investment being in the name of Seville, the $1,500,000.00 came from Ferrell Capital and its employees, who oversaw and managed all aspects of the investment with NPA.

143.    Similarly, with full knowledge that it would be used to facilitate the high-interest loans, Skye invested $1,000,000.00 in NPA to be used in connection with the usurious lending scheme. In exchange, Skye received a fixed return of 20% APR on the invested funds, as well as fixed percentage of the revenue based on their investment—all of which was paid via the illegal amounts collected from consumers.

144.    Similarly, with full knowledge that it would be used to facilitate the high-interest loans, Cabbage City invested $4,870,000.00 in NPA to be used in connection with the usurious lending scheme. In exchange, Cabbage City received a fixed return of 20% APR on the invested funds, as well as fixed percentage of the revenue based on their investment—all of which was paid via the illegal amounts collected from consumers.

145.    As a result of their investment and ownership interest in NPA, the NPA Investors received quarterly updates related to portfolios, such as information regarding performance of the portfolios, their operations, and regulatory actions and litigation against other comparable enterprises engaged in tribal lending.

146.    By way of example, on September 24, 2012, Landy sent correspondence that indicated "a number of important events have affected the [payday] industry—most notably the appointment of a director to the Consumer Financial Protection Bureau and a number of lawsuits targeting online lenders with which we have no association." Ex. 7 at 1402.

31

147.   And although there had "been no new regulations or verdicts," NPA had been "listening and learning from these events," resulting in the initiation of the "agreement with a Native American Tribe to purchase participation interests" in their "generated loans." *Id*.

148.   This letter further explained that the "new endeavor" would require "start-up capital" and NPA Investors would "experience decreased profitability as the business builds and gains momentum." *Id*.

149.   But just as it had been in the past, Landy indicated that he expected "the same as we transition the business" to tribal lending to "build a sustainable and profitable future." *Id*.

150.   By way of another example, the NPA Investors received correspondence in May 2013, which explained that the tribal lending program "was proceeding well" and on the verge of "future growth." Ex. 8 at 2019.

151.   This correspondence further informed the NPA Investors that "[i]n order to take advantage of this prime season of leads and continue growing the Tribe participation portfolio," NPA would not be making "distributions during June and July 2013 but instead" it was going to "reinvest in the portfolio." *Id*.

152.   Reinvesting the profits back into the portfolio allowed NPA "to leverage the opportunity that presents itself during this time of year," *i.e.*, when borrowers were more susceptible to these high-interest products. *Id*.

153.   Put differently, the NPA Investors' reinvestment of the profits from the scheme allowed it to grow and continue in the making and collection of more unlawful loans, including those made to Plaintiffs.

F.      **Allegations Regarding the Restructure of the Usurious Lending Scheme.**

154.    A few years after the creation of the tribal lending model, regulators caught onto the scheme.

155.    Most notably, on August 6, 2013, the New York Department of Financial Services ("DFS") issued a cease-and-desist letter to 35 online lending companies, including Golden Valley. The Official Website of New York State, *Press Room, Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

156.    The cease and desist was issued after an "extensive" investigation "uncovered that those companies were offering payday loans to consumers over the Internet in violation of New York law, including some loans with annual interest rates as high as 1,095 percent." *Id*.

157.    In addition to the cease and desist sent to the payday lenders, the Superintendent of Financial Services, Benjamin Lawsky, also sent letters to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer accounts for illegal payday lenders." *Id*.

158.    In his public comments on the letters, Mr. Lawsky explained: "Companies that abuse New York consumers should know that they can't simply hide from the law in cyberspace. We [a]re going to use every tool in our tool-belt to eradicate these illegal payday loans that trap families in destructive cycles of debt." *Id*.

159.    In addition to Golden Valley, a number of other "tribal lenders" received the cease and desist, including Red Rock Tribal Lending, American Web Loan, Plain Green, Great Plains, and Western Sky Financial.

160.    Within two days of its issuance, Amit Raizada emailed a copy of the cease and desist to certain partners at NPA. Ex.14 at 02744.

161.    Five days later, another member of NPA's management sent correspondence to NPA Investors, explaining that "a significant number of online lenders have lost the ability to advance loan proceeds and process loan payments through the ACH (Automated Clearing House) network." Ex. 15 at 3110.

162.    "This of course, reduces the ability of on-line lenders to originate and process loans," the letter explained. *Id.*

163.    Shortly thereafter, several of NPA's competitors funded and spearheaded litigation to challenge a cease and desist issued to the tribal lenders. As part of this lawsuit, the tribal lending entities (Great Plains and Red Rock Tribal Lending) sought a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

164.    On September 30, 2013, the district court denied the tribal plaintiff's request for a preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, the loans were "subject to the State's non-discriminatory anti-usury laws." *Id.* at 361.

165.    The court reasoned, "There is simply no basis . . . that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id.*

166.    In addition to the loss in *Otoe-Missouria*, a growing number of lawsuits and government enforcement actions against the scheme's competitors brought increased scrutiny to

the tribal lending business model, including the New York Attorney General's lawsuit filed in August 2013 against a tribal lending enterprise involving CashCall and Western Sky. *People of the State of New York v. Western Sky Financial, et al*, New York State Supreme Court, New York County, No. 451370/2013.

167.    Less than five months after the lawsuit was filed, the New York Attorney General entered into a settlement with Western Sky, CashCall, and their owners, requiring the enterprise to refund borrowers who paid more than the legal rate of interest and pay $1.5 million in penalties. New York State Office of the Attorney General, Press Releases, *A.G. Schneiderman Announces Settlement With Western Sky Financial And Cashcall For Illegal Loans Made Over The Internet* (Jan. 24, 2014), *available at* https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-western-sky-financial-and-cashcall-illegal-loans.

168.    The litigation in New York was a small part of the problem for the tribal lending business model, the Department of Justice launched "Operation Choke Point" in 2013, and the Consumer Financial Protection Bureau filed a lawsuit against CashCall in December 2013. *Consumer Fin. Protection Bureau v. CashCall, Inc.*, No. 1:13-cv-13167 (D. Mass.) (complaint filed on Dec. 16, 2013).[13]

169.    In that case, the CFPB took the same position as the district court in *Otoe-Missouria*, *i.e.*, that state usury laws applied to tribal lenders.

---

[13] *See, e.g.*, *In Re Cashcall, Inc.*, 2013 WL 3465250, at *1 (NH Banking Dept. 2013) ("[I]t appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."); *Consumer Fin. Protection Bureau v. CashCall, Inc.,* No. 1:13-cv-13167 (D. Mass.) (complaint filed on Dec. 16, 2013); *In re Moses,* No. 12-05563-8-RDD, 2013 WL 53873, at *4 (Bankr. E.D.N.C. Jan. 3, 2013).

170.    As a result of the attack on the industry, NPA's owners and executives knew the tribal business model was at risk and that the consequences would be severe.

171.    Over the next nine months, NPA's management team and other members in the industry worked to develop a solution to shield the non-tribal members (including Defendants) but at the same time continue the deceptive scheme to collect usurious amounts from consumers.[14]

172.    Ultimately, the solution was the sale of NPA its affiliated entities to newly created tribal entities.

173.    As explained in a legal memorandum to NPA's primary owners and managers, there were several "benefits" to the merger transaction, including enhancement of the optics and reduction of exposure. More specifically, the legal memorandum explained:



Ex. 9 at 12211 (emphasis added) (filed under seal).

_____

[14] At least two of Rosette's other clients, Red Rock and American Web Loan, completed similar mergers. *Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 272 (E.D. Va. 2018) (explaining that plaintiffs "presented credible evidence" that following a district court's decision against one of Rosette's other clients, the non-tribal member and "Tribe looked for ways to restructure" the "lending operation in order to reduce exposure liability."); *Solomon v. Am. Web Loan*, 2019 WL 1324490, at *7 (E.D. Va. Mar. 22, 2019) (describing a similar sale involving another tribal lending enterprise).

174.    Upon information and belief, this legal memorandum was shared with the NPA Investors, who were fully and completely informed regarding the reasons for the merger.

175.    And although NPA was "sold" to the Tribe through a series of complex legal documents, NPA and its investors continued to receive the vast majority of the profits from the usurious lending scheme through a promissory note to NPA in excess of $64,100,000.00.

176.    In addition, the sale involved a series of other interrelated agreements that gave NPA significant influence and power over the lending operations—essentially requiring no material changes to the lending operations despite the sale.

177.    Although technically reorganized and renamed, ULPS continues to operate in the same manner as NPA, *i.e.*, with its operations being conducted by non-tribal members working thousands of miles away from the Tribe's reservation.

178.    These employees handle most of the day-to-day administrative operations of Golden Valley, Silver Cloud, and Mountain Summit, such as their underwriting, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management.

179.    At all times relevant hereto, the NPA Investors had knowledge of the usurious lending scheme and knowingly maintained their interest and involvement. In addition, the NPA Investors were required to and approved many of the legal documents establishing the structure and operations of the usurious lending scheme.

180.    The NPA Investors were also entitled to vote on the restructure and had an opportunity to relinquish their ownership interest. Yet, each of the NPA Investors agreed to move forward with the restructure and knowingly profit from the illegal lending scheme.

**F.    The NPA and the NPA Investors allow the Tribe to create a fourth portfolio with Defendants Gravley, Signal Light, Kellner Capital, Hymken, and George Kellner, subject to certain restrictions.**

181.    Recognizing the substantial profits generated by other hedge funds who invested in tribal lending, Defendant Gravley sought out to create partnership with a Native American Tribe to create, develop, and invest in a usurious lending portfolio.

182.    As part of this process, Gravley formed Signal Light to be the entity to have the direct partnership with the Tribe's entities.

183.    Gravley is the sole owner of Signal Light, as well as its controlling principal/manager. Gravley was also the former president of Kellner Capital, LP.

184.    In order to raise money for the partnership with the Tribe, Gravley also created Hvmken. The purpose of Hvmken was to allow outside investors to invest in Signal Light's partnership with the Tribe.

185.    Signal Light was Hvmken's general partner. Thus, as the sole owner and controlling principal of Signal Light, Gravley was its de facto manager.

186.    In addition to his own contribution to Hvmken, Gravley solicited and obtained investments from others, including George Kellner.

187.    George Kellner personally invested in Hymken, and those funds were then used to provide capital to Signal Light to purchase the participation interests in the usurious lending scheme.

188.    Upon information and belief, Kellner Capital partially funded Signal Light's promissory note and the participation interests, and Kellner Capital received the proceeds (albeit indirectly through its holding of other companies involved).

189.    Backed by substantial capital from Kellner Capital, Gravley sought out a partnership with a Native American tribe in or around January 2015.

190.    Upon information and belief, Gravley was introduced to the Habematolel Pomo of Upper Lake through Rosette or his associates.

191.    The Tribe was interested in creating a fourth portfolio, but it had a problem: its contractual agreements with NPA prohibited it from engaging in another lending businesses.



193.    In a proposed draft of this letter, NPA's attorney initially wrote:



*Id.* at 12545–47 (filed under seal).[15]

194.   Over the course of the next several months, the Tribe pushed NPA to allow it to create the fourth portfolio with Gravley and Kellner Capital.

---

[15] To be clear, it appears that a toned-down version of this letter was ultimately sent to the executives at Kellner Capital. However, Plaintiffs use this version as evidence of NPA's knowledge regarding the illegal predatory lending practices at issue, as well as the terms of the arrangement between NPA and the Tribe.

198.    Within two months of this meeting, the Tribe, Kellner Capital, and NPA Investors reached agreement on the creation of the fourth portfolio, including the income split. And on August 7, 2015, Signal Light formalized a partnership with the Tribe, resulting in the creation of a fourth tribal lending entity, Majestic Lake Financial, LLC.

199.    As part of this transaction, Signal Light entered into a promissory note dated August 7, 2015, with Majestic Lake's parent company, Tribal Lending Enterprise, Inc., in the amount of $1,500,000.00, which was used to make the illegal loans to consumers.

200.    In exchange for this loan, Signal Light took a security interest in the right, title, and interest of all of the assets of Majestic Lake, including the principal and gross profit received from each loan.

201.    In addition to providing the startup capital to fund the loans, Signal Light agreed "to commit capital . . . up to a Twenty-Five Million Dollars ($25,000,000)" to acquire "participation interests" in the *originated* loans originated by Majestic Lake. Signal Light had the right to acquire "no less than 75% and no more than 99%" of "the face value of the principal amount of a loan."

202.    As a result of its interest, Signal Light received the gross profit from loans, including the usurious interest. In turn, portions of these amounts were distributed to Gravley and Hvmken's other partners, including George Kellner and Kellner Capital.

203.    In 2016, Signal Light restructured its partnership with the Tribe to a similar model used by the NPA Investors where Signal Light became a creditor through a promissory, as opposed to an investor in the loans.

204.    In addition to its substantial investment, Gravely (acting on behalf of Signal Light, Kellner Capital, and Hymken) also had substantial input on operational decisions. Ex. 12 at 12865.

205.    This is confirmed by a follow up letter from an August 2016 meeting, memorializing concerns of NPA and its investors. In this letter, a representative of NPA noted:



*Id*. at 12864–65.

206.    In sum, Gravley, Signal Light, Hvmken, Kellner Capital, and George Kellner knowingly aided, maintained an interest in, funded, and profited from the usurious lending scheme as described above. Similarly, NPA and the NPA Investors consented to the creation of Majestic Lake, established the parameters by which it could operate, and profited from the loans.

207.    In addition, NPA and the NPA Investors agreed to the sharing of certain services to benefit the overall usurious lending scheme, such as costs and expenses associated with each tribal lending entity.

**G.      Plaintiffs' experiences.**

208.    Because of the ostensible protections created by the tribal business model, the interest rates charged on the loans were more than 40 to 75 times the amount permitted by state usury and licensing laws.

209.    For example, Blackburn received multiple loans (totaling $2,900) between October 2015 and May 23, 2016. These loans had APRs of 627%, 665%, 767%, and 709%.

210.    Blackburn repaid $4,372.25 on these loans—all of which were void, illegal, and unenforceable under Virginia law. Blackburn's last payment was made on August 12, 2016.

211.    Similarly, Rose received multiple loans (totaling $1,700) between June 2017 and January 29, 2018. These loans all had APRs over 600%.

212.    Rose repaid $5,217.50 on these loans—all of which were void, illegal, and unenforceable under Virginia law. Blackburn's last payment was made on July 20, 2018.

213.    Likewise, Bumbray obtained a loan in the name of Majestic Lake on November 9, 2017, in the amount of $700. The loan had an APR of 543%.

214.    Bumbray repaid $1,981.00 on that loan, which was void, illegal, and unenforceable under Virginia law. Bumbray's last payment was made on December 18, 2018.

215.    Hengle also received multiple loans (totaling $1,500) between September 2016 and October 2016. These loans all had APRs over 600%.

216.    Hengle repaid $1,127.65 on these loans—all of which were void, illegal, and unenforceable under Virginia law. Hengle's last payment was made on October 14, 2016.

217.    Nolte, too, received multiple loans (totaling $16,800) between September 2012 and April 2018. Upon information and belief, all of these loans had APRs over 400%.

218.    Nolte repaid $29,033.39 on these loans—all of which were void, illegal, and unenforceable under Indiana law. Nolte's last payment was made on April 20, 2018.

219.    Similarly, Falash received multiple loans (totaling $19,600) between May 2015 and October 2019. Upon information and belief, all of these loans had APRs over 400%.

220.    Falash repaid $33,875.58 on these loans—all of which were void, illegal, and unenforceable under Wisconsin law. Falash's last payment was made on March 4, 2022.

221.    Likewise, Tucker received multiple loans (totaling $3,700) between September 2017 and December 2019. Upon information and belief, all of these loans had APRs over 400%.

222.    Tucker repaid $10,155.21 on these loans—all of which were void, illegal, and unenforceable under California law. Tucker's last payment was made on November 20, 2020.

223.    Murphy also received multiple loans (totaling $1,100) between November 2019 and December 2019. These loans had APRs close to 600%.

224.    Tucker repaid $2,502.50 on these loans—all of which waere void, illegal, and unenforceable under Ohio law. Tucker's last payment was made in October 2020.

225.    Plaintiffs all applied for their loans on the internet while located in their respective home states. None of Plaintiffs traveled to the reservation to obtain their loans.

226.    Plaintiffs all used their respective addresses when they applied for the loans, and they used their bank accounts maintained in their home states to receive the loans and for the subsequent ACH debits to pay down the loans.

227.    Plaintiff Nolte applied for her loans on the internet from Indiana; and Plaintiff Falash applied for her loan on the internet while located in Wisconsin.

228.    Because of the failure to comply with each Plaintiffs' respective state's usury and licensing requirements, Plaintiffs' loans were void and no principal, interest, fees, or other charges

were recoverable in connection with the loans. *See* Va. Code § 6.2-1541; Ind. Code § 24-4.5-7-111; Wis. Stat. § 138.06; Cal. Fin. Code § 22750; Ohio Rev. Code Ann. § 1321.02.

229.    Similarly, almost all other state jurisdictions treat as illegal unlicensed small loans like those involved here.[16]

230.    Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans

---

[16] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. See Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

at issue in this case, which have victimized hundreds of thousands of consumers on terms similar

to Plaintiffs.

**H.      Facts Related to the Tolling for Any Injuries Suffered Outside the Statute of Limitations Period.[17]**

231.    Tolling doctrines, including equitable tolling and fraudulent concealment, apply to

RICO claims.

232.    To establish equitable tolling, "[t]he circumstances preventing a party from

pursuing his or her rights must be external to the party's own conduct." *Hengle v. Asner*, 433 F.

Supp. 3d 825, 892 (E.D. Va. 2020) (quoting *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d

469, 478 (4th Cir. 2015)).

233.    "Such circumstances must be extraordinary and include instances when 'wrongful

conduct on the part of the defendant' prevents the plaintiff from asserting his claims." *Id.* (quoting

*Wynne*, 792 F.3d at 478) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)).

234.    Based on these standards, the Court previously found that "equity warrants tolling"

of one plaintiffs' claims "***until at least June 2017***, when similarly situated consumers first filed

---

[17] Defendants have erroneously argued that "to fall within the RICO statute of limitations, Plaintiffs must show that they entered into their loans after March 15, 2018—four years before they filed the Complaint." Dkt. 54 at 25. This is incorrect because it is "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555 (2000). A subset of this rule is the " 'separate accrual rule,' which provides that a new cause of action accrues for each new and independent injury, even if the RICO violation causing the injury happened more than four years before." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (quoting *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988)); *see also Smith v. Allred*, 2016 WL 3094008, at *3 (S.D.W. Va. 2016) (rejecting an argument that a plaintiff may not sue for "new injuries within the last four years if the plaintiff has previously suffered RICO violations as part of the same pattern before that time."). Thus, neither Bumbray nor Rose's claims are time barred as they suffered injuries—payment of usurious amounts—within 4 years prior to the filing. Notwithstanding the above, the statute of limitations should be tolled for all injuries suffered for the reasons explained herein.

suit against a tribal payday lending practice in this district," which put him on "notice that he could pursue similar claims in federal court." *Id*. (emphasis added).

235. By holding that the claims were tolled "until at least June 2017," the Court left open the question of whether tolling was appropriate after June 2017.

236. Under the circumstances, Plaintiffs believe that the statute of limitation should be equitably tolled until January 9, 2020,[18] which is the first date that any court issued a ruling relating to the contracts at issue in this case.

237. Tolling is warranted until this time because the contracts waive the borrowers' federal and state rights and "force them to litigate any remaining rights in an ill-defined 'Tribal Form' with no apparent existence." *Hengle*, 433 F. Supp. 3d at 892.

238. Equitable tolling is further warranted because the "tribal law" governing the contracts prospectively waived all substantive and procedural rights of borrowers. *See, e.g., Hengle v. Treppa*, 19 F.4th 324, 344 (4th Cir. 2021) ("[W]e conclude that a claimant proceeding under tribal law would be unable to assert a RICO claim against individuals associated with a tribal lender and certainly could not pursue RICO's treble damages remedy.").

239. In addition, the doctrine of fraudulent concealment is a separate doctrine that "prevents a defendant from 'concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until' the defendant 'could plead the statute of limitations to protect it.'" *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 549 (4th Cir. 2019) (citation omitted).

---

[18] As explained below, the statute of limitations should be further tolled until December 2021 pursuant to the doctrine of fraudulent concealment.

240.    This purpose of this doctrine is to "ensur[e] that wrongdoers are not permitted, or encouraged, to take advantage of the limitations period to commit secret illegal conduct without penalty." *Id*.

241.    To toll the limitations period based on fraudulent concealment, "a plaintiff must demonstrate: "(1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Id*. (citation omitted).

242.    In this case, each condition is satisfied.

243.    First, as explained above, Defendants fraudulently concealed their involvement in the lending scheme by using the tribal lending entities as fronts for their illegal lending activities after it was no longer viable to lend through their Delaware entities.

244.    And once tribal lending came under fire, Defendants admittedly attempted to ███████████████████████████████████████████████████ ███████████████████████████████████████████ Ex. 9 at 12211 (emphasis added) (filed under seal). This merger was intended to further conceal the role of NPA and the Defendants.

245.    In addition, document after document demonstrates that borrowers were misled into believing that they were doing business with a company owned and operated by a sovereign government. By way of example, on its homepage, the website stated that "GOLDENVALLEYLENDING.COM IS A WEBSITE *OWNED AND OPERATED* BY GOLDEN VALLEY LENDING, WHICH IS A TRIBAL LENDING ENTITY WHOLLY

***OWNED AND OPERATED*** BY THE HABEMATOLEL POMO OF UPPER LAKE, CALIFORNIA… AND ***IS OPERATING*** WITHIN THE TRIBE'S RESERVATION."[19]

246.     The template loan contracts made similar misrepresentations designed to fraudulently conceal the role of NPA and Defendants. The template loan contracts also waived federal and state law for the purpose of inhibiting borrowers from filing any claims related to the loans, which may have uncovered the role of NPA and Defendants.

247.     Second, Plaintiffs failed to discover the facts regarding Defendants' involvement until December 2021.

248.     And third, Plaintiffs exercised due diligence. Despite the fraudulent concealments and misrepresentations, Plaintiffs identified and sued some of the key participants in the scheme as early as April 9, 2019. This lawsuit placed Defendants on notice that, once identified, they would likely be sued for their involvement.

249.     However, because the defendants in the *Hengle* case filed and subsequently appealed this Court's decision on their voluminous motions to dismiss and to compel arbitration, Plaintiffs were unable to serve discovery until December 2021.

250.     In other words, Plaintiffs were not dilatory in their prosecution of the case against the Tribal Officials and Defendants' business partners. In fact, they served their discovery as soon as they could—even weeks before the Court's Initial Pretrial Conference on January 10, 2022.

251.     Defendants' business partners first responded to this discovery in February 2022. Approximately one month later, Plaintiffs filed this lawsuit.

---

[19] The Wayback Machine, a digital archive containing the history of billions of websites, first captured a snapshot of Golden Valley's website on June 10, 2013. *See* Wayback Machine, Archive of Golden Valley Lending, *available at* https://web.archive.org/web/2013-0610153342/http://www.goldenvalleylending.com/ (emphasis added).

252.    Because the identities of the Defendants had been fraudulently concealed through the structure, misrepresentations, and restructure of the scheme, Plaintiffs submit that the statute of limitations should be tolled until January 1, 2022.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

253.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

254.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(d) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

Plaintiffs are members of the § 1962(d) Class.

255.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Bumbray, Hengle, Blackburn and Rose bring this action for themselves and on behalf of a class—the "Virginia § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, and (3) repaid any amount on the loans.

Plaintiffs Bumbray, Hengle, Blackburn, and Rose are members of this subclass.

256.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Nolte brings this action for herself and on behalf of a class—the "Indiana § 1962(d) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Indiana; and (3) repaid any amount on the loans.

Plaintiff Nolte is a member of this subclass.

257.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Falash brings this action for herself and on behalf of a class—the "Wisconsin § 1962(d) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Wisconsin; and (3) repaid any amount on the loans.

Plaintiff Falash is a member of this subclass.

258.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Tucker brings this action for himself and on behalf of a class—the "California § 1962(d) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from California; and (3) repaid any amount on the loans.

Plaintiff Tucker is a member of this subclass.

259.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Murphy brings this action for herself and on behalf of a class—the "Ohio § 1962(d) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Ohio; and (3) repaid any amount on the loans.

Plaintiff Murphy is a member of this subclass.

260.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained

by Golden Valley, Silver Cloud, Mountain Summit, and Majestic Lake, and the class members may be notified of the pendency of this action by published and/or mailed notice.

261. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5)  whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

262. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

263. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

264. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal

loans. Alternatively, Golden Valley, Silver Cloud, Mountain Summit, Majestic Lake, and NPA were enterprises as defined in 18 U.S.C. § 1961(4).

265.    In the alternative, Plaintiffs allege that National Performance Agency, LLC was an enterprise as defined by 18 U.S.C. § 1691(4)

266.    All of the loans made to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

267.    Defendants violated § 1962(d) of RICO by agreeing to undertake and advance the usurious lending scheme, including by aiding, abetting, and facilitating the scheme through their funding of the loans, as well as through their ownership and oversight of NPA. Defendants further violated including by aiding, abetting, and facilitating the scheme through their role in the creation of the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities.

268.    Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

269.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth

at length herein.

270.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

action for themselves and on behalf of a class—the "§ 1962(b) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley,
> Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit;
> (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas,
> California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii,
> Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland,
> Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New
> Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon,
> Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas,
> Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid any
> amount on the loans.

Plaintiffs are members of the § 1962(b) Class.

271.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Bumbray,

Hengle, Blackburn and Rose bring this action for themselves and on behalf of a class—the

"Virginia § 1962(b) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley,
> Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit;
> (2) from Virginia, and (3) repaid any amount on the loans.

Plaintiffs Bumbray, Hengle, Blackburn, and Rose are members of this subclass.

272.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Nolte brings

this action for herself and on behalf of a class—the "Indiana § 1962(b) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley,
> Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit;
> (2) from Indiana; and (3) repaid any amount on the loans.

Plaintiff Nolte is a member of this subclass.

273.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Falash brings this action for herself and on behalf of a class—the "Wisconsin § 1962(b) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Wisconsin; and (3) repaid any amount on the loans.

Plaintiff Falash is a member of this subclass.

274.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Tucker brings this action for himself and on behalf of a class—the "California § 1962(b) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from California; and (3) repaid any amount on the loans.

Plaintiff Tucker is a member of this subclass.

275.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Murphy brings this action for herself and on behalf of a class—the "Ohio § 1962(b) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Ohio; and (3) repaid any amount on the loans.

Plaintiff Murphy is a member of this subclass.

276.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Golden Valley, Silver Cloud, Mountain Summit, and Majestic Lake, and the class members may be notified of the pendency of this action by published and/or mailed notice.

277.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5)  whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

278.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

279.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

280.   As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

281.   Alternatively, Golden Valley, Silver Cloud, Mountain Summit, Majestic Lake, and National Performance Agency were enterprises as defined in 18 U.S.C. § 1691(4).

282.     All of the loans made to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

283.     As alleged above, Defendants violated § 1962(b) of RICO by acquiring and maintaining interests in and control of the enterprise involved in the unlawful collection of debt. More specifically, Defendants engaged in the unlawful debt collection to maintain an interest and control of the enterprises identified above.

284.     Through their ownership interests in NPA and their status as major investors, Defendants exercised considerable control over how NPA, Golden Valley, Silver Cloud, Mountain Summit, and Majestic Lake carried out the unlawful lending scheme as a whole. As detailed above, Defendants also reinvested the usurious proceeds back into the lending scheme, thereby increasing their involvement and the number of loans made to consumers, such as Plaintiffs.

285.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

286.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

287.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

288.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(a) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

Plaintiffs are members of the § 1962(a) Class.

289.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Bumbray, Hengle, Blackburn and Rose bring this action for themselves and on behalf of a class—the "Virginia § 1962(b) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, and (3) repaid any amount on the loans.

Plaintiffs Bumbray, Hengle, Blackburn, and Rose are members of this subclass.

290.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Nolte brings this action for herself and on behalf of a class—the "Indiana § 1962(b) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Indiana; and (3) repaid any amount on the loans.

Plaintiff Nolte is a member of this subclass.

291.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Falash brings this action for herself and on behalf of a class—the "Wisconsin § 1962(a) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Wisconsin; and (3) repaid any amount on the loans.

Plaintiff Falash is a member of this subclass.

292.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Tucker brings this action for himself and on behalf of a class—the "California § 1962(a) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from California; and (3) repaid any amount on the loans.

Plaintiff Tucker is a member of this subclass.

293.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Murphy brings this action for herself and on behalf of a class—the "Ohio § 1962(a) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Ohio; and (3) repaid any amount on the loans.

Plaintiff Murphy is a member of this subclass.

294.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Golden Valley, Silver Cloud, Mountain Summit, and Majestic Lake, and the class members may be notified of the pendency of this action by published and/or mailed notice.

295.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants reinvested in the enterprise; and (5)  whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

296.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

297.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

298.    As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

299.    Alternatively, Golden Valley, Silver Cloud, Mountain Summit, Majestic Lake, and National Performance Agency were enterprises as defined in 18 U.S.C. § 1691(4).

300.     All of the loans made to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

301.     As alleged above, Defendants violated § 1962(a) of RICO in three separate and distinct ways—any one of which independently suffices.

302.     First, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt through the Delaware entities and using and investing such income in the establishment and operation of the tribal lending scheme.

303.     Second, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt through the tribal lending scheme and reinvesting that income into the tribal lending scheme in order to increase the size of the scheme.

304.     Third, Defendants violated § 1962(a) of RICO by using their income and proceeds to restructure usurious lending scheme and through the creation of the promissory notes entitling them to $64 million of future revenues of the tribal lending entities.

305.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

306.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT FOUR:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

307.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

308.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(c) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

Plaintiffs are members of the § 1962(c) Class.

309.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Bumbray, Hengle, Blackburn and Rose bring this action for themselves and on behalf of a class—the "Virginia § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, and (3) repaid any amount on the loans.

Plaintiffs Bumbray, Hengle, Blackburn, and Rose are members of this subclass.

310.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Nolte brings this action for herself and on behalf of a class—the "Indiana § 1962(c) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Indiana; and (3) repaid any amount on the loans.

Plaintiff Nolte is a member of this subclass.

311.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Falash brings this action for herself and on behalf of a class—the "Wisconsin § 1962(c) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Wisconsin; and (3) repaid any amount on the loans.

Plaintiff Falash is a member of this subclass.

312.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Tucker brings this action for himself and on behalf of a class—the "California § 1962(c) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from California; and (3) repaid any amount on the loans.

Plaintiff Tucker is a member of this subclass.

313.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Murphy brings this action for herself and on behalf of a class—the "Ohio § 1962(c) Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Ohio; and (3) repaid any amount on the loans.

Plaintiff Murphy is a member of this subclass.

314.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained

by Golden Valley, Silver Cloud, Mountain Summit, and Majestic Lake, and the class members may be notified of the pendency of this action by published and/or mailed notice.

315.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

316.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

317.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

318.     As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal

loans. Alternatively, Golden Valley, Silver Cloud, Mountain Summit, Majestic Lake, and NPA were enterprises as defined in 18 U.S.C. § 1691(4).

319.    All of the loans made to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

320.    As alleged above, Defendants participated in the operation of the enterprise, which existed for the purpose of collection of unlawful debt. Among other things and as detailed above, Defendants helped design, implement and fund the tribal lending scheme through their ownership and control of NPA and its affiliates, which developed the tribal lending scheme at the heart of this case. Further, Defendants conducted the affairs of the enterprise by altering the business model in response to growing legal pressures. In addition, Defendants received quarterly updates regarding the scheme and reviewed and approved key business decisions related to NPA and its instrumental involvement in the lending scheme.

321.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) because the loans would not have been made but for Defendants' participation in the enterprise.

322.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT FIVE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

323.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

324.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

> Plaintiffs are members of the § 1962(c) Class.

325.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Bumbray, Hengle, Blackburn and Rose bring this action for themselves and on behalf of a class—the "Virginia Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, and (3) repaid any amount on the loans.

> Plaintiffs Bumbray, Hengle, Blackburn, and Rose are members of this subclass.

326.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Nolte brings this action for herself and on behalf of a class—the "Indiana Unjust Enrichment Subclass"—defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Indiana; and (3) repaid any amount on the loans.

Plaintiff Nolte is a member of this subclass.

327.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Falash brings this action for herself and on behalf of a class—the "Wisconsin Unjust Enrichment Subclass"—defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Wisconsin; and (3) repaid any amount on the loans.

Plaintiff Falash is a member of this subclass.

328.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Tucker brings this action for himself and on behalf of a class—the "California Unjust Enrichment Subclass"—defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from California; and (3) repaid any amount on the loans.

Plaintiff Tucker is a member of this subclass.

329.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Murphy brings this action for herself and on behalf of a class—the "Ohio Unjust Enrichment Subclass"—defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Ohio; and (3) repaid any amount on the loans.

Plaintiff Murphy is a member of this subclass.

330.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Golden Valley, Silver Cloud, Mountain Summit, and Majestic Lake, and the class members may be notified of the pendency of this action by published and/or mailed notice.

331.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

332.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

333.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of

the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

334.     As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

335.     Plaintiffs and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

336.     Accordingly, on behalf of themselves and the class defined above, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Golden Valley, Silver Cloud, Mountain Summit, and Majestic Lake.

<u>**COUNT SIX:**</u>
**COMMON LAW CONSPIRACY**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

337.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

338.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Common Law Conspiracy Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

Plaintiffs are members of the § 1962(c) Class.

339.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Bumbray, Hengle, Blackburn and Rose bring this action for themselves and on behalf of a class—the "Common Law Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, and (3) repaid any amount on the loans.

Plaintiffs Bumbray, Hengle, Blackburn, and Rose are members of this subclass.

340.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Nolte brings this action for herself and on behalf of a class—the "Common Law Conspiracy Subclass"—defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Indiana; and (3) repaid any amount on the loans.

Plaintiff Nolte is a member of this subclass.

341.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Falash brings this action for herself and on behalf of a class—the "Common Law Conspiracy Subclass"—defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Wisconsin; and (3) repaid any amount on the loans.

Plaintiff Falash is a member of this subclass.

342.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Tucker brings this action for himself and on behalf of a class—the "California Common Law Conspiracy Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from California; and (3) repaid any amount on the loans.

Plaintiff Tucker is a member of this subclass.

343.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Murphy brings this action for herself and on behalf of a class—the "Ohio Common Law Conspiracy Subclass"— defined as:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Ohio; and (3) repaid any amount on the loans.

Plaintiff Murphy is a member of this subclass.

344.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Golden Valley, Silver Cloud, Mountain Summit, and Majestic Lake, and the class members may be notified of the pendency of this action by published and/or mailed notice.

345.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable;

(3) whether Defendants combined together or with others to accomplish an unlawful purpose; (4) whether at least one member of the conspiracy committed an unlawful act; (5) whether collection of a usurious and unenforceable loan caused injuries to Plaintiffs and the class members; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

346.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

347.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

348.    As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

349.    As alleged above, Defendants violated state common law conspiracy prohibitions by joining together through a series of agreements to accomplish the making, collection, and

profiting from the blatantly illegal usurious loans. Among others, these agreements include the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities through the promissory notes and related documents.

350.    Plaintiffs and the class members were injured as a result of Defendants' violations because they repaid amounts arising from the unlawful conspiracy.

351.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.    An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.    An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.    An Order declaring that Defendants committed the violations of law alleged herein;

D.    An Order providing for any and all injunctive relief the Court deems appropriate;

E.    An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.    An Order awarding treble damages in accordance with proof and in an amount

consistent with applicable precedent;

G.    An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.    An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.    Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Respectfully submitted,
**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/*
Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB No. 92699
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com

Leonard A. Bennett, VSB No. 37523
Craig C. Marchiando VSB No. 89736
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
*Counsel for Plaintiffs*