IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SHERRY BLACKBURN, *et al.*,
*individually and behalf of all*
*others similarly situated*
 Plaintiffs,

v.                                                          Civil No. 3:22cv146 (DJN)

A.C. ISRAEL ENTERPRISES, *et al.*,
 Defendants.

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on nine motions:

(1)   The Kellner Defendants'[1] Motion to Dismiss Pursuant to Rules 12(b)(2) and 12(b)(6) (ECF No. 95);[2]

(2)   The LP Investor Defendants'[3] and Signal Light Defendants'[4] joint Motion to Dismiss Pursuant to Rule 12(b)(2) (ECF No. 96);[5]

(3)   The LP Investor Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) (ECF No. 98);[6]

---

[1]    The Court collectively refers to Defendants George Kellner and Kellner Capital, LLC as the "Kellner Defendants."

[2]    Plaintiffs responded (ECF No. 123), and the Kellner Defendants replied (ECF No. 137).

[3]    The Court collectively refers to the following Defendants as the "LP Investor Defendants": Monu Joseph, Joseph Investment, LLC, Joseph NPA Investment, LLC, E Opportunities, LLC, Skye, LLC, A.C. Israel Enterprises, Inc., d/b/a Ingleside Investors, Richard Investors LLC, Greg Warner, Ferrell Capital and Seville, Ltd.

[4]    The Court collectively refers to Defendants Benjamin Gravley, Signal Light, LLC and HYMKEN, LP as the "Signal Light Defendants."

[5]    Plaintiffs responded (ECF No. 121), and the LP Investor Defendants and Signal Light Defendants jointly replied (ECF No. 138).

[6]    Plaintiffs responded (ECF No. 126), and the LP Investor Defendants replied (ECF No. 139).

(4)      The Signal Light Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) (ECF No. 101);[7]

(5)      Defendant Cabbage City, LLC's ("Cabbage City") Motion to Dismiss Pursuant to Rules 12(b)(2) and 12(b)(6) (ECF No. 116);[8,9]

(6)      The Raizada Defendants'[10] Motion to Dismiss Pursuant to Rule 12(b)(2) (ECF No. 145);[11]

(7)      Defendant Spectrum Business Ventures Inc.'s Motion to Dismiss Pursuant to Rule 12(b)(6) (ECF No. 147)[12]

(8)      Defendant Amit Raizada's Motion to Dismiss Pursuant to Rule 12(b)(6) (ECF No. 149);[13] and,

(9)      The Raizada Group LLLP's Motion to Dismiss Pursuant to Rule 12(b)(6) (ECF No. 150).[14] (Collectively, the "Motions" or the "Motions to Dismiss.")

The Motions now stand ripe for disposition. The Court dispenses with oral argument because the materials before it sufficiently address the facts and legal positions, and argument would not aid

---

[7]    Plaintiffs responded (ECF No. 128), and the Signal Light Defendants replied (ECF No. 140).

[8]    Because Cabbage City's motion to dismiss adopts the LP Investor Defendants' Motions to Dismiss in whole cloth, the Court hereinafter treats Cabbage City's motion as incorporated into the LP Investor Defendants' motions. Thus, where the Court discusses the LP Investor Defendants and their motions, such discussion applies with equal force to Cabbage City.

[9]    Plaintiffs responded (ECF No. 131), and the filing deadline for Cabbage City's reply has expired.

[10]   The Court collectively refers to the following defendants as the "Raizada Defendants": Spectrum Business Ventures, Inc. ("SBV"), Raizada Group, LLLP ("Raizada Group") and Amit Raizada ("Raizada").

[11]   Plaintiffs responded (ECF No. 155), and the Raizada Defendants replied (ECF No. 170).

[12]   Plaintiffs responded (ECF No. 160), and the Raizada Defendants jointly replied (ECF No. 171).

[13]   *See supra* Note 12.

[14]   *See supra* Note 12.

the decisional process.  The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331[15] and

1367(a).[16]  For the reasons set forth below, the Court will deny all nine Motions in their entirety.

## I.    BACKGROUND

### A.    Factual Allegations[17]

This suit arises out of Defendants' participation in an allegedly unlawful short-term,

payday lending operation, elements of which were the subject of earlier litigation before this

Court.  *See Hengle v. Asner*, 433 F. Supp. 3d 825, 839–44  (E.D. Va. 2020), *aff'd sub nom.*

*Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021) (summarizing factual allegations).  Plaintiffs

describe the lending operation as a "rent-a-tribe" scheme, whereby "non-tribal payday lenders

and their business partners use[] Native American tribes to originate illegal loans" that victimize

"financially vulnerable consumers" by skirting state usury laws.  (Am. Compl. ¶¶ 2, 73, 76.)

In *Hengle*, four of the plaintiffs to this action, alongside others, brought suit against tribal

officials of the Habematolel Pomo of Upper Lake (the "Tribe" or "Habematolel Pomo Tribe")

and two of the Tribe's non-tribal business partners — Scott Asner ("Asner") and Joshua Landy

---

[15]    "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The Amended Complaint alleges violations of 18 U.S.C. § 1962 of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  (*See* Am. Compl., ECF No. 79.)

[16]    The Court exercises supplemental jurisdiction over Plaintiffs' unjust enrichment and civil conspiracy claims pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").

[17]    In considering the Rule 12(b)(6) Motions to Dismiss, the Court accepts the well-pleaded factual allegations in the Amended Complaint as true and draws all reasonable inferences in favor of Plaintiffs.  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("[A] court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

("Landy"). 433 F. Supp. 3d at 840–43. There, the plaintiffs alleged that the Tribe, through its consumer-facing lending entities, and Asner and Landy, through their ownership and operation of various non-tribal businesses created to support those tribal entities, violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, Virginia's usury and consumer finance statutes, and Virginia common law. *Hengle*, 433 F. Supp. 3d at 839. That suit culminated in a nationwide class action settlement agreement, to which this Court granted its final approval on October 25, 2022.

Plaintiffs to this action now bring suit against several individuals and entities whom Plaintiffs allege "knowingly aided, funded, facilitated and participated in the usurious lending scheme" at the heart of the *Hengle* case. (Am. Compl. ¶ 3.) Plaintiffs allege that these "business partners and investors," whose identities and involvement Plaintiffs failed to uncover until nearly two years into the *Hengle* litigation, also committed RICO and Virginia common law violations through their contributions to the Habematolel Pomo Tribe's payday lending enterprise. (Am. Compl. ¶¶ 3–4.) In that vein, Plaintiffs allege the following facts.

### 1. Joshua Landy and the Formation of National Performance Agency, LLC

Between the early 1990s and 2010, Joshua Landy, an entrepreneur in the consumer lending industry, formed "several successful consumer finance companies" that "offered short term micro-finance consumer loans to customers." (Am. Compl. ¶ 93, Ex. 1 at 2688.) Landy's companies enjoyed "extreme[] success[]," and by the end of this roughly twenty-year period, Landy's companies boasted an approximately $4 million combined loan portfolio with aggregated annual revenues exceeding $30 million. (Am. Compl. ¶ 94, Ex. 1 at 2688.)

In October 2011, Landy sold a seventy percent interest in his lending businesses to a group of private investors. (Am. Compl. ¶ 96.) Defendant Spectrum Business Ventures

4

("SBV"), a private equity firm "primarily owned and managed" by Defendant Amit Raizada ("Raizada"), spearheaded the sale effort by recruiting many of those investors in exchange for a five percent finder's fee. (Am. Compl. ¶¶ 35, 96–97.)  The closely held "successor" company that emerged on the other side of this sale took on the name of National Performance Agency, LLC ("NPA").  (Am. Compl. ¶ 91, Ex. 1 at 2688.)  Notably, though SBV did not itself purchase an ownership interest in NPA during this sale process, Raizada owned a significant interest in NPA through his wholly-owned affiliate, the Raizada Group.  (Am. Compl. ¶¶ 36, 127, 132.)

"To facilitate the sale" of Landy's lending businesses, Landy and Raizada, among others, formed a limited partnership — NPA Investors, LP ("NPA Limited Partnership").  (Am. Compl. ¶ 98.)  The private investors that SBV recruited to undertake the partial acquisition of Landy's companies — Defendants Ingleside Investors, Richard Investors, LLC, Ferrell Capital, LLC, Seville, Ltd., E-Opportunities, LLC,[18] Skye, LLC, and Cabbage City, LLC, among others — invested in NPA Limited Partnership.  (LP Investors MTD Mem. (ECF No. 99) at 3.)  NPA Limited Partnership in turn invested those parties' funds in NPA.  (Am. Compl. ¶ 96, 98; LP Investors MTD Mem. at 3.)  Thus, Raizada and the bulk of his codefendants,[19] whom this Opinion refers to collectively as the "LP Investor Defendants," became partial owners, through their interests in NPA Limited Partnership, of NPA — an entity that, as discussed in detail below, would go on to provide much of the financial capital and technical infrastructure backing

---

[18]     As Plaintiffs note elsewhere in the Amended Complaint, E-Opportunities "was a pooled investment fund created, overseen, and managed by [Defendant] Monu Joseph."  (Am. Compl. ¶ 139.)  Defendants Joseph Investment, LLC and Joseph NPA Investment, LLC — also controlled and partially owned by Monu Joseph — were among the entities that invested in NPA Investors, LP.  (Am. Compl. ¶ 140.)

[19]     Neither the Signal Light nor Kellner Defendants invested in NPA or NPA Limited Partnership.  The Court discusses these Defendants' interests in the tribal lending operation *infra*, in Section I.A.6.

the Habematolel Pomo Tribe's consumer-facing lending operation.  (Am. Compl. ¶¶ 96–106.)
NPA Limited Partnership would also later serve as the vehicle through which the LP Investor
Defendants "received the proceeds generated by the usurious loans" at issue in this suit.  (Am.
Compl. ¶ 98.)

### 2.    The Tribal Lending Operation

Within two years of its formation, and "after consultation with, input from, and
agreement by" the LP Investor Defendants, NPA "adjusted its business model" away from the
structure under which Landy's consumer lending businesses had historically operated.  (Am.
Compl. ¶ 99, Ex. 1 at 2688.)  Rather than originate loans through consumer-facing entities
incorporated in Delaware, i.e., through the "Delaware lending model," NPA resolved to partner
with a Native American tribe and originate loans through consumer-facing entities incorporated
under tribal law, i.e., through the "tribal lending model."  (Am. Compl. ¶¶ 99–102; Pls.' Resp.
LP Investors MTD at 5.)  To consecrate this change, and "after consultation with and input from"
the LP Investor Defendants, Landy and Raizada "'assessed numerous tribes' to serve as the
conduit for [NPA's] high-interest loans."  (Am. Compl. ¶ 103, Ex. 1 at 2689.)  "Ultimately, NPA
initiated a partnership with the Habematolel Pomo of Upper Lake" in the summer of 2012.  (Am.
Compl. ¶ 104.)

In furtherance of its agreement with NPA, the Habematolel Pomo Tribe established three
Tribal Lending Entities ("TLEs") to serve as the consumer-facing vehicle for NPA's high-
interest loans.  (Am. Compl. ¶¶ 106–14.)  By August 2012, two of these TLEs — Golden Valley
and Silver Cloud — were issuing payday loans to consumers via their websites.  (Am. Compl.
¶¶ 107–12.)  A third TLE, Mountain Summit, began issuing loans via its website no later than
January 2014.  (Am. Compl. ¶ 113.)  The interest rates charged on these loans "were more than

40 to 75 times the amount permitted by state usury" laws, and the websites of all three TLEs represented to customers that the TLEs were "'wholly owned and operated' by the Tribe" from "'within the Tribe's reservation.'"  (Am. Compl. ¶¶ 109, 112, 114, 208.)

Notwithstanding these representations, however, "the Tribe's role was a front."  (Am. Compl. ¶ 115.)  In exchange for the Tribe's willingness to "serve as the conduit" for NPA's high-interest loans, "NPA provided the Tribe with a turnkey lending operation."  (Am. Compl. ¶ 106.)  Indeed, "non-tribal outsiders handled every material aspect of the [Tribe's] lending activities."  (Am. Compl. ¶ 115.)  Among the resources and services that NPA provided to the Tribe were "(1) funding for the loans; (2) management and servicing of the loans; (3) a call center for customer support and processing of the loans; and (4) marketing for the loans."  (Am. Compl. ¶ 105.)  NPA provided the bulk of these services from Overland Park, Kansas — "thousands of miles away from the Tribe's reservation" in Upper Lake, California.  (Am. Compl. ¶¶ 115, 177.)

Consistent with this "rent-a-tribe" structure, "nearly all of the revenue" generated by the payday loans that the TLEs originated accrued to "non-tribal outsiders."  (Am. Compl. ¶ 123.)  Under the "participation model" that NPA negotiated with the Tribe, NPA enjoyed the right to acquire "participation agreements" in the TLE-issued loans.  (Am. Compl. ¶¶ 123–24.)  At a high level, these participation agreements entitled NPA "to purchase essentially all of the economic interests in the loan[s]" that the TLEs originated.  (Am. Compl. ¶ 124.)  In other words, NPA and, by extension, the LP Investor Defendants, received "nearly all of the income and any profits from the loans while, at the same time, disguising [their] role" through "the façade that the loans were from a tribal government."  (Am. Compl. ¶ 125.)

### 3.   The LP Investor Defendants' Initial Involvement

The LP Investor Defendants participated in and benefitted from this tribal lending scheme in three ways.  First, the LP Investor Defendants provided "substantial capital to fund the loans to consumers."  (Am. Compl. ¶ 133.)  Second, the LP Investor Defendants exerted "input, influence and consent on decisions relating to the [loan] portfolios."  (Am. Compl. ¶ 133.) Finally, the LP Investor Defendants "roll[ed] over profits in the scheme for reinvest[ment] and growth of the portfolios."  (Am. Compl. ¶ 133.)

At an individual level, and allegedly "with full knowledge that [the funds] would be used to facilitate . . . high-interest loans," the LP Investor Defendants invested the following amounts into NPA Limited Partnership:

(1)   Richard Investors, LLC (a wholly-owned subsidiary of Defendant Ingleside Investors, overseen by Defendant Greg Warner) – $4,000,000

(2)   E Opportunities, LLC (overseen by Defendant Monu Joseph) – $4,505,000

(3)   Seville, Ltd. (a wholly-owned subsidiary of Defendant Ferrell Capital) – $1,500,000

(4)   Skye, LLC – $1,000,000

(5)   Cabbage City, LLC – $4,870,000

(Am. Compl. ¶¶ 134–44.)   In exchange for their investments in NPA Limited Partnership, the above Defendants "received a fixed return of 20% APR on the invested funds, as well as [a] fixed percentage" of NPA's revenue, which varied from Defendant to Defendant based on the amount invested.  (Am. Compl. ¶¶ 134, 138, 141, 143, 144.)  The LP Investor Defendants also received  "quarterly updates related to [loan] portfolios," including "information regarding performance of the portfolios, their operations, and regulatory actions and litigation against other comparable enterprises engaged in tribal lending."  (Am. Compl. ¶ 145.)

### 4.   Amit Raizada's Unique Role in the Scheme

As compared to the LP Investor Defendants, Defendant Amit Raizada, the principal

owner and manager of both SBV and the Raizada Group, played an outsized role in the "negotiation and implementation" of NPA's partnership with the Habematolel Pomo Tribe and the "ongoing operation" of the tribal lending operation. (Am. Compl. ¶¶ 34–36, 126–32.) Above all else, Raizada's complete ownership of the Raizada Group[20] entitled him to "a substantial amount of the revenue generated by the scheme." (Am. Compl. ¶¶ 34, 132.) But as noted above, SBV, through Raizada and others, also "helped raise capital for the tribal lending scheme" from private investors. (Am. Compl. ¶ 35.) In fact, "Raizada was . . . the primary person responsible for recruiting investors to participate in" the enterprise. (Am. Compl. ¶ 129.) And in consideration for Raizada's efforts, SBV received a finder's fee of five percent (at a minimum) of the amount invested by each recruited investor. (Am. Compl. ¶ 35.)

"Between July 2012 and July . . . 2013," Raizada also served as "one of the managers of NPA and controlled a seat on its management board." (Am. Compl. ¶ 126.) In a letter to a colleague "defending the fees that SBV earned for activities performed" on NPA's behalf, Raizada listed the following efforts, among others, as justification for SBV's levies against NPA:

> (1) raising capital for loans made through the tribe . . . ; (2) obtaining "a $30,000 expense account per month" to facilitate the scheme; (3) raising "$4M for a new, very profitable portfolio structure" involving the tribe; (4) raising an additional "$15M for a new, very profitable portfolio structure" involving the tribe; (5) giving NPA "20,000 leads for free," which were used to solicit borrowers for loans; (6) administrative reporting and financial support from SBV's employees, including Raizada; and (7) helping build the team who managed and oversaw the payday lending scheme.

(Am. Compl. ¶ 130) (quoting Am. Compl. Ex. 6 at JL000101-102). Though NPA ultimately expelled Raizada from management in September 2013, Raizada "retained his ownership interest

---

[20] Plaintiffs allege that Raizada also wholly owns SBV through a combination of direct ownership and indirect ownership (via other entities that Raizada wholly owns, including Defendant Raizada Group). (Am. Compl. ¶ 35, 131.) Although Plaintiffs fail to specify the exact value of Raizada's investment in NPA, Plaintiffs allege that Raizada's contributions rendered him a majority owner. (Am. Compl. ¶ 127.)

in NPA and its affiliated companies through the Raizada Group, which entitled him to significant distributions" going forward.  (Am. Compl. ¶ 132.)

### 5.   Restructure of the Tribal Lending Operation and Further Involvement from the LP Investor Defendants

In the latter of half of 2013, regulatory and legal headwinds — first personified by a cease-and-desist letter from the New York Department of Financial Services — began to blow in NPA's direction.  (Am. Compl. ¶¶ 154–56.)  Having "caught onto the [tribal lending] scheme," regulators in New York acted to defang the lending operations of the Habematolel Pomo Tribe, among other tribal lenders, by working with "117 banks and the National Automated Clearinghouse Association" to "cut off" the tribes' "access to New York customer accounts." (Am. Compl. ¶¶ 154, 157.)  These efforts signaled the first of many regulatory and legal actions against tribal lenders in New York and elsewhere.  (Am. Compl. ¶¶ 163–68.)  And among the first of these actions to resolve was the New York Attorney General's suit "against a tribal lending enterprise involving CashCall and Western Sky" — two tribal lending entities akin to Golden Valley, Silver Cloud and Mountain Summit.  (Am. Compl. ¶ 166.)  That litigation culminated in a 2014 settlement whereby "Western Sky, CashCall, and their owners" were forced to "refund borrowers who paid more than the legal rate of interest and pay $1.5 million in penalties."  (Am. Compl. ¶ 167.)

"As a result of the attack on the [tribal lending] industry, NPA's owners and executives knew [that] the tribal business model was at risk and that the consequences would be severe." (Am. Compl. ¶ 170.)  Accordingly, NPA's management team devised a restructuring strategy that they hoped would "shield the non-tribal members (including Defendants) but at the same time" allow the "deceptive scheme [collecting] usurious amounts from consumers" to continue. (Am. Compl. ¶ 171.)  Under the restructured scheme, the Habematolel Pomo Tribe's TLEs

would merge with NPA, thus reacquiring "the economic interests in the loans" that they had previously sold to NPA via participation agreements. (Am. Compl. ¶¶ 173, 175.) "And although NPA was 'sold' to the Tribe through a series of complex legal documents, NPA and its investors [would continue] to receive the vast majority of the profits from the scheme through a promissory note to NPA in excess of $64,100,000.00." (Am. Compl. ¶ 175.) Moreover, non-tribal individuals and entities would continue to exert "significant influence and power over the lending operations — essentially requiring no material changes" to the substance of the prior structure. (Am. Compl. ¶¶ 176–77.) A new entity, Upper Lake Processing Services, Inc. ("ULPS") was born, taking on a role identical to the one NPA had played under the scheme's previous legal structure. (Am. Compl. ¶¶ 177–78.)

The LP Investor Defendants "were fully and completely informed regarding the reasons for the merger." (Am. Compl. ¶ 174.) Indeed, the LP Investor Defendants "approved many of the legal documents establishing the structure and operations" of the scheme. (Am. Compl. ¶ 179.) The LP Investor Defendants voted on the restructuring arrangement and "had an opportunity to relinquish their ownership interest" if they so desired. (Am. Compl. ¶ 180.) "Yet, each of the NPA Investors agreed to move forward with the restructure and knowingly profit from" the lending operation. (Am. Compl. ¶ 180.)

### 5. The Signal Light and Kellner Defendants Get in on the Action

Not long after the Tribe, NPA and the LP Investor Defendants restructured the tribal lending operation, a new set of investors sought out a partnership with the Habematolel Pomo Tribe. (Am. Compl. ¶¶ 181–89.) After learning of the "substantial profits generated" in the tribal lending business, Defendant Benjamin Gravley — a hedge fund manager by trade — resolved to enter the industry. (Am. Compl. ¶¶ 29, 181–84.) In anticipation of pursuing a partnership with a Native American tribe, Gravley formed two entities — Defendants Signal

Light and HYMKEN — in the months leading up to January 2015. (Am. Compl. ¶¶ 181–84.) Gravley formed Signal Light, which he wholly owned, to serve as the entity that would partner directly with a Native American tribe. (Am. Compl. ¶¶ 182–83.) And Gravley formed HYMKEN — an entity for which Signal Light served as general partner — "to allow outside investors to invest in Signal Light's partnership" with that same tribe. (Am. Compl. ¶¶ 184–85.)

Having formed these entities, Gravley then sought out investors. (Am. Compl. ¶ 186.) Among the investors that Gravley successfully solicited was George Kellner, the managing partner of Kellner Capital, a New York-based hedge fund. (Am. Compl. ¶¶ 32–33, 186–89.) Kellner, through Kellner Capital, "personally invested in HYMKEN." (Am. Compl. ¶ 187.) And "[b]acked by [this] substantial capital from Kellner Capital," Gravley then "sought out a partnership with a Native American tribe in or around January 2015." (Am. Compl. ¶ 189.)

Gravley found a willing partner in the Habematolel Pomo Tribe, to whom he was introduced by the Tribe's attorneys. (Am. Compl. ¶¶ 190–91.) The Tribe's interest in a partnership with the Signal Light and Kellner Defendants faced opposition, however, from NPA, whose contractual agreements with the Tribe "prohibited [the Tribe] from engaging in another lending business." (Am. Compl. ¶ 191.) In the spring and early summer of 2015, the Tribe therefore "pushed NPA to allow it to create" a portfolio of loans in partnership with the Signal Light and Kellner Defendants. (Am. Compl. ¶¶ 194–95.) After several months of negotiations, NPA and the Tribe reached an agreement whereby the Tribe could create a new portfolio of loans in partnership with the Signal Light and Kellner Defendants, subject to several conditions. (Am. Compl. ¶¶ 195–96.) Chief among these conditions was a provision dictating that fifty percent of the income from this new portfolio would accrue to "existing noteholders," i.e., the LP Investor and Raizada Defendants, among others. (Am. Compl. ¶¶ 195–96.)

12

In August 2015, with the above agreement in place, the Tribe created a fourth TLE —
Majestic Lake Financial, LLC ("Majestic Lake") — that would originate payday loans in the
same manner as Golden Valley, Silver Cloud and Mountain Summit.  (Am. Compl. ¶ 198.)
Signal Light then "entered into a promissory note . . . with Majestic Lake's parent company,
Tribal Lending Enterprise, Inc., in the amount of  $1,500,000.00," which Majestic Lake would
use to underwrite its first set of high-interest loans.  (Am. Compl. ¶ 199.)  In exchange for this
promissory note, Signal Light acquired a security interest "in the right, title and interest of all of
the assets of Majestic Lake, including the principal and gross profit received from each loan."
(Am. Compl. ¶ 200.)

On top of this provision of $1.5 million in "startup capital," Signal Light further "agreed
'to commit capital . . . up to . . . Twenty-Five Million Dollars ($25,000,000)' to acquire
'participation interests' in the . . . loans originated by Majestic Lake."  (Am. Compl. ¶ 201.)
Under this agreement, Signal Light "had the right to acquire 'no less than 75% and no more than
99%' of 'the face value of the principal amount'" of each loan.  (Am. Compl. ¶ 201.)

As a result of these two maneuvers, "Signal Light received the gross profit from
[Majestic Lake's] loans," which in turn was distributed, in part, "to Gravley and HYMKEN's
other partners, including George Kellner and Kellner Capital."  (Am. Compl. ¶ 202.)  Gravley —
"acting on behalf of Signal Light, Kellner Capital, and HYMKEN" — "also had substantial
input on [Majestic Lake's parent company's] operational decisions."  (Am. Compl. ¶ 204.)  This
input included "control and influence on daily . . . operations, such as making or significantly
influencing . . . hiring processes and decisions, changing or implementing . . . operational
processes and procedures, establishing or modifying . . . underwriting standards[,] and
scheduling and conducting meetings of the employees . . . ."  (Am. Compl. ¶ 205.)

###### 6.     Plaintiffs' Loans

Plaintiffs all entered into loan agreements with one or more of Golden Valley, Silver Cloud, Mountain Summit and Majestic Lake. (Am. Comp. ¶¶ 255–59.) "Plaintiffs all applied for their loans on the internet while located in their respective home states," and "[n]one of Plaintiffs traveled to the reservation to obtain their loans." (Am. Compl. ¶ 225.)[21]

Blackburn received multiple loans between October 2015 and May 2016, with a combined principal amount of $2,900 and interest rates ranging from 627% to 767%. (Am. Compl. ¶ 209.) Blackburn's last loan payment occurred on August 12, 2016. (Am. Compl. ¶ 210.)

Rose received her loans, totaling $1,700 in principal, between June 2016 and January 2018. (Am. Compl. ¶ 211.) All of Rose's loans demanded interest rates over 600%, and Rose made her last payment on July 20, 2018. (Am. Compl. ¶¶ 211–12.)

Bumbray obtained his loan — with a face value of $700 — in November 2017. (Am. Compl. ¶ 213.) The loan accrued interest at a 543% rate, and Bumbray made his last payment on December 18, 2018. (Am. Compl. ¶ 214.)

The last of the Virginia Plaintiffs, Hengle, received multiple loans between September and October 2016. (Am. Compl. ¶ 215.) The combined principal amount of those loans summed to $1,500, and Hengle paid interest rates exceeding 600% on all of them. (Am. Compl. ¶ 215.) Hengle made his last payment on October 14, 2016. (Am. Compl. ¶ 216.)

---

[21]     Sherry Blackburn ("Blackburn"), Willie Rose ("Rose"), Elwood Bumbray ("Bumbray") and George Hengle ("Hengle") (collectively, the "Virginia Plaintiffs") executed their loan agreements from Virginia (Am. Compl. ¶ 255); Regina Nolte ("Nolte") executed her loan agreements from Indiana (Am. Compl. ¶ 227); John Tucker ("Tucker") executed his loan agreements from California (Am. Compl. ¶ 258); Jo Ann Falash ("Falash") executed her loan agreements from Wisconsin (Am. Compl. ¶ 257); and Emily Murphy ("Murphy") executed her loan agreements from Ohio. (Am. Compl. ¶ 259.)

Nolte's multiple loans, totaling $16,800 in principal, issued between September 2012 and April 2018. (Am. Compl. ¶ 217.) All of these loans accrued interest at rates exceeding 400%. (Am. Compl. ¶ 217.) Nolte made her final payment on these loans on April 20, 2018. (Am. Compl. ¶ 218.)

Falash received multiple loans, totaling $19,600. (Am. Compl. ¶ 219.) All of Falash's loans featured interest rates exceeding 400%, and Falash made his final payment on March 4, 2022. (Am. Compl. ¶ 220.)

Tucker received multiple loans, with a sum principal amount of $3,700. (Am. Compl. ¶ 221.) All of Tucker's loans accrued interest at over 400% APR. (Am. Compl. ¶ 221.) Tucker made his last payment on these loans on November 20, 2020. (Am. Compl. ¶ 222.)

Finally, Murphy also received several loans, with a combined principal amount of $1,100. (Am. Compl. ¶ 223.) Murphy's loans accrued interest at rates exceeding 600%, and Murphy made her last payment in October 2020. (Am. Compl. ¶ 224.)

### B. Procedural History

On September 2, 2022, Plaintiffs filed a putative class action Amended Complaint[22] against Defendants, asserting several federal and state causes of action arising from the allegedly unlawful lending operation. Plaintiffs pursue this suit on behalf of the following putative class:

> All natural persons who: (1) entered into a loan agreement with Golden Valley, Silver Cloud, Majestic Lake, or prior to February 1, 2021, with Mountain Summit; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid any amount on the loans.

---

[22] Plaintiffs initially filed this suit on March 15, 2022. (ECF No. 1.) On September 2, 2022, Plaintiffs filed their Amended Complaint as a matter of right.

Plaintiffs bring six class counts as follows:

> **Count One:  18 U.S.C. § 1962(d).**  Plaintiffs allege that Defendants violated § 1962(d) by "agreeing to undertake and advance the usurious lending scheme, including by aiding, abetting, and facilitating the scheme through their funding of the loans, as well as through their ownership and oversight of NPA." (Am. Compl. ¶ 267.)

> **Count Two:  18 U.S.C. § 1962(b).**  Plaintiffs allege that "Defendants violated § 1962(b) of RICO by acquiring and maintaining interests in and control of" the tribal lending operation, which was "involved in the unlawful collection of debt." (Am. Compl. ¶ 283.)

> **Count Three:  18 U.S.C. § 1962(a).**  Plaintiffs allege that Defendants violated § 1962(a) "in three separate and distinct ways." (Am. Compl. ¶ 301.)  "First, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt through the Delaware entities and using and investing such income in the establishment and operation of the tribal lending scheme." (Am. Compl. ¶ 302.)  "Second, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt through the tribal lending scheme and reinvesting that income into the tribal lending scheme in order to increase the size of the scheme." (Am. Compl. ¶ 303.)  "Third, Defendants violated § 1962(a) of RICO by using their income and proceeds to restructure usurious lending scheme and through the creation of the promissory notes entitling them to $64 million of future revenues of the tribal lending entities." (Am. Compl. ¶ 304.)

> **Count Four:  18 U.S.C. § 1962(c).**  Plaintiffs allege that Defendants violated § 1962(c) by "participat[ing] in the operation of the enterprise, which existed for the purpose of collection of unlawful debt." (Am. Compl. ¶ 320.)

> **Count Five:  Unjust Enrichment.**  Plaintiffs allege that they conferred a benefit on Defendants when they repaid the allegedly usurious loans; that Defendants "knew or should have known of the benefits"; and that Defendants "have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans." (Am. Compl. ¶ 335.)

> **Count Six:  Common Law Conspiracy.**  Plaintiffs allege that "Defendants violated state common law conspiracy prohibitions by joining together through a series of agreements to accomplish the making, collection, and profiting from the blatantly illegal usurious loans." (Am. Compl. ¶ 349.)

Plaintiffs assert all six counts against all Defendants, with two exceptions.  First, Plaintiffs voluntarily dismissed their § 1962(a) claims against the Kellner Defendants, the Signal Light Defendants and SBV. (ECF No. 169.)  Second, Plaintiffs also dismissed their § 1962(b) action against SBV. (ECF No. 169.)  Plaintiffs seek:  (1) class certification; (2) declaratory and

injunctive relief and damages; and (3) attorneys' fees, litigation expenses and the costs of suit.

In response to Plaintiffs' Amended Complaint, Defendants — at times jointly and at times individually — filed nine motions to dismiss.  (ECF Nos. 95, 96, 98, 101, 116, 145, 147, 149, 150.)  Plaintiffs responded in opposition (ECF Nos. 120, 121, 122, 123, 131, 155, 160), and Defendants replied in support (ECF Nos. 137, 138, 139, 140, 170, 171).  For brevity's sake, the Court forgoes summary of Defendants' motions here and instead addresses the arguments raised in each motion, as relevant, throughout the remainder of this opinion.

## II.    ANALYSIS:  RULE 12(b)(6) MOTIONS TO DISMISS

The Court first addresses the seven[23] Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons articulated below, the Court will deny the motions.

### A.    Legal Standard

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); see also Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is

---

[23]    Both Cabbage City (ECF No. 116) and the Kellner Defendants (ECF No. 95) filed consolidated Motions to Dismiss that included argument under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  The Court includes these two motions among the "seven" 12(b)(6) motions accounted for here.  The Court also includes these two motions among the "four" Rule 12(b)(2) motions accounted for later in this Opinion.  Thus, although Defendants collectively filed nine Motions to Dismiss, the Court's opinion could be read as referring to a total of eleven motions.  This is not an error, but simply a result of subdividing the motions filed by Cabbage City and the Kellner Defendants into their component parts.

17

entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

### B.     Neither Plaintiffs' RICO Claims nor Plaintiffs' State Law Claims Warrant Dismissal as Time-Barred

The LP Investor Defendants, joined by the Kellner Defendants, the Signal Light Defendants, and the Raizada Defendants, argue that the Virginia Plaintiffs' claims against them must be dismissed on statute of limitations grounds.[24] (LP Investors MTD Mem. at 26–30;

---

[24]     Defendants only make this argument with respect to Plaintiffs Rose, Bumbray, Blackburn

Kellner MTD Mem. (ECF No. 105) at 19–20; Signal Light MTD Mem. (ECF No. 102) at 15; SBV MTD Mem. (ECF No. 148) at 2; Raizada MTD Mem. (ECF No. 151) at 2; Raizada Group MTD Mem. (ECF No. 152) at 2.)  Defendants contend that (1) the four-year statute of limitations for civil RICO actions bars Plaintiffs' RICO claims while (2) Virginia's two-year statute of limitations for civil conspiracy and three-year statute of limitations for unjust enrichment time bar Plaintiffs' state law claims.  (LP Investors MTD Mem. at 29.)  Because these statutes of limitation are not clearly applicable from the face of the Amended Complaint, the Court will not dismiss any of the Virginia Plaintiffs' claims as time-barred at this stage.

As a general rule, "a defense based on the statute of limitations must be raised by the defendant through an affirmative defense." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  A 12(b)(6) motion to dismiss, which tests the sufficiency of the complaint, "generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's complaint is time-barred." *Id.*  Indeed, "these defenses are more properly reserved for consideration on a motion for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993).  Nonetheless, in the "relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint" may a defendant raise — and the court consider — a statute of limitations defense at the motion to dismiss stage. *Goodman*, 494 F.3d at 464.  When the facts necessary to establish the time bar are not apparent on the face of the complaint, however, the Court should allow the suit to proceed to discovery. *See Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) (reversing the district court's dismissal and remanding for discovery when Plaintiff pled facts sufficient to support equitable

---

and Hengle (the "Virginia Plaintiffs"), each of whom were issued loans before March 15, 2018. Defendants do not dispute the timeliness of the claims of Plaintiffs Nolte, Falash, Tucker and Murphy.

tolling of the statute of limitations).

### 1. The Amended Complaint Alleges Sufficient Facts to Defeat a Time-Bar of the Virginia Plaintiffs' RICO Claims

Defendants first contend that all four of the Virginia Plaintiffs' RICO claims must fail as time-barred because those Plaintiffs entered into their loans before March 15, 2018 — more than four years before Plaintiffs filed their initial Complaint and thus outside of the limitations period for civil RICO claims. (LP Investors MTD Mem. at 126.) Because the Amended Complaint alleges facts sufficient to show that an equitable tolling doctrine may apply to toll the RICO statute of limitations, the Court will not dismiss these claims at the motion to dismiss stage. *Goodman*, 494 F.3d at 464.

Civil RICO actions are subject to a four-year statute of limitations, which runs from "the date when plaintiff discovered, or should have discovered, the injury." *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 266 (4th Cir. 2001) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 183 (1997), and *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). The RICO Act's statute of limitations thus functions through the "injury discovery" rule, whereby "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella*, 528 U.S. at 555. The Supreme Court has recognized, however, that "equitable principles may toll RICO's statute of limitations." *Hengle*, 433 F. Supp. 3d at 892 (citing *Rotella*, 528 U.S. at 560–61). The doctrine of equitable tolling "[tolls] a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." *Lozano v. Alvarez*, 572 U.S. 1, 10 (2014). Fraudulent concealment, a separate tolling doctrine, "prevents a defendant from concealing a fraud, . . . or committing a fraud in a manner that it concealed itself until the defendant could plead the statute of limitations to protect it." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 549 (4th Cir. 2019) (cleaned up). "To toll a

limitations period based on fraudulent concealment, a plaintiff must demonstrate that (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Id.* at 548.

Though the Amended Complaint concedes that the Virginia Plaintiffs received all of their loans before March 15, 2018, Plaintiffs maintain that the doctrines of equitable tolling and fraudulent concealment operate to toll the statute of limitations period for all four Virginia Plaintiffs, thus entitling them to relief from the limitations period.[25] (Am. Compl. ¶¶ 231–52.) With respect to Plaintiffs' equitable tolling argument, the Amended Complaint asserts that certain provisions in Plaintiffs' loan contracts — namely, clauses that purport to "waive the borrowers' federal and state rights" and force them to litigate disputes in non-existent tribal fora — prevented Plaintiffs from filing a timely action. (Am. Compl. ¶ 237.) Given that these clauses raised serious doubts concerning the availability of federal and state law remedies, Plaintiffs maintain that they were not on notice that they could pursue their claims in federal court until January 9, 2020, when this Court issued its opinion in *Hengle*, thus making clear the facial viability of federal and state law claims against Defendants. (Am. Compl. ¶ 236.)

In support of their fraudulent concealment argument, Plaintiffs allege that Defendants intentionally obscured their involvement in the lending entities when switching to the tribal lending model. (Am. Compl. ¶¶ 16–36, 99–105, 109–14, 246.) Specifically, Plaintiffs allege

---

[25]     Plaintiffs also urge the Court to adopt the separate accrual rule, under which "a new cause of action accrues for each new and independent injury, even if the RICO violation causing the injury happened more than four years before." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996). Given that Plaintiffs Rose and Bumbray submitted loan payments within four years of the commencement of this action, Plaintiffs believe that the separate accrual rule brings Rose and Bumbray within RICO's limitations period. (Am. Compl. at 46 n.17.) Because Plaintiffs allege sufficient facts to warrant tolling of all four of the Virginia Plaintiffs' claims, the Court need not address Plaintiffs' argument regarding the separate accrual rule at this juncture.

that after regulatory crackdowns, NPA shifted from the Delaware lending model to the tribal

lending model, which allowed NPA to use the Habematolel Pomo Tribe as a front for NPA's

high-interest loans, all while NPA provided funding, management and marketing for the

enterprise.  (Am. Compl. ¶¶ 99–105.).  Each Defendant invested in and profited from the tribal

lending scheme, Plaintiffs allege, while "knowing that [their] funds would be used to support

[NPA's] usurious lending activities."  (Am. Compl. ¶¶ 16–36.)  Despite Defendants' back-end

involvement in the lending operation, however, the TLEs' webpages represented that the TLEs

were wholly owned and operated by the Tribe, thus concealing Defendants' role.  (Am. Compl.

¶¶ 109–14.)  Moreover, the template loan contracts "made similar misrepresentations designed to

fraudulently conceal the role of NPA and Defendants."  (Am. Compl. ¶ 246.)

The Amended Complaint further alleges that Plaintiffs failed to discover Defendants'

involvement in the scheme despite exercising due diligence.  Specifically, Plaintiffs allege that

despite identifying and bringing suit against "key participants in the scheme as early as April 9,

2019," they failed to discover facts indicative of Defendants' involvement in the scheme until

December 2021.  (Am. Compl. ¶¶ 247–48.)  These delayed revelations resulted not from dilatory

behavior, but from the cumbersome, resource-intensive motion to dismiss and interlocutory

appeal thereof in the *Hengle* suit.  (Am. Compl. ¶¶ 249–50.)  Due to the resource demands of the

*Hengle* motions practice, Plaintiffs represent that they could not serve discovery in that suit until

December 2021.  (Am. Compl. ¶ 249.)  And it was not until Defendants' business partners

responded to that discovery in February 2022 that Plaintiffs learned of Defendants' identities.

(Am. Compl. ¶¶ 249–51.)  Thus, "[b]ecause the identities of the Defendants had been

fraudulently concealed through the structure, misrepresentations, and restructure of the scheme,"

Plaintiffs argue, "the statute of limitations should be tolled until January 1, 2022."  (Am. Compl.

22

¶ 252.)

The foregoing allegations support the possible tolling of the statute of limitations, and the Court therefore finds that the facts on the face of the Amended Complaint do not conclusively establish a time bar. *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 475 (4th Cir. 2005). While the Amended Complaint alleges facts that may warrant application of a tolling doctrine, the Court notes that Plaintiffs were not "required to rebut the affirmative defense of statute of limitations in their complaint." *Wendy Rupe Tr. v. Cabot Oil & Gas Corp.*, 2010 WL 3894039, at *4 (S.D.W. Va. Sept. 30, 2010) (citing *Goodman*, 494 F.3d at 465–66). To dispose of the Amended Complaint this early in the litigation, Defendants bear the burden to demonstrate that Plaintiffs' "potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint." *Goodman*, 494 F.3d at 466. Defendants fail to make such a showing. Quite the opposite, the allegations in the Amended Complaint describe the contract waivers that ostensibly waived Plaintiffs' rights to sue, as well as Defendants' role in the lending enterprise and the façade by which Defendants concealed their involvement. (Am. Compl. ¶¶ 16–36, 99–105, 109–14, 246.) Because these allegations may warrant tolling the statute of limitations, the Amended Complaint does not foreclose any possibility that Plaintiffs could overcome the statute of limitations affirmative defense. *Dean*, 395 F.3d at 475. The Court does not, at this time, contemplate whether tolling is appropriate, but finds only that dismissal of Plaintiffs' RICO claims based on the pleadings alone would prove premature. *Id.* Accordingly, the Court will deny Defendants' Motions to Dismiss to the extent that they seek dismissal of the Virginia Plaintiffs' RICO claims on statute of limitations grounds.

> **2.   The Amended Complaint Alleges Sufficient Facts to Defeat a Time Bar of the Virginia Plaintiffs' State Law Claims**

Defendants next contend that the Virginia Plaintiffs' unjust enrichment and civil

conspiracy claims must fail under those claims' respective statutes of limitation.  (LP Investors

MTD Mem. at 29–30; Signal Light MTD Mem. at 15; Kellner MTD Mem. at 19–20.)  Much like

Plaintiffs' RICO claims, however, the Amended Complaint does not conclusively establish a

time bar with respect to Plaintiffs' state law claims.  Consequently, the Court will not dismiss the

Virginia Plaintiffs' state law claims on statute of limitations grounds.

   Virginia courts require that unjust enrichment claims be filed within three years of

accrual, *Belcher v. Kirkwood*, 383 S.E.2d 729, 731 (Va. 1989), which occurs "at the time the

unjust enrichment of the defendant actually occurs.*"  Primrose Dev. Corp. v. Benchmark

Acquisition Fund I L.P.*, 47 Va. Cir. 296, 298 (1998).  The statute of limitations for common law

civil conspiracy, on the other hand, "is based on the statute of limitations for the underlying act."

*Lokhova v. Halper*, 995 F.3d 134, 148 (4th Cir. 2021).  The underlying act in this case, violation

of state usury laws, provides for a two-year statute of limitations, running from "the last

scheduled loan payment or the date of the payment in full — whichever comes first.*"  Williams

v. Big Picture Loans, LLC*, 339 F.R.D. 46, 57 (E.D. Va. 2021) (citing Va. Code Ann. § 6.2-305).

Virginia courts recognize that equitable tolling doctrines may operate to toll these limitations

periods.  *See Newman v. Walker*, 618 S.E.2d 336, 340 (Va. 2005) (applying the fraudulent

concealment doctrine to a state law claim under a similar standard to the federal courts);

*Brunswick Land Corp. v. Perkinson*, 151 S.E. 138, 140 (Va. 1930) (noting that "extraordinary

circumstances" may warrant equitable tolling).

   As explained in the preceding section, Plaintiffs allege several facts that support the

possible tolling of the limitations period for their claims.  *See supra* Section II.B.1.  Those same

allegations apply with equal measure to Plaintiffs' state law claims, and the Court will not rehash

them here.  As the Court has explained, Plaintiffs' allegations suffice to show that a time bar of

24

Plaintiffs' claims is not apparent "on face of the [Amended] [C]omplaint." *Dean*, 395 F.3d at

475.  Accordingly, Defendants' statute of limitations defenses to Plaintiffs' state law claims "are

more properly reserved for consideration on a motion for summary judgment." *Forst*, 4 F.3d at

250.  The Court will therefore deny Defendants' Motions to Dismiss to the extent they seek

dismissal of the Virginia Plaintiffs' state law claims on statute of limitations grounds.

## C.      Plaintiffs' RICO Claims Survive the Rule 12(b)(6) Motions to Dismiss

As noted *supra*, Plaintiffs' Amended Complaint alleges that Defendants' usurious

lending scheme violated all four of the prohibitions found in the RICO statute's "prohibited

activities" section, 18 U.S.C. § 1962(a)–(d).  Across their Motions to Dismiss, Defendants

launch several attacks on the sufficiency of these allegations.  Three of these attacks apply with

equal force to all four RICO counts, as they identify supposed pleading deficiencies regarding

elements which are shared by the four causes of action.  The remainder of Defendants'

arguments concern alleged pleading inadequacies unique to one of the four RICO counts — i.e.,

elements not shared across RICO subsections.  The Court first discusses the arguments which cut

across all four RICO claims before moving to consider the alleged pleading inadequacies unique

to one or another of the four RICO counts.

### 1.      Plaintiffs Adequately Allege that the Virginia Plaintiffs' Tribal Loans Prove Unlawful

In an attempt to rehash an argument raised, and rejected, in the *Hengle* litigation, the

Kellner and Signal Light Defendants assert that the Virginia Plaintiffs' RICO claims must fail for

lack of an underlying "unlawful" debt on which Defendants collected.  (Signal Light MTD Mem.

at 7–9; Kellner MTD Mem. at 6–8.)  Because the relevant factual allegations in this suit are on

all fours with the allegations in *Hengle*, and because Defendants provide no compelling reason

for this Court to contradict its holding in that case, which the Fourth Circuit affirmed, the Court

again rejects this argument. 433 F. Supp. 3d at 865–68.

> RICO defines an "unlawful debt," in relevant part, as:
>
> a debt . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and . . . which was incurred in connection with . . . the business of lending money . . . at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1961(6). As in *Hengle*, the supposedly unlawful debts underpinning the Virginia Plaintiffs' RICO claims in this case are the loans that they received from the Tribal Lending Entities, loans which accrued interest at annual rates between 400 and 800 percent. (Am. Compl. ¶¶ 209–16.) Plaintiffs allege that these loans prove unlawful pursuant to Virginia's state usury statute, which provides that "'no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year.'" (Am. Compl. ¶ 40 (quoting Va. Code § 6.2-303(A)).) While the statute sets forth an exception to this twelve percent interest rate limit for those who obtain a consumer finance license, Va. Code § 6.2-1501, Plaintiffs further allege that Defendants lack such a license and thus fall outside the exception. (Am. Compl. ¶ 229.) Because their "unlicensed, high rate" loans thus fall afoul of Virginia's usury cap, Plaintiffs allege, the loans prove "void" under Va. Code § 6.2-1541 and therefore constitute unlawful debts for RICO purposes. (Am. Compl. ¶¶ 229 n.16, 230.)

For their part, Defendants contend that the Virginia Plaintiffs' RICO theory erroneously relies on Virginia's usury cap, and that the Court must instead look to the Tribe's laws — which "do[] not have a usury cap" — to determine the legality of the underlying loans. (Signal Light MTD Mem. at 7–9; Kellner MTD Mem. at 6–8.) Tribal law governs, Defendants maintain, pursuant to the choice-of-law provisions contained in Plaintiffs' loan agreements. (Kellner MTD Mem. at 7.) And because the Tribe's laws present no bar to high-interest loans, Defendants conclude, the Virginia Plaintiffs fail to plausibly allege that their debts prove unlawful — an

allegation necessary to render their RICO claims actionable.  (Signal Light MTD Mem. at 7–9;
Kellner MTD Mem. at 6–8.)

The fundamental flaw in Defendants' argument — one that the Signal Light Defendants
readily acknowledge — is that it runs headlong into both this Court's decision in *Hengle* and the
Fourth Circuit's opinion affirming that decision on appeal. 433 F. Supp. 3d at 865–68.  In
*Hengle*, this Court assessed the propriety, under Virginia law, of the very same choice-of-law
provision which stands at issue here, and the Court found that "enforcing the [p]rovision would
violate Virginia's public policy against usurious loans." *Id.*  The Fourth Circuit affirmed that
finding, noting that although "contractual choice-of-law clauses should be enforced absent
unusual circumstances," the circumstances underlying this particular choice-of-law provision —
"unregulated usurious lending of low-dollar short-term loans at triple-digit interest rates to
Virginia borrowers" — counseled against enforcing it, as they "unquestionably 'shock . . . one's
sense of right' in view of Virginia law." *Treppa*, 19 F.4th at 352 (quoting *Tate v. Hain*, 25
S.E.2d 321, 325 (Va. 1943)).

Here, Defendants offer no compelling reason why the Court should abandon its prior
analysis and, moreover, contradict what now amounts to controlling Fourth Circuit precedent.
Defendants' sole argument in support of the choice-of-law provision attempts to relitigate the
Fourth Circuit's interpretation of *Settlement Funding v. Von Neumann-Lillie*, 645 S.E.2d 436
(Va. 2007), a precedent which has received ample attention in this Court and need not be
reexamined in detail yet again. *See, e.g.*, *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 929
(E.D. Va. 2019) ("*Gibbs I*") (analyzing *Settlement Funding* in similar context); *Gibbs v. Stinson*,
421 F. Supp. 3d 267, 309 n.63 (E.D. Va. 2019) (*Gibbs II*) (same).  Defendants continue to
maintain, against the weight of numerous cases holding to the contrary, that *Settlement Funding*

27

stands for the proposition that under Virginia law, courts must, "without reservation," honor and enforce the choice-of-law clause found in a loan contract, irrespective of whether the loan violates Virginia's usury statute. (Signal Light MTD Mem. at 8.) Without unnecessarily repeating either its analysis in *Hengle* or the Fourth Circuit's analysis on appeal, this Court again finds that Defendants' interpretation of the *Settlement Funding* case proves misguided. Defendants' reading stretches the Virginia Supreme Court's opinion beyond its relatively narrow scope, and this Court, as well as others, has explained why *ad nauseam*. *See, e.g., Gibbs II*, 421 F. Supp. 3d at 309 n.63 (explaining that *Settlement Funding* addressed a limited evidentiary question and "never substantively addressed the enforceability of" the choice-of-law provision at issue in the suit, "or the merits of any possible contract defenses"). This Court again holds that adherence to the choice-of-law provision found in the Virginia Plaintiffs' loan agreements would violate Virginia's "compelling public policy against usurious lending practices," and the Court therefore will not enforce it. *Hengle*, 433 F. Supp. 3d at 867–68.

Because Defendants raise no other objections to the sufficiency of Plaintiffs' allegations as it concerns the unlawfulness of their debts, the Court need go no further. The Virginia Plaintiffs — whose loans were issued in Virginia and are therefore subject to Virginia state law — state a plausible claim that the loans at issue violate Virginia's usury statute and therefore constitute "unlawful" debts" under RICO. *See id.* at 868 (analyzing Virginia's choice-of-law rules under identical circumstances). The Court will therefore deny the Kellner and Signal Light Defendants' Motions to Dismiss (ECF Nos. 95, 101) to the extent that they argue to the contrary.

### 2.       Plaintiffs Adequately Allege the Existence of a RICO Enterprise

The Kellner Defendants also argue that all four of Plaintiffs' RICO counts must fail because Plaintiffs "fail to adequately plead the existence of a RICO enterprise." (Kellner MTD Mem. at 8.) Because the Amended Complaint sets forth the nature of the alleged RICO

enterprise with great detail, the Court finds that this argument lacks merit.

An "enterprise" under RICO "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Here, Plaintiffs allege that Defendants' tribal lending operation constituted an "association-in-fact." (Am. Compl. ¶ 264.) An association-in-fact enterprise "is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). To adequately plead an association-in-fact enterprise, Plaintiffs must allege the presence of three structural features: "(1) [a common] purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Mao v. Glob. Tr. Mgt., LLC*, 2022 WL 989012, at *8 (E.D. Va. Mar. 31, 2022) (citing *Boyle*, 556 U.S. at 948). These structural requirements do not constitute an exacting standard, however. *Id.*, at *8 (observing that the structural requirements of a well-plead association-in-fact "are not extensive"). An association-in-fact enterprise "need not have a hierarchical structure," and "decisions may be made on an ad hoc basis . . . by any number of methods." *Boyle*, 556 U.S. at 948. Group members "need not have fixed roles," and nothing in the statute requires that the group's crimes be "sophisticated, diverse, complex, or unique." *Id.*

Here, Plaintiffs' detailed factual allegations adequately describe an association-in-fact enterprise characterized by all three of the above features. First, Plaintiffs indeed allege that Defendants' tribal lending enterprise functioned cooperatively to achieve a common purpose — namely, profiting from a "usurious lending scheme" designed to evade state usury laws by employing the "tribal lending model." (Am. Compl. ¶¶ 72–90.) Plaintiffs allege that each Defendant invested in this scheme "knowing that [its] funds would be used" to issue "illegal

loans to consumers through agreements between NPA and the Tribe's [lending] entities." (Am. Compl. ¶¶ 16–36.) Plaintiffs further allege that Defendants reaffirmed their commitment to this common purpose when restructuring the tribal lending scheme, as Defendants "were . . . entitled to vote on the restructure and . . . agreed to move forward . . . and profit from the illegal lending scheme." (Am. Compl. ¶ 180.) As it concerns the Kellner Defendants specifically, Plaintiffs allege that George Kellner "personally invested in [HYMKEN]," knowing that those funds would then be "used to provide capital to Signal Light to purchase . . . participation interests in the usurious lending scheme." (Am. Compl. ¶ 33.) This Court has repeatedly found that allegations of a similar nature prove sufficient to meet the common purpose element. *See, e.g.*, *Solomon v. Am. Web Loan*, 2019 WL 1320790, at *7 (E.D. Va. Mar. 22, 2019) (purpose element met where Plaintiffs alleged that defendants collectively sought to "exploit[] the sovereignty of the Tribe to engage in the practice of issuing usurious loans"). Thus, the common purpose requirement stands adequately alleged.

Plaintiffs also adequately allege that the members of the tribal lending operation bore some relationship to each other and were not — as would prove insufficient to plead a RICO association-in-fact enterprise — mere individuals acting "independently and without coordination." *Boyle*, 556 U.S. at 947 n.4. The Amended Complaint dedicates the bulk of its seventy pages worth of factual allegations to describing the web of relationships connecting the four Tribal Lending Entities to the various Defendants and the various Defendants to each other. (Am. Compl. ¶¶ 72–207.) First, Plaintiffs describe how Landy and the Raizada Defendants (through Raizada) coordinated to sell a seventy percent interest in Landy's lending businesses to a group of private investors, which included the LP Investor Defendants. (Am. Compl. ¶¶ 91–98.) Plaintiffs then describe the specific structure through which the LP Investor Defendants, via

30

NPA, partnered with the Habematolel Pomo Tribe and their TLEs.  (Am. Compl. ¶¶ 99–114.)

Importantly, Plaintiffs' allegations make clear that the LP Investor Defendants were not

independent, distant and detached investors who were then unwittingly tied to Golden Valley,

Silver Cloud and Mountain Summit.  Quite the opposite, Plaintiffs specifically allege that NPA

partnered with the Habematolel Pomo Tribe and its TLEs "after consultation with, input from,

and agreement by" the LP Investor Defendants.  (Am. Compl. ¶ 101.)  Plaintiffs then further

describe the process by which NPA's participation interests in the TLEs' loans served as a

vehicle to upstream the Tribe's lending revenues to the LP Investor Defendants.  (Am. Compl.

¶¶ 123–25.)  These allegations include an outline of the formula by which revenues were split

among the LP Investor Defendants.  (Am Compl. ¶¶ 134, 138, 141, 143–44.)  Finally, Plaintiffs

describe how the LP Investor Defendants voiced their support for restructuring NPA's legal

relationship with the Tribe, affirmatively voting in favor of the TLEs' acquisition of NPA and

declining the opportunity to relinquish their ownership interests in the NPA Limited Partnership.

(Am. Compl. ¶¶ 179–80.)

As it concerns the Kellner Defendants, the Amended Complaint contains five pages of

factual allegations detailing both the origins and the nature of the Kellner Defendants'

relationships with the Signal Light and LP Investor Defendants.  (Am. Compl. ¶¶ 181–207.)

Plaintiffs allege that the Signal Light Defendants (through Gravley) solicited investment from the

Kellner Defendants and then, together with the Kellner Defendants, entered into an agreement

with the Tribe and the LP Investor Defendants that resulted in a fourth portfolio of tribal loans.

(Am. Compl. ¶¶ 186–98.)  These allegations include specific details concerning an agreed

income split between the LP Investor Defendants, on the one hand, and the Signal Light and

Kellner Defendants, on the other hand, of the revenues generated by Majestic Lake, the Tribe's

31

fourth TLE. (Am. Compl. ¶¶ 194–98.) These allegations also detail how Gravley, "acting on behalf of Signal Light, Kellner Capital, and Hymken," exercised "substantial input" over the TLEs' operational decisions, which itself strained the relationship between the LP Investor Defendants and the Signal Light and Kellner Defendants. (Am. Compl. ¶¶ 204–05.)

Plaintiffs' allegations as to the relationships between the various Defendants thus prove extraordinarily detailed — at least as thorough as those which this Court found sufficient to survive a motion to dismiss in *Mao*. 2022 WL 989012, at *8. The Kellner Defendants point to *Mao* as demonstrative of the shortcomings in Plaintiffs' allegations. (Kellner MTD Reply Mem. (ECF No. 137) at 8–9.) Yet even accepting Defendants' characterization of the *Mao* Plaintiffs' allegations at face value, Plaintiffs here have equaled, if not exceeded, the allegations in that suit. *Mao*, 2022 WL 989012, at *8. "In *Mao*, the Kellner Defendants assert, "it was alleged that;"

> (1) the defendants contracted with specific "debt collectors to collect these debts from consumers;" (2) they structured operations "so that the Downstream Debt Collectors could use aggressive and illegal debt collection techniques while the Debt Buyer Defendants would be insulated from liability;" (3) one defendant owned other companies playing a role in the scheme – i.e. "own[ing] RTC Investors which owns Reel Time Capital, and [owning] Global Trust Managers which owns Global Trust Management;" (4) that same defendant managed two other defendants involved in the alleged scheme; and (5) certain defendants "were all interrelated through various ownership schemes."

(Kellner MTD Reply Mem. at 8–9 (quoting *Mao*, 2022 WL 989012, at *1, 8, 11).) Here, Plaintiffs' allegations match or surpass each of these points. Indeed, Plaintiffs allege that Defendants — via NPA (for the Raizada and LP Investor Defendants) and Signal Light (for the Signal Light and Kellner Defendants) — contracted with the TLEs to collect usurious debts. (Am. Compl. ¶¶ 99–153, 181–207.) Plaintiffs also allege that Defendants structured the tribal lending operation such that upstream investors — like the Kellner Defendants — would "be insulated from liability." *Mao*, 2022 WL 989012, at *1; (Am. Compl. ¶¶ 125, 199–202). Finally, Plaintiffs further allege that certain participants in the tribal lending scheme proved to be

32

interrelated entities with common ownership. (Am. Compl. ¶¶ 16–36.)

The Kellner Defendants appear to suggest that because not all of Plaintiffs' allegations concerning the association-in-fact apply with equal force to George Kellner and Kellner Capital, Plaintiffs have failed to allege an enterprise at all. (Kellner MTD Reply Mem. at 9–10.) But that contention establishes too high a bar. Plaintiffs need only allege facts sufficient for the Court to draw the reasonable inference that the scheme's participants maintained relationships in furtherance of a common purpose. *Cf. Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1006 (E.D. Va. 2021) (finding that Plaintiffs failed to adequately allege necessary relationships to establish an association-in-fact where allegations were "best read" as demonstrating "independent, parallel conduct directed at [the] [p]laintiff . . . "). Plaintiffs have done so. Accordingly, Plaintiffs adequately allege "relationships among those associated with the enterprise." *Boyle*, 556 U.S. at 946.

Finally, Plaintiffs sufficiently allege that the tribal lending operation enjoyed "longevity sufficient to permit [Defendants] to pursue the enterprise's purpose." *Id.* The Kellner Defendants make no effort to challenge the sufficiency of Plaintiffs' allegations on this front, as they reference longevity only when citing the tripartite requirements to plead an association-in-fact enterprise. (Kellner MTD Mem. at 8–9.) In any event, such a challenge would lack reasonable basis, as Plaintiffs allege that the tribal lending operation existed as early as 2012, when the LP Investor Defendants, via NPA, initiated their partnership with the Habematolel Pomo Tribe, and continued through March 2022, when Plaintiff Falash made her final payment on her allegedly usurious loans. (Am. Compl. ¶¶ 104, 220.)

For the foregoing reasons, the Court finds that Plaintiffs adequately allege that Defendants collectively formed an association-in-fact RICO enterprise. *Boyle*, 556 U.S. at 946.

33

Accordingly, the Court will deny the Kellner Defendants' Motion to Dismiss (ECF No. 95) to the extent that they argue the opposite.

### 3.   Plaintiffs Adequately Allege Proximate Causation

In their final attempt to fell all four of Plaintiffs' RICO counts in a single swing of the axe, Defendants argue that Plaintiffs have failed to allege facts sufficient to show that Defendants proximately caused Plaintiffs' injuries. (LP Investors MTD Mem. at 21–23; Signal Light MTD Mem. at 5–7; Kellner MTD Mem. at 14–15; SBV MTD Mem. at 6; Raizada MTD Mem. at 6; Raizada Group MTD Mem. at 6.)   Because Plaintiffs allege facts which, taken as true, demonstrate a "direct relation" between their injuries and Defendants' alleged RICO violations, the Court rejects this challenge as well. *Albert v. Glob. Tel*Link*, 68 F.4th 906, 910 (4th Cir. 2023).

RICO creates a private right of action for anyone "injured in his business or property *by reason of* a violation of" RICO's criminal provisions. 18 U.S.C. § 1964(c) (emphasis added). "The phrase 'by reason of' requires a 'direct relation' between the plaintiff's injury and the defendant's RICO violation." *Albert*, 68 F.4th at 910–11 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).   In other words, "proximate cause is . . . required." *Holmes*, 503 U.S. at 268.

The proximate causation standard in civil RICO actions does not succumb to a bright-line test. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) ("Proximate cause . . . is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case.") (cleaned up).   Broadly speaking, a plaintiff adequately pleads proximate causation where he alleges facts sufficient to demonstrate "'some *direct* relation between the injury asserted and the injurious conduct alleged.'" *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018) (quoting *Holmes*, 503 U.S. at 268) (emphasis

in original).  This direct relation inquiry "differs," however, "from the ordinary proximate cause inquiry at common law."  *Gibbs v. Elevate Credit, Inc.*, 2021 WL 4851066, at *16 (E.D. Va. Oct. 17, 2021) (*"Gibbs III"*).  "[R]ather than incorporating the concept of foreseeability or traceability of an injury to conduct, RICO causation requires a proximity of statutory violation and injury such that the injury is sequentially the direct result — generally at 'the first step' in the chain of causation."  *Slay's*, 884 F.3d at 494 (quoting *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)).

Recently, in *Albert v. Global Tel\*Link*, the Fourth Circuit outlined the key limiting principles that shape this "direct relation" concept.  68 F.4th at 910–13.  Those principles are twofold.  *Id.*  First, "RICO proximate causation is lacking when . . . there is a 'more direct victim' from whom (or intervening factor from which) the plaintiff's injuries derive . . . ."  *Id.* at 911 (quoting *Saint Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 301 (3d Cir. 2020)).  In other words, "a plaintiff can't show RICO proximate cause when the plaintiff's injuries derive from those suffered by parties more closely or directly victimized by the defendant's wrongdoing."  *Id.*  Second, RICO proximate cause proves absent "when the alleged RICO predicate violation is 'too distinct' or logically unrelated from the cause of the plaintiff's injury."  *Id.* (quoting *Saint Luke's*, 967 F.3d at 301).  This scenario arises when the alleged RICO violation enables or facilitates separate, unconnected injurious conduct, but does not itself cause the injury.  *Id.*; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006).

Across their Motions to Dismiss, Defendants offer variations of what amounts to a single proximate cause argument:  Defendants constitute mere passive investors, and because Defendants did not perform the formalities associated with issuing and collecting upon Plaintiffs' loans, they did not proximately cause Plaintiffs' injuries.  The LP Investor Defendants, for

example, assert that Plaintiffs fail to demonstrate proximate cause where Defendants "neither . . . directly issued [the] loans" nor "directly caused the Plaintiffs" to take them out.  (LP Investors MTD Mem. at 23.)  Similarly, the Signal Light Defendants argue that Plaintiffs "fail[] to connect the general allegation that Signal Light was able to purchase loan participations . . . with a plausible allegation that Signal Light *actually* purchased a participation interest in a loan made to any of the Plaintiffs, or that Signal Light actually received any portion of a loan repayment from any of the Plaintiffs."  (Signal Light MTD Mem. at 6.)  The Kellner Defendants also highlight their supposed distance from the injurious conduct, stating that they merely "invested in HYMKEN," which then "invested in Signal Light, which in turn acquired participation interests in loans made by tribal lending entities . . . , which in turn issued loans to Plaintiff[s]."  (Kellner MTD Mem. at 14.)  Finally, the Raizada Defendants take a similar approach, arguing that "there are no facts demonstrating that [the Raizada Defendants] did anything in connection with the Tribal Lending Enterprise that directly resulted in Plaintiffs paying usurious interest."  (SBV MTD Mem. at 6.)

The shortcomings in Defendants' arguments are several.  First, and most fundamentally, Plaintiffs "need not argue that each defendant individually collected the debt" to adequately allege proximate cause.  *See, e.g.*, *Duggan v. Martorello*, 596 F. Supp. 3d 158, 191 n.12 (D. Mass. 2022) (proximate cause adequately pled despite no allegation that defendant personally collected the usurious debt).  Here, Plaintiffs allege that Defendants invested capital in either NPA Limited Partnership or Signal Light "with full knowledge" that their investments would, through the TLEs, go on to fund high-interest loans.  (Am. Compl. ¶¶ 134, 138, 143, 144, 206.)  Without a doubt, the capital buttressing a lending operation proves at least as essential to that operation as the day-to-day managers who direct the issuing and collecting of loans.  *See*

36

eb

*Solomon*, 2019 WL 1320790, at *11 ("Plaintiffs would not have been subjected to the allegedly usurious loans if [the financial backers] did not incentivize the profitability of those loans."). Indeed, capital is the product that a lender sells; without access to liquid funds, a lender is no lender at all. *Gibbs I*, 368 F. Supp. 3d at 932 (noting that, "without funding, the [tribal lending] enterprise could not continue to grow its business or issue loans"). The injury sustained by one who takes out a usurious loan flows naturally and directly from the lender's access to capital, and the financier who furnishes that capital — with full knowledge that it will serve as the principal underpinning usurious loans — cannot credibly claim that the debtor's injury proves "logically unrelated" to his provision of funds. *Cf. Albert*, 68 F.4th at 911.

Second, Plaintiffs' allegations, taken as true, demonstrate that Defendants' involvement in the lending operation exceeded mere capital investment. For example, Plaintiffs allege that the LP Investor Defendants "approved many of the legal documents establishing the structure and operations of the usurious lending scheme," including the documents necessary to implement the Tribal Lending Entities' acquisition of NPA. (Am. Compl. ¶¶ 179–80.) Amit Raizada, Plaintiffs allege, "was closely involved in NPA's operations" and served as the "primary person responsible for recruiting investors" to the scheme. (Am. Compl. ¶¶ 126 , 129.) Similarly, Plaintiffs allege that Gravley, acting "on behalf of" the Signal Light and Kellner Defendants, exercised "substantial input on operational decisions," including by influencing "TLE hiring processes, . . . , establishing or modifying TLE underwriting standards, and scheduling and conducting meetings of [TLE employees]." (Am. Compl. ¶ 204–05.) Plaintiffs further allege that the Signal Light, Kellner, and LP Investor Defendants played a role in negotiating how income from the Tribe's fourth TLE, Majestic Lake, would be divvied up among those Defendants. (Am. Compl. ¶¶ 190–98.) These numerous allegations mirror those

which this Court has found sufficient to plead proximate cause in prior tribal lending cases. *See Solomon*, 2019 WL 1320790, at \*11 (proximate cause adequately plead where plaintiffs alleged that tribal lending scheme's financial backers "participated in extensive ongoing monitoring and rigorous oversight" of their investment in the tribal lender).

Finally, the cases that Defendants cite in support of dismissal involve chains of causation between the alleged RICO violation and the plaintiff's injury that prove far more attenuated than the theory of causation asserted here. In fact, these cases aptly demonstrate that Plaintiffs' claims in this suit are neither derivative of those suffered by a "more direct victim" nor logically removed from the alleged injurious conduct. *Albert*, 68 F.4th at 911.

Take first the chain of causation described in *Slay's Restoration v. Wright Nat'l Flood Ins. Co.*, which all Defendants cite in support of dismissal under the "more direct victim" theory. 884 F.3d at 491–93. There, the plaintiff-subcontractor, Slay's, agreed to help repair flood damage to a property owner's apartment complex. *Id.* at 491. Upon completion of its work, Slay's submitted supporting documentation to the property owner, who in turn presented several claims to the owner's insurer. *Id.* "To adjust the claims," the insurer retained a claims-adjusting firm, who itself hired two consulting firms to evaluate Slay's repair work. *Id.* at 491–92. Based in part on the consultants' assessment of Slay's repairs, the insurer adjusted the property-owner's claim downward, offering the property owner "less than one-half" the amount claimed. *Id.* at 491.

Slay's brought a RICO action against the insurer and its consultants, alleging that the defendants "fraudulently conspired" to reduce the property owner's claim through "false reports" of Slay's supposedly shoddy workmanship. *Id.* at 491–92. "According to Slay's," the downward adjustment prevented the property owner from fully compensating his general

38

contractor, who in turn could not reimburse Slay's for the full value of its work. *Id.* at 492. The downward adjustment, Slay's claimed, thus resulted in an over $900,000 loss. *Id.*

The Fourth Circuit found that Slay's failed to adequately allege proximate cause, as its "claimed injury was not the *direct* result of the [insurer]'s fraudulent conduct." *Id.* at 494. Rather, the court stated, Slay's "descib[ed] a chain of causation that extend[ed] significantly beyond 'the first step,' proceeding from the consulting firms' fraudulent conduct, through [the claims-adjusting firm] and [the insurer] to [the property owner], then to [the general contractor], and ultimately to Slay's . . . ." *Id.* Notwithstanding Slay's allegation that its injury "*foreseeably* resulted" from the insurer's alleged RICO violation, the Court concluded, Slay's could not adequately plead proximate cause by asserting an injury "derivative of harm suffered by a different party" — namely, the property owner itself. *Id.*

Consider, too, the theory of causation advanced in *Anza v. Ideal Steel Supply Corp.*, which both the Raizada and Kellner Defendants cite in support. 547 U.S. at 451. There, Ideal brought suit against a competitor steel retailer, alleging that the competitor violated RICO by (1) deliberately failing to collect New York sales tax and then (2) concealing that fraud through false tax returns. *Id.* at 453–55. This scheme, Ideal alleged, allowed its competitor to artificially deflate its prices while maintaining profitability, giving the competitor "a competitive advantage over Ideal." *Id.* at 455. That advantage ultimately manifested in a new store, which alongside the lower prices, Ideal alleged, "attracted [away] customers who otherwise would have purchased from Ideal." *Id.* at 461.

The Supreme Court rejected Ideal's theory of RICO proximate causation, finding that the connection between the alleged violation and supposed injury proved too "attenuated" to satisfy RICO's "directness requirement." *Id.* at 458–59. Even accepting Ideal's allegations, "[t]he

cause of Ideal's asserted harms," the Court wrote, was "a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the state)." *Id.* at 458.  The Court further emphasized that Ideal's harm — lost customers — could have arisen from any number of causes, as "[b]usinesses lose and gain customers for many reasons . . . ." *Id.* at 459.

Here, Plaintiffs' theory of causation proves distinguishable from both *Slay's* and *Anza*, as the alleged injury neither flows through a more direct victim of Defendants' scheme nor relies on injurious conduct unrelated to Defendants' alleged RICO violations.  Quite the opposite, Plaintiffs set forth numerous allegations that draw a "direct causal connection" between Defendants' participation in the usurious lending scheme and Plaintiffs' injuries.  *Nunes*, 531 F. Supp. 3d at 1013.  Plaintiffs allege that Defendants' funds, which Defendants tendered with full knowledge of their impending use in the lending scheme, were "used as the capital to make the illegal loans to consumers."  (Am. Compl. ¶¶ 16, 20, 22, 25, 26, 27, 30.)  Plaintiffs further allege that Defendants oversaw and ultimately approved, at multiple junctures, the legal and financial structure of the lending operation.  (Am. Compl. ¶¶ 20, 22, 23, 26, 27, 36, 101, 133, 204.)  These allegations demonstrate that Plaintiffs' injuries — the payment of absurd interest rates on small-dollar loans — were "expressly contemplated, and allegedly designed and specifically intended by" Defendants.  *Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 983 (N.D. Cal. 2019) ("*Brice I*").  Unlike *Slay's*, Plaintiffs' allegations make no mention of a more direct victim of the usurious lending scheme through whom Plaintiffs' injuries traveled.  And unlike *Anza*, the alleged RICO violation — the facilitation and funding of an unlawful debt collection scheme — proves directly and immediately connected to the complained-of injury, payment of illegal interest.  Plaintiffs' allegations, though stated in general terms, suffice to allege proximate cause. *See Albert*, 68 F.4th at 914 (noting that at the motion to dismiss stage of a RICO action, plaintiffs

40

"need only allege facts *plausibly supporting a reasonable inference of causation*") (emphasis added); *see also Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) ("[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."). Accordingly, the Court will deny Defendants' Motions to Dismiss (ECF Nos. 95, 98, 101, 116, 147, 149, 150) to the extent they argue that Plaintiffs fail to adequately allege proximate cause.

### 4.    Plaintiffs Adequately Allege a RICO Action under § 1962(a)

The Court now moves to consider those arguments which concern a single RICO subsection, beginning with § 1962(a). Amit Raizada, the Raizada Group, and the LP Investor Defendants — the only Defendants against whom Plaintiffs continue to assert a cause of action under § 1962(a) — identify two supposed pleading deficiencies in these claims. First, those Defendants contend that the Amended Complaint fails to allege that they participated "as . . . principal[s]" in the collection of unlawful debts. (LP Investors MTD Mem. at 16–17; Raizada MTD Mem. at 2–3; Raizada Group MTD Mem. at 2–3.) Second, those Defendants argue that the Amended Complaint fails to plead facts supporting a plausible inference that they "received income" from the scheme and subsequently "reinvested that income back into the enterprise." (LP Investors MTD Mem. at 17–18; Raizada MTD Mem. at 2–3; Raizada Group MTD Mem. at 2–3.) Both of these challenges amount to veiled factual disputes, which prove premature at the motion to dismiss stage. Because Plaintiffs' allegations support plausible § 1962(a) claims, the Court leaves these factual quibbles for another day.

In pertinent part, § 1962(a) provides:

It shall be unlawful for any person who has received any income derived, directly or indirectly, . . . through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States

> Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

*Id.* In other words, § 1962(a) "prohibits a person who has received income derived [through collection of an unlawful debt] from using the income in the operation of an enterprise engaged in commerce." *New Beckley Min. Corp. v. Int'l Union, United Mine Workers of Am.*, 18 F.3d 1161, 1165 (4th Cir. 1994). Thus, to state a claim under § 1962(a), Plaintiffs must allege that: "(1) the Defendants derived income [through the collection of an unlawful debt]; [and], (2) the income was used or invested, directly or indirectly, in the establishment or operation; (3) of an enterprise; (4) which is engaged in or the activities of which affect interstate or foreign commerce." *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union, et al.*, 633 F. Supp. 2d 214, 222 (E.D. Va. 2008) (citing *United States v. Vogt*, 910 F.2d 1184, 1193 (4th Cir. 1990)).

Defendants' first argument — that they did not participate "as . . . principal[s]" in the alleged collection of unlawful debts — attacks the sufficiency of Plaintiffs' allegations with respect to the first of above four elements. (LP Investors MTD Mem. at 16–17; Raizada MTD Mem. at 2–3; Raizada Group MTD Mem. at 2–3.) A relatively brief foray into the statute's construction, followed by a quick accounting of Plaintiffs' allegations, demonstrates that Plaintiffs' allegations in fact prove more than adequate.

Section 1962(a) makes clear that for RICO liability to attach, the person who receives income derived through the collection of an unlawful debt "must have participated as a principal in" the unlawful debt collection. *Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149, 1152 (9th Cir. 1992); *accord Genty v. Resolution Trust Corp.*, 937 F.2d 899, 908 (3d Cir. 1991). Whether a defendant constitutes a "principal" within the meaning of § 1962(a) requires reference to 18

42

U.S.C. § 2, which provides that, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). Thus, a defendant participates "as a principal" in the collection of an unlawful debt where he (1) collects the debt himself or (2) aids or abets its collection. 18 U.S.C. §§ 2, 1962(a). To be held liable under the aiding and abetting theory of liability, the defendant must take "an affirmative act in furtherance of" the collection of the unlawful debt. *Rosemond v. United States*, 572 U.S. 65, 71 (2014). Moreover, "participation as a principal requires possession of the specific intent associated with the various underlying predicate offenses." *Genty*, 937 F.2d at 908. It thus follows that to be held liable for aiding and abetting an offense under § 1962(a), "the defendant must have 'chosen, with full knowledge, to participate in the illegal scheme.'" *United States v. Odum*, 65 F.4th 714, 721 (4th Cir. 2023) (quoting *Rosemond*, 572 U.S. at 79, 81–82 (2014)).

In summation, Plaintiffs adequately allege that Defendants participated as principals in the underlying unlawful debt collection if they set forth facts supporting the reasonable inference that Defendants (1) committed an affirmative act in furtherance of the usurious lending operation and (2) "did so with the intent of facilitating" the scheme. 18 U.S.C. §§ 2, 1962(a); *Genty*, 937 F.2d at 908; *Odum*, 65 F.4th at 721. Plaintiffs have clearly levied such allegations here. First, Plaintiffs unquestionably allege that Raizada, the Raizada Group, and the LP Investor Defendants committed affirmative acts in furtherance of the usurious lending scheme. Plaintiffs allege that the LP Investor Defendants invested amounts ranging from $750,000 to $4,500,000 into the tribal lending operation "to facilitate [its] high-interest loans." (Am. Compl. ¶¶ 134, 138, 143, 144.) Plaintiffs further allege that the LP Investor Defendants approved "many of the legal documents establishing the structure and operations of the usurious lending scheme." (Am.

43

Compl. ¶ 179.)  Plaintiffs allege that the Raizada Group, which Raizada wholly owned, funded the usurious lending operation via a "significant ownership interest in NPA."  (Am. Compl. ¶¶ 34, 36.)  And Plaintiffs allege that Raizada himself recruited investors for the lending operation, participated in NPA's management and lent "administrative reporting . . . support" to NPA, among other contributions.  (Am. Compl. ¶¶ 126–32.)  All of the above suffice for allegations of affirmative acts in furtherance of the alleged unlawful debt collection.

Plaintiffs couple these allegations with corresponding allegations that Defendants specifically intended to facilitate a lending scheme premised on high-interest, usurious loans.  For example, Plaintiffs allege that each of the LP Investor Defendants invested in NPA Limited Partnership "with full knowledge" that their funds would go on to support high-interest loans.  (Am. Compl. ¶¶ 134, 138, 143, 144.)  Even if the Court were to reject these allegations as conclusory, however, Plaintiffs also allege that NPA restructured its relationship with the Habematolel Pomo Tribe — a restructuring that the LP Investor Defendants explicitly approved — in response to a legal and regulatory crackdown on usurious tribal lending.  (Am. Compl. ¶¶ 154–70 .)  This allegation gives rise to the reasonable inference that the LP Investor Defendants approved NPA's restructuring in the hope of continuing to skirt state usury laws by issuing high-interest payday loans.  (Am. Compl. ¶¶ 171–80.)  Plaintiffs further allege that both Raizada and the Raizada Group acted with intent to facilitate the usurious lending scheme.  (Am. Compl. ¶¶ 126–32.)  These allegations include a description of efforts which Raizada himself described as supportive of the scheme.  (Am. Compl. ¶ 130.)  Plaintiffs thus provide ample allegations that Defendants acted as principals in the usurious lending operation.  *Brady*, 974 F.2d at 1152.

Defendants' second argument — that they neither "received income" from the usurious

lending scheme nor "reinvested that income back into the enterprise" — takes aim at both the first and second element of a well-pled § 1962(a) claim. (LP Investors MTD Mem. at 17–18; Raizada MTD Mem. at 2–3; Raizada Group MTD Mem. at 2–3.) Defendants contend that the Amended Complaint sets forth "mere conclusory allegations" that Defendants received income from the collection of unlawful debts, as those allegations lack "specific details" concerning "how much was invested or the contours" of the investment. (LP Investors MTD Mem. at 17.) Defendants further argue that Plaintiffs' allegations of reinvestment prove definitionally flawed, as Plaintiffs' allegations strictly discuss actions taken by NPA, not by Defendants or by the NPA Limited Partnership. (LP Investors MTD Reply Mem. (ECF No. 139) at 17.) These actions, Defendants argue, are not attributable to Defendants. (*Id.*) Because these disputes present factual questions reserved for the jury, however, Defendants' arguments prove premature at this juncture. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999) (noting that "a Rule 12(b)(6) motion does not resolve contests surrounding the facts . . . .") (cleaned up).

 As it concerns the supposed dearth of allegations that Defendants "received income" from the scheme, Defendants' Motions give the Amended Complaint short shrift. Far from "conclusory allegations" of income collected, Plaintiffs allege that the LP Investor Defendants "received a fixed return of 20%" on the funds they invested in the NPA Limited Partnership, "as well as [a] fixed percentage of the revenue" generated by the lending operation. (Am. Compl. ¶¶ 134, 138, 141, 143, 144.) With respect to Raizada and the Raizada Group, the Amended Complaint alleges that Raizada, through the Raizada Group and "several different companies affiliated with him," owned a majority stake in NPA. (Am. Compl. ¶ 127.) Because NPA was a for-profit enterprise, this allegation gives rise to the reasonable — indeed, almost self-evident — inference that Raizada and the Raizada Group received income from NPA's lending operations.

*U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (noting that at the 12(b)(6) stage, the court "construe[s] facts in the light most favorable to the plaintiff, and draw[s] all reasonable inferences in his favor . . . .") (cleaned up).

Plaintiffs also sufficiently plead that Defendants reinvested in the enterprise. Here, Defendants conflate their disagreement with Plaintiffs' interpretation of the facts with a pleading deficiency. Notwithstanding Defendants arguments, Plaintiffs assert three theories of "reinvestment," and all three prove plausible at this stage. First, Plaintiffs allege that Raizada, the Raizada Group, and the LP Investor Defendants "reinvested" in the lending enterprise when NPA shifted its business model from the "Delaware Model" to the "Tribal Model," as this required capital infusions in the TLEs using funds derived from prior unlawful debt collection undertaken by the Delaware entities. (Am. Compl. ¶¶ 99–102, 302.) This theory of reinvestment proves plausible and thus adequately alleged. *Cf. Brice v. Haynes Invs., LLC.*, 548 F. Supp. 3d 882, 894 (N.D. Cal. 2021) ("*Brice II*") (holding, in RICO suit against tribal lender, that allegations that Defendant reinvested "the monies gained . . . from its 'rent-a-bank' arrangement" into "the Tribal Lending Scheme" sufficed to confer standing under § 1962(a)).

Plaintiffs next allege that Defendants reinvested in the scheme when NPA elected not to issue distributions in June and July of 2013 and instead "reinvested in the portfolio" to "increase the size of the scheme." (Am. Compl. ¶¶ 151, 303.) Though Defendants argue that "the fact that [NPA] determined not to make distributions to its investors does not equate to reinvestment by [Defendants]," (LP Investors MTD Mem. at 18), this argument takes issue with Plaintiffs' contention that Defendants "indirectly" reinvested in the lending enterprise by virtue of their interests in the NPA Limited Partnership and, by extension, NPA. (Am. Compl. ¶¶ 151–54, 303.) Because § 1962(a) makes it unlawful "for any person who has received any income

46

derived, *directly or indirectly* . . . to use or invest, *directly or indirectly*, any part of such income, or the proceeds of such income," in an enterprise, Plaintiffs' theory of reinvestment proves facially plausible. 18 U.S.C. § 1962(a) (emphasis added). Whether NPA's decision to "reinvest" in the tribal lending portfolio can indirectly be attributed to Defendants constitutes a factual question that the Court will not resolve through a Rule 12(b)(6) motion. *Brice II*, 548 F. Supp. 3d at 894; *Twombly*, 550 U.S. at 556.

Finally, Plaintiffs allege that Defendants reinvested in the lending enterprise when NPA, with Defendants' advice and consent, restructured the tribal lending scheme by merging with the TLEs and executing a $64 million promissory note for NPA's — and by extension, Defendants' — benefit. (Am. Compl. ¶¶ 36, 304.) Puzzlingly, Defendants argue that a promissory note issued in favor of LP Investor Defendants cannot amount to reinvestment. (LP Investors MTD Mem. at 18.) Yet, the Amended Complaint alleges that the Tribe received something of value in consideration for the $64 million promissory note — namely, NPA. (Am. Compl. ¶¶ 36, 175.) This alleged transaction — NPA and its assets in exchange for a $64 million promissory note — constitutes a restructuring of the scheme that could plausibly fall under the umbrella term "reinvestment," as it represents Defendants' decision to continue participating in the issuance and collection of unlawful debts through a revised organizational structure. Rather than abandon the scheme in the face of regulatory pressure, Defendants allegedly repurposed their equity investment into a debt instrument. (Am. Compl. ¶ 175.) This constitutes an affirmative decision to roll-over an investment from one legal arrangement to the next, which a factfinder could find constitutes reinvestment, i.e., a decision "to invest again or anew." *Reinvest*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/reinvest [https://perma.cc/F7J7-RLU4] (last visited June 30, 2023).

Because Plaintiffs adequately allege facts supporting all four elements of a § 1962(a) claim against Raizada, the Raizada Group, and the LP Investor Defendants, the Court will deny those Defendants' Motions to Dismiss (ECF Nos. 98, 149, 150) with respect to such claims.

### 5.    Plaintiffs Adequately Allege a RICO Action under § 1962(b)

Defendants[26] attack the sufficiency of Plaintiffs' allegations under § 1962(b) on two grounds as well.  First, Defendants argue that Plaintiffs fail to allege that Defendants acquired or maintained an interest in or control of an enterprise *through* their unlawful debt collection.  (LP Investors MTD Mem. at 5–7; Kellner MTD Mem. at 11; Signal Light MTD Mem. at 9–10; Raizada MTD Mem. at 3–4; Raizada Group MTD Mem. at 4–5.)  In other words, Defendants urge this Court to find an insufficient "nexus" between Defendants' unlawful debt collection and their de facto ownership interests in and management of the TLEs.  Second, Defendants assert that Plaintiffs fail to allege an injury caused by Defendants' acquisition of an interest in those same entities.  The only injuries alleged, Defendants argue, are those that Plaintiffs suffered by virtue of Defendants' collection on the underlying unlawful debts, injuries which by themselves prove insufficient to maintain a § 1962(b) claim.  (LP Investors MTD Mem. at 7–9; Kellner MTD Mem. at 11; Raizada MTD Mem. at 3–4; Raizada Group MTD Mem. at 4–5.)  As to the first argument, the Court finds that Plaintiffs in fact allege a nexus between Defendants' collection on Plaintiffs' high-interest debts and Defendants' ongoing, indirect interests in the TLEs.  (Am. Compl. ¶¶ 170–80; 203.)  As to the second argument, the Court finds that Defendants overstate § 1962(b)'s pleading requirements, as Plaintiffs need not allege an "acquisition injury" to maintain a RICO claim under that subsection.  *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839 (4th Cir. 1990).  For these reasons, the Court will deny Defendants'

---

[26]    With the exception of SBV, Plaintiffs assert a RICO action under § 1962(b) against all Defendants.

Motions to Dismiss with respect to Plaintiffs' § 1962(b) claims.

To state a claim under § 1962(b), Plaintiffs must allege that: "(1) the Defendants engaged in [collection of an unlawful debt]; (2) in order to acquire or maintain, directly or indirectly; (3) any interest or control over an enterprise; (4) which is engaged in, or the activities of which affect interstate or foreign commerce." *Smithfield Foods*, 633 F. Supp. 2d at 222; § 1962(b). Inherent to a plausible § 1962(b) claim is "a specific nexus" between Defendants' interest in or control of an enterprise and their alleged collection on unlawful debts. *Id.*; *Field v. GMAC LLC*, 660 F. Supp. 2d 679, 687 (E.D. Va. 2008) (quoting *Davis v. Hudgins*, 896 F. Supp. 561, 567 (E.D. Va. 1995)). To satisfy this "nexus" requirement, Plaintiffs must allege a causal link between Defendants' collection on the usurious loans and Defendants' continuing interests in the TLEs. *Field*, 660 F. Supp. 2d at 687.

The Signal Light, LP Investor and Kellner Defendants, as well as Amit Raizada and the Raizada Group, all argue that Plaintiffs' Amended Complaint fails to set forth facts that establish § 1962(b)'s "nexus" requirement. (LP Investors MTD Mem. at 5–7; Kellner MTD Mem. at 11; Signal Light MTD Mem. at 9–10; Raizada MTD Mem. at 3–4; Raizada Group MTD Mem. at 4–5.) Specifically, the LP Investor Defendants argue that, because their investments in NPA Limited Partnership predated NPA's decision to transition to the tribal lending model, "the LP Investors' investment . . . could not have resulted from the collection of the loans made by the tribal entities." (LP Investors MTD Mem. at 6.) Similarly, the Kellner Defendants argue that "[a]ll Plaintiffs have alleged in the Section 1962(b) context is that the Kellner Defendants had money — of unidentified origin — and purportedly invested that money." (Kellner MTD Reply Mem. at 11.) For their part, the Signal Light Defendants maintain that Plaintiffs' "dubious and conclusory" allegations "fail[] to plausibly show that the [Signal Light] Defendants acquired or

maintained their interests in the enterprise through prohibited means." (Signal Light MTD Reply Mem. (ECF No. 140) at 10.) The Raizada Group argues that "[w]hile Plaintiffs allege that [Raizada Group] had an interest in NPA, they do not allege that [Raizada Group] acquired or maintained that interest through the collection of an unlawful debt." (Raizada Group MTD Mem. at 4.) And finally, Amit Raizada almost identically contends that "[w]hile Plaintiffs allege that Raizada had an indirect interest in NPA, they do not allege that he acquired or maintained that interest through collection of an unlawful debt." (Raizada MTD Mem. at 3.)

Defendants' assertions notwithstanding, the Amended Complaint, read favorably, alleges a sufficient nexus between Defendants' collection of usurious debts and their interests in the TLEs to plead a § 1962(b) claim. (Am. Compl. ¶¶ 170–80, 203.) In response to Defendants' arguments, Plaintiffs point to the restructuring of both NPA's and Signal Light's legal and economic relationships with the Tribe as indicative of the nexus between Defendants' unlawful debt collection, on the one hand, and their ongoing interests in the TLEs, on the other. (Pls.' Resp. LP Investors MTD Mem. (ECF No. 126) at 8–9.) The logic of this connection proves sound, and it proceeds as follows.

Initially, Defendants' investments in the tribal lending enterprise manifested, in large part, as "participation agreements" with the Tribe, which allowed NPA (in whom the LP Investor Defendants and both Raizada and the Raizada Group invested) and Signal Light (in whom Gravley, HYMKEN, and the Kellner Defendants invested) to purchase "essentially all of the economic interests" in loans issued by the TLEs through financial instruments known as "participation interests." (Am. Compl. ¶¶ 123–25, 201.) The value of these participation interests, which entitled NPA and Signal Light to purchase up to 99% of each loan's face value, derived solely from the TLEs' issuance of and collection upon high-interest payday loans. (Am.

Compl. ¶¶ 30, 124, 201.)  Without underlying loans, the participation interests would hold no

economic value whatsoever.  (Signal Light MTD Mem. at 7 n.1.)

     Later, in the face of mounting regulatory and legal pressure, NPA and Signal Light sold

their assets — chiefly, their participation interests in the TLEs' loans — to the Tribe in exchange

for promissory notes.  (Am. Compl. ¶¶ 172–80, 203.)  Through these transactions, NPA and

Signal Light became creditors of, rather than equity investors in, the TLEs.  (Am. Compl.

¶¶ 172–80, 203.)  Despite the change in legal and economic form, however, the substance of

NPA's and Signal Light's interests in the TLEs remained the same — they "continued to receive

the vast majority of the profits from the usurious lending scheme."  (Am. Compl. ¶ 175.)

     Taken together as true, the initial equity investment and the subsequent restructuring of

that investment into a debt instrument establish a strong nexus between Defendants' unlawful

debt collection and their maintenance of an interest in an enterprise engaged in interstate

commerce.  *Cf. Gibbs  II*, 421 F. Supp. at 312 (finding a § 1962(b) claim adequately plead where

plaintiffs alleged that "[d]efendants collected revenue from the allegedly unlawful loans . . . then

reinvested [those] funds" in the lending enterprise).  For it was collection on the unlawful debts

— whose initial funding Defendants provided — that imbued NPA's and Signal Light's

participation interests with value.  (Am. Compl. ¶ 123–25, 201.)  NPA and Signal Light then sold

those participation interests to the Tribe in exchange for promissory notes.  (Am. Compl. ¶¶ 175,

203.)  This restructuring, to which Defendants allegedly granted their full imprimatur, allowed

Defendants to maintain substantive economic interests in the TLEs' lending operation while

simultaneously rejiggering their legal relationship to those entities to insulate themselves from

potential liability.  (Am. Compl. ¶ 173, 180, 204.)

     Without the collection of unlawful debts — again, made possible by funds invested by

Defendants — neither NPA nor Signal Light could have amassed value in their participation interests. And without value in their participation interests, neither NPA nor Signal Light could have sold those interests to the Tribe in exchange for promissory notes. Defendants' collection of unlawful debts thus enabled and facilitated Defendants' continued (indirect) interest in the TLEs. This constitutes a sufficient nexus between alleged unlawful debt collection, on the one hand, and maintenance of an interest in an enterprise, on the other, to satisfy § 1962(b)'s pleading requirements. *See Constellation Bank, N.A. v. C.L.A. Mgmt. Co.*, 1995 WL 42285, at *4 (S.D.N.Y. Feb. 1, 1995) ("Allegations that the acquisition or maintenance of an interest in an enterprise was obtained by arranging financing satisfies the requirements of section 1962(b)."). Accordingly, the Court will not dismiss Plaintiffs' § 1962(b) claims for lack of sufficient "nexus" between predicate act and continued interest in an enterprise.

Whereas Defendants' "nexus" argument fails because Plaintiffs in fact satisfy the supposedly unmet pleading requirement, Defendants' second argument — that Plaintiffs neglect to allege an "acquisition injury" — falls short because Defendants seek to impose a pleading requirement that this Court finds inapplicable altogether. The Fourth Circuit has yet to demand that a civil RICO plaintiff allege an "acquisition injury" to maintain a claim under § 1962(b). What's more, the Fourth Circuit has explicitly rejected an analogous "investment injury" pleading requirement for RICO claims brought under § 1962(a). *Busby*, 896 F.2d at 839. Because the Court finds that the Fourth Circuit's logic in *Busby* applies with equal force to claims brought pursuant to § 1962(b), and because Defendants provide no compelling reason to stray from the *Busby* Court's reasoning, the Court holds that Defendants' proposed "acquisition injury" requirement overstates § 1962(b)'s pleading standard. *Id.* The Court therefore shall not enforce it against Plaintiffs here.

The "acquisition injury" rule stems from the same statutory language giving rise to the RICO statute's proximate cause requirement, § 1964(c). The bulk of the Nation's circuit courts interpret that subsection — which bestows a private right of action on "[a]ny person injured in his business or property *by reason of* a violation of section 1962" — as requiring that a plaintiff who sues for a violation of § 1962(b) allege injury not only from the underlying predicate acts of racketeering or unlawful debt collection, but also from the defendant's acquisition or maintenance of an interest in an enterprise. *See, e.g.*, *D'Addario v. D'Addario*, 901 F.3d 80, 97 (2d Cir. 2018) ("To successfully plead a RICO claim under § 1962(b), a plaintiff must indeed allege distinct damages arising from the acquisition or maintenance of control of the enterprise."). Here, application of the "acquisition injury" rule would require that Plaintiffs allege an injury caused not by Defendants' collection of unlawful debts, but rather by Defendants' acquisition or maintenance of an interest in the TLEs. *Id.*

Raizada, the Raizada Group, and the LP Investor Defendants invoke the "acquisition injury" rule in support of their Motions to Dismiss, arguing that Plaintiffs fail to allege an injury caused by Defendants' acquisition or maintenance of an interest in or control of the TLEs. (LP Investors MTD Mem. at 7–9; Raizada MTD Mem. at 3–4; Raizada Group MTD Mem. at 4–5.) Though the Fourth Circuit has not expressly adopted the doctrine, Defendants correctly point out that at least two district courts within the Circuit, including a court in this District, have previously applied the "acquisition injury" rule to dismiss § 1962(b) claims as inadequately pled. *See In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 597 (E.D. Va. 2009) (dismissing § 1962(b) claim for want of an "acquisition injury"); *In re Am. Honda Motor Co., Inc. Dealerships Rels. Litig.*, 941 F. Supp. 528, 550 (D. Md. 1996) (same). Defendants further point out, and the Court's own research confirms, that the majority of the Fourth Circuit's sister

circuits have adopted the "acquisition injury" rule when presented with the opportunity. *See D'Addario*, 901 F.3d at 97 (citing Jed S. Rakoff and Howard W. Goldstein, *RICO: Civil and Criminal Law and Strategy*, § 3.03[2], 28–29, n.23 (2011) (observing that, as of 2011, all but the Fourth and Eighth Circuits require plaintiffs alleging a section 1962(b) violation to identify an "acquisition or maintenance" injury)).

Plaintiffs counter Defendants' show of precedential force by drawing the Court's attention to *Busby v. Crown Supply, Inc.*, wherein the Fourth Circuit rejected the closely analogous "investment injury" rule in the context of a § 1962(a) civil RICO claim. 896 F.2d at 835. There, plaintiff John Busby ("Busby"), a salesman, brough suit against his former employer, Crown Supply ("Crown"), alleging that Crown executives wrongfully withheld sales commissions from him and his fellow salespersons by falsely representing the company's cost of goods sold. *Id.* The district court dismissed Busby's § 1962(a) claim, finding it inadequately pled where Busby's alleged injury flowed from the executives' fraudulent scheme, not from their investment or use of the income that the scheme generated. *Id.* at 836. The Fourth Circuit reversed and, in so doing, rejected the "investment injury" rule as without basis in either RICO's text or the Supreme Court's caselaw interpreting the statute. *Id.* at 836–40. Acknowledging that its decision ran contrary to many of its sister circuits, the panel proffered three principal reasons for its refusal to apply the rule. *Id.*

First, the court found little support for the "investment injury" rule in the RICO statute's text. *Id.* at 837–38. "Nothing in [§ 1964(c)'s] 'by reason of' language," the court wrote, "limits the compensable racketeering injuries to those sustained . . . *after* the investment and/or use of the [racketeering] income." *Id.* at 837. Though true that "individuals may be injured by the investment and use of the illegally obtained income," the court observed, "this is not the only

54

injury that plaintiffs sustain 'by reason of' a § 1962(a) violation." *Id.* Indeed, operation of the

RICO enterprise itself could and often did injure a § 1962(a) plaintiff. *Id.* Given "the broadly

drafted . . . language in § 1964(c)," the court reasoned, individuals and entities injured "in the

process of" a § 1962(a) violation could recover for such injuries under the statute's express

terms, "despite the fact that one element of the violation, the use of the proceeds, may not have

contributed to or caused the injury." *Id.*

The court next noted that application of the "investment injury" rule would "conflict[]

with the explicit policy that RICO be liberally interpreted," *id.*, which is codified in the statute's

liberal construction clause. Organized Crime Control Act of 1970, Pub. L. 91–452, § 904(a), 84

Stat. 947. Though "Congress explicitly intended for RICO to cover corporations engaged in

racketeering activity," the court observed, the investment injury rule would "eviscerate[]"

corporate liability under RICO, "as it is virtually impossible to prove that the invested income

caused the alleged injury." *Busby*, 896 F.2d at 838–39. Combined with preexisting judicially-

imposed limits on § 1962(c) claims against corporations — specifically, the "person/enterprise"

rule, *see infra* — such a dramatic narrowing of RICO's applicability cut directly against the

statute's purportedly broad scope, contravening Congress' intent. *Id.* If the statute proved

overbroad, the court concluded, the onus to correct that error "lies with Congress . . . not . . .

judicially-imposed statutory limitations." *Id.* at 839.

Finally, the Fourth Circuit found that the Supreme Court's decision in *Sedima, S.P.R.L. v.*

*Imrex Co.*, 473 U.S. 479 (1985), counseled against application of an "investment injury" rule.

*Id.* There, the Supreme Court rejected the defendant's contention that the plaintiff's § 1962(c)

action must fail where the plaintiff neglected to allege a "racketeering injury" separate and apart

from injuries it suffered by virtue of the underlying RICO predicate acts. 473 U.S. at 495. In

reversing the decision below, the Supreme Court stated that:

> we perceive no distinct "racketeering injury" requirement.  Given that 'racketeering activity' consists of no more and no less than commission of a predicate act, § 1961(1), we are initially doubtful about a requirement of a "racketeering injury" separate from the harm of the predicate acts.  A reading of the statute belies any such requirement.  Section 1964(c) authorizes a private suit by "[a]ny person injured in his business or property by reason of a violation of § 1962."  Section 1962 in turn makes it unlawful for "any person" — not just mobsters — to use money derived from a pattern of racketeering activity to invest in an enterprise, to acquire control of an enterprise through a pattern of racketeering activity, or to conduct an enterprise through a pattern of racketeering activity.  §§ 1962(a)–(c).  If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c).  There is no room in the statutory language for an additional, amorphous 'racketeering injury' requirement.

*Id.*  Though *Sedima* concerned a civil RICO action pursuant to § 1962(c), the *Busby* panel found that the Supreme Court's reasoning applied with equal force to Busby's § 1962(a) claim, as it was "clear that the [*Sedima*] Court was referring to § 1962 as a whole . . . ."  896 F.2d at 839.  Thus, the court noted, "a similarly unfounded 'investment injury' rule has no place" in RICO actions brought pursuant to § 1962(a).  *Id.*

The Fourth Circuit's reasoning in *Busby*, a decision it has since reaffirmed,[27] applies with equal force to Plaintiffs' § 1962(b) claims here.  *Id.* at 836–40.  First, for the same reasons that § 1964(c)'s "by reason of" text imposes no "investment injury" requirement on § 1962(a) plaintiffs, it imposes no "acquisition or maintenance" injury requirement on § 1962(b) plaintiffs.  *Id.*  Recall that to allege a violation of § 1962(b), Plaintiffs must show that:  "(1) the Defendants engaged in [collection of an unlawful debt]; (2) in order to acquire or maintain, directly or indirectly; (3) any interest or control over an enterprise; (4) which is engaged in, or the activities

---

[27]    The Fourth Circuit reaffirmed *Busby*'s holding in *Potomac Elec. Power Co.*, 262 F.3d at 268, where it stated that "[i]n this Circuit, a [§ 1962(a)] plaintiff need not show that [his] damages flowed from the use or investment of the racketeering income, only that [those] damages flowed from racketeering activity itself."  *Id.* at 264 n.2.

of which affect interstate or foreign commerce." *Smithfield Foods*, 633 F. Supp. 2d at 222. While it is conceivable that Defendants' acquisition or maintenance of an interest in the TLEs could injure Plaintiffs, nothing in § 1964(c)'s requirement that Plaintiffs' injury occur "by reason of" Defendants' § 1962(b) violation necessitates that Plaintiffs' injury arise from Defendants' satisfaction of any one particular element of that violation. In other words, Plaintiffs' injury occurred "by reason of" Defendants' § 1962(b) violation whether that injury flowed from satisfaction of the first element (unlawful debt collection) or satisfaction of the second and third elements (acquisition or maintenance of an interest in or control of an enterprise). Thus, § 1964(c)'s text provides insufficient basis for this Court to impose an "acquisition injury" pleading requirement. *Busby*, 896 F.2d at 837–38.

Further, as in *Busby*, the RICO statute's liberal construction clause cuts against imposing a pleading requirement that would materially narrow the statute's applicability, particularly where that pleading requirement amounts to a judicially-imposed, rather than textually-mandated, burden. As the *Busby* Court observed, the Supreme Court has oft-cited the liberal construction clause to "support broad applications of the RICO statute . . . ." *Id.* at 838. Here, mandating a "acquisition or maintenance injury" would foreclose a § 1962(b) cause of action from a set of plaintiffs who plainly allege facts sufficient to establish all four elements of such a claim. *Smithfield Foods*, 633 F. Supp. 2d at 222. If Congress intended to limit standing in § 1962(b) claims to shareholders in legitimate businesses whose interests are usurped by mobsters, such intent finds no source in the text of the statute. *Busby*, 896 F.2d at 837–38. And on the other side of the ledger sits both the statute's explicit policy of liberal construction and the Supreme Court's tendency to interpret the statute's remedial provisions broadly. *Id.* at 838–39. In keeping with the Fourth Circuit's reasoning in *Busby*, the Court here follows Plaintiffs'

preferred construction, which falls most in line with the RICO statute's "explicit policy" of liberal interpretation. *Id.*

Finally, the Court finds that the Fourth Circuit's understanding of the *Sedima* decision proves compelling, and the Court therefore extends *Sedima*'s logic to § 1962(b). Though the *Sedima* court addressed the pleading standard required to maintain a § 1962(c) claim, the Supreme Court's reasoning drew no distinction between the application of § 1964(c)'s "by reason of" language to § 1962(c) claims, on the one hand, and claims under Sections 1962(a) and (b), on the other. 473 U.S. at 495. Indeed, the Supreme Court's reasoning belies Defendants' preferred interpretation, as the Court stated that "[i]f the defendant engages in a pattern of racketeering activity in a manner forbidden by *these provisions*, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)." *Id.* Though its sister circuits have at times criticized the Fourth Circuit's interpretation of *Sedima*, this District Court stands in no position to do the same. *See Sadighi v. Daghighfekr*, 36 F. Supp. 2d 279, 289 n.9 (D.S.C. 1999) (noting that despite criticism of the decision in other courts, district courts in the Fourth Circuit must follow the *Busby* precedent). The Court therefore holds that Plaintiffs need not allege an "acquisition injury" to plead a RICO claim brought under § 1962(b).[28]

For the reasons stated above, the Court finds that both of Defendants' arguments under

---

[28]    Though at least two courts in the Fourth Circuit have applied the "acquisition injury" rule to dismiss RICO actions under § 1962(b), this Court finds that Plaintiffs' reading of the *Busby* opinion proves more persuasive than those courts' invocations of contradictory precedent from outside the Fourth Circuit. To be sure, the *Busby* Court's observation that *Sedima*'s holding applies to "§ 1962 as a whole" was not wholly necessary to resolve that suit. 896 F.2d at 839. Nonetheless, "as a general principle, a federal district court is required to give great weight to the pronouncements of its Court of Appeals, even though those pronouncements appear by way of dictum." *Branch v. Coca-Cola Bottling Co. Consol.*, 83 F. Supp. 2d 631, 634–35 (D.S.C. 2000) (cleaned up). Here, the *Busby* Court's reading of the *Sedima* holding proves eminently reasonable, and the Court chooses to follow it as compelling, albeit nonbinding, precedent.

§ 1962(b) prove meritless.  Accordingly, Plaintiffs' § 1962(b) claims shall proceed forward.

### 6.    Plaintiffs Adequately Allege a RICO Action under § 1962(c)

Broadly speaking, each group of Defendants attacks the viability of Plaintiffs' § 1962(c)

claims on identical grounds.  Defendants all contend that the Amended Complaint fails to allege

that their participation in the tribal lending enterprise rose to the level of operational or

managerial control required to impose liability under § 1962(c).  (LP Investors MTD Mem. at 9–

15; Signal Light MTD Mem. at 12–14; Kellner MTD Mem. at 12–14; SBV MTD Mem. at 4–5;

Raizada MTD Mem. at 4–6; Raizada Group MTD Mem. at 5–6.)  Rather, Defendants argue,

Plaintiffs' allegations merely establish that Defendants undertook actions typical of "the day-to-

day activities of passive investors."  (LP Investors MTD Mem. at 10.)  Because the Court finds

that the Amended Complaint plausibly alleges that each Defendant participated "in the operation

or management of the enterprise itself," however, the Court rejects these challenges as meritless.

*Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

In pertinent part, § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate or foreign commerce, to
> conduct or participate, directly or indirectly, in the conduct of such enterprise's
> affairs through . . . collection of unlawful debt.

*Id.*  Thus, to state a claim under § 1962(c), Plaintiffs must allege that Defendants:  "(1)

conducted [or participated in] the affairs of an enterprise (2) through the collection of unlawful

debt (3) while employed by or associated with (4) the 'enterprise engaged in, or the activities of

which affect, interstate or foreign commerce.'"  *Gibbs II*, 421 F. Supp. 3d at 312.  Defendants'

arguments almost exclusively speak to the first element.[29]

---

[29]    The Signal Light Defendants briefly argue that Plaintiffs fail to allege the second element
of the prima facie § 1962(c) claim.  (Signal Light MTD Reply Mem. at 10–11.)  As discussed
*infra*, this argument lacks merit.

"'To conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs under RICO[,] one must participate in the operation or management of the enterprise itself.'" *Solomon*, 2019 WL 1320790, at *10 (quoting *Reves*, 507 U.S. at 185). In other words, "participation" in a RICO enterprise requires "some part" in directing the enterprise's affairs. *Reves*, 507 U.S. at 179. Be that as it may, § 1962(c)'s participation requirement does not limit RICO liability "to those with primary responsibility for the enterprise's affairs." *Id.* Far from cabining RICO liability to "upper management," § 1962(c)'s reach extends to both (1) "lower rung participants in the enterprise" who act at the behest of upper management and (2) those persons "'associated with' the enterprise *who exert control over it.*" *Id.* at 184 (emphasis added).

With respect to investors and lenders specifically, "[t]he normal incidents of a borrower-lender relationship, including monitoring, protection and disposition of collateral, do not amount to control" under RICO. *NCNB Nat. Bank of N. Carolina v. Tiller*, 814 F.2d 931, 936 (4th Cir. 1987). However, "allegations of fraudulent or illegal activity by involved entities do not constitute 'normal business affairs.'" *In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879 (D. Colo. 2020); *see also Brice I*, 372 F. Supp. 3d at 985 (finding § 1962(c) claims adequately pled where the plaintiffs alleged that the defendants "were instrumental in setting up, and knowingly set up, an enterprise whose sole purpose was to collect illegal debts, thereby causing those acts to occur and reaping the benefits therefrom"); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 844 (D. Md. 2013) ("[U]nlawful acts are not conducted in the ordinary course of business."). Indeed, in *Solomon*, another RICO suit against tribal lenders, this Court found § 1962(c)'s "operation or management" element met where the defendant investors in the scheme "associated with each other and nonparties for the common purpose of *exploiting the sovereignty of the Tribe to engage in the practice of issuing usurious loans.*" 2019 WL 1320790,

at *7 (emphasis added).  As relevant to the instant suit, plaintiffs in a § 1962(c) RICO action adequately allege the "control or direction" element of their claim where they set forth facts "from which a reasonable juror could determine that the whole purpose of the [e]nterprise (and the primary if not sole purpose of [Defendants' involvement]) was to create, fund, run, and profit from the making of the usurious loans through" a tribal lending scheme. *Brice II*, 548 F. Supp. 3d at 896.

Accepting Plaintiffs' allegations against each group of Defendants as true, the Amended Complaint sets forth sufficient facts to demonstrate that Defendants exerted a degree of control over the tribal lending enterprise sufficient to satisfy *Reves'* "operation or management" test. 507 U.S. at 184.  In taking up the allegations against each group of Defendants in turn, the Court therefore concludes that Plaintiffs § 1962(c) claims will proceed forward from this juncture.

Plaintiffs' relevant allegations against the LP Investor Defendants consist of the following:

> [The LP Investor Defendants]:  (1) were involved and participated in the initial structure of the scheme, including the plan to continue the lending through Native American tribes, Am. Compl. ¶ 19, 22, 101; (2) needed to and approved many of the legal documents establishing the structure and operations of the lending scheme, Am. Compl. ¶ 179; (3) extensively monitored the lending scheme, including through "quarterly updates" related to the portfolios, including information related to their operations, Am. Compl. ¶ 145;10 (4) were entitled to vote on the restructure, including an opportunity to relinquish their ownership interest in NPA and the loans, Am. Compl. ¶ 180; (5) were part of the agreement to allow for the creation of the fourth portfolio, Am. Compl. ¶ 198; and (6) retained significant control over the scheme, including the ability to prevent the tribe from engaging in any other lending, Am. Compl. ¶ 193.

(Pl.'s Resp. LP Investors MTD at 19) (footnote omitted).  These allegations readily demonstrate a degree of control over the tribal lending enterprise that suffices for § 1962(c)'s pleading requirements. *Reves*, 507 U.S. at 184; *Brice II*, 548 F. Supp. 3d at 896.  Accordingly, Plaintiffs' § 1962(c) suit shall proceed against the LP Investor Defendants.

Plaintiffs' allegations against both the Signal Light and Kellner Defendants prove similar and thus are similarly adequate to state a RICO claim under § 1962(c).  Plaintiffs plausibly allege that the Signal Light and Kellner Defendants, through Gravley's actions on their behalf, enjoyed "substantial input" in the tribal lending scheme's "operational decisions."  (Am. Compl. ¶ 204.) This operational oversight allegedly extended to "daily TLE operations, such as making or significantly influencing TLE hiring processes and decisions, changing or implementing TLE operational processes and procedures, establishing or modifying TLE underwriting standards and scheduling and conducting meetings of the employees of the TLE."  (Am. Compl. ¶ 205.) Moreover, Plaintiffs allege that Gravley formed both Signal Light (the entity that partnered directly with the Habematolel Tribe) and HYMKEN (the entity in which the Kellner Defendants directly invested with the alleged intention that the funds would be used for usurious loans) for the express purpose of "create[ing], develop[ing], and invest[ing] in a usurious lending portfolio."  (Am. Compl. ¶¶ 181–88.)  Thus, to the extent the Kellner and Signal Light Defendants argue that they constitute mere "passive investors," (Kellner MTD Mem. at 14), whose participation in the scheme amounted to nothing more that "the provision of financial instruments through arm's-length commercial terms," (Signal Light MTD Mem. at 13), such protestations fall flat, as participation in an enterprise whose "primary if not sole purpose . . . was to create, fund, run, and profit from the making of the usurious loans" runs inconsistent with the ordinary, day-to-day activities of a quotidian investing or lending entity. *Brice II*, 548 F. Supp. 3d at 896.  Additionally, to the extent the Kellner and Signal Light Defendants challenge the veracity of Plaintiffs' factual allegations, (Kellner MTD Reply Mem. at 14–15; Signal Light MTD Mem. at 13), such factual disputes are more properly reserved for trial. *Nat'l Org. for Women*, 510 U.S. at 256 ("[Petitioner's] complaint must be sustained if relief could be granted

'under any set of facts that could be proved consistent with the allegations.'"); *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 455 (E.D. Va. 2015) (noting that courts must analyze 12(b)(6) motions "without resolving factual disputes").

The Signal Light Defendants also argue that Plaintiffs' § 1962(c) claims against them must fail, because Plaintiffs neglect to allege that Defendants "participated in the enterprise *through* prohibited acts." (Signal Light MTD Reply Mem. at 10.) Put differently, the Signal Light Defendants contend that Plaintiffs' § 1962(c) claims suffer from the same want of a "nexus" between Defendants' collection of unlawful debts and Defendants' violation of § 1962 that supposedly plagued Plaintiffs § 1962(b) claims. (*Id.*) Section 1962(c)'s nexus requirement presents a low bar, however, as Plaintiffs need only allege that "the affairs of the charged enterprise were conducted through . . . collection of unlawful debt." *United States v. Mandel*, 591 F.2d 1347, 1376 (4th Cir. 1979); *see also Mylan Lab'ys, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1081 (D. Md. 1991) (finding nexus requirement under § 1962(c) satisfied where "the defendant is associated with the enterprise and the [predicate act] is related to the activities of the enterprise") (quoting *Gussin v. Shockey*, 725 F. Supp. 271, 277 (D.Md.1989)). Plaintiffs readily satisfy that pleading requirement here, as Plaintiffs repeatedly allege that the fundamental, motivating purpose of the tribal lending enterprise, which it accomplished when lending to Plaintiffs, was the issuance of and collection upon usurious loans. (Am. Compl. ¶¶ 208–30, 264, 280, 298, 318, 320.)[30]

---

[30]    The Signal Light Defendants' further contend that Plaintiffs' § 1962(c) claims against them must fail, because Plaintiffs do not allege that the Signal Defendants "personally engaged in prohibited acts (the collection of unlawful debts)." (Signal Light MTD Reply Mem. at 10–11.) As this Court and others have repeatedly observed in past RICO actions premised on the collection of unlawful debts, "[a] plaintiff suing under RICO need not argue that each defendant individually collected the debt" to satisfy his pleading burden under § 1962(a)–(c). *Gibbs I*, 368 F. Supp. 3d at 930 n.53; *Gibbs II*, 421 F. Supp. 3d at 310 n.67.

Finally, Plaintiffs' allegations against the Raizada Defendants also suffice to state a

§ 1962(c) claim.  At times leaning on Raizada's own description of his conduct, Plaintiffs allege

that Raizada, both in his personal capacity and in his role as principal manager and owner of

SBV, exerted operational control over the tribal lending enterprise's affairs by:

> (1) raising capital for loans made through the tribe . . . ; (2) obtaining "a $30,000
> expense account per month" to facilitate the scheme; (3) raising "$4M for a new,
> very profitable portfolio structure" involving the tribe; (4) raising an additional
> "$15M for a new, very profitable portfolio structure" involving the tribe; (5)
> giving NPA "20,000 leads for free," which were used to solicit borrowers for
> loans; (6) [providing] administrative reporting and financial support from SBV's
> employees, including Raizada; and (7) helping build the team who managed and
> oversaw the payday lending scheme.

(Am. Compl. ¶ 130) (quoting Am. Compl. Ex. 6 at JL000101-102).  Plaintiffs further allege that

Raizada occupied a seat on NPA's management board from 2012 to 2013 — a period

encompassing "the negotiation and implementation of the tribal lending partnership."  (Am.

Compl. ¶ 126.)  Plaintiffs allege that SBV (1) successfully spearheaded NPA's efforts to recruit

investors for the scheme in exchange for a five percent finder's fee and (2) received fees for

operational "activities performed on behalf of NPA."  (Am. Compl. ¶¶ 35, 97, 130.)  Finally,

Plaintiffs allege that the Raizada Group, which Raizada wholly owned, "knowingly aided" the

usurious lending scheme both before and after Raizada's removal from NPA management.  (Am.

Compl. ¶¶ 36, 132.)  These allegations adequately state a RICO claim pursuant to § 1962(c).

Because the Court finds that Plaintiffs sufficiently allege RICO actions pursuant to

§ 1962(c) against all Defendants, the Court will deny Defendants' Motions to Dismiss (ECF Nos.

95, 98, 101, 116, 147, 149, 150) to the extent they seek dismissal of those claims.

### 7.      Plaintiffs Adequately Allege a RICO Action under § 1962(d)

Defendants' arguments in support of dismissal of Plaintiffs' RICO conspiracy claims

merit only brief discussion, as all three plainly lack merit.  Section 1962(d) makes it unlawful

"for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).  Under RICO, "liability only attaches to 'the knowing agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute.'" *Solomon*, 2019 WL 1320790, at *11 (quoting *United State v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012)).  "Accordingly, to prove a RICO conspiracy, two things must be established: '(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense.'" *Id.* (quoting *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998)).  Proof of such an agreement "may be established solely by circumstantial evidence." *Id.* (citations omitted).

Defendants proffer three arguments in support of dismissal.  First, Defendants contend that Plaintiffs' RICO conspiracy claims fail where Plaintiffs substantive RICO claims under Sections 1962(a) through (c) prove "meritless." (LP Investors MTD Mem. at 18; Signal Light MTD Mem. at 14; Kellner MTD Mem. at 18; SBV MTD Mem. at 6: Raizada MTD Mem. at 6; Raizada Group MTD Mem. at 6.)  Second, the LP Investor Defendants assert that Plaintiffs' RICO conspiracy claims against them fail under the intracorporate immunity doctrine, as "[t]he [Amended Complaint] remains bereft of any allegations of an agreement among the LP Investors independent from the NPA Investors Limited Partnership Agreement itself." (LP Investors MTD Mem. at 19.)  Third and finally, Defendants argue that Plaintiffs fail to sufficiently allege an agreement among Defendants to further the conspiracy's overall objective, as opposed to an agreement to simply make and collect usurious debts. (LP Investors MTD Mem. at 20–21; Signal Light MTD Mem. at 14–15; Kellner MTD Mem. at 17–18; SBV MTD Mem. at 6–7; Raizada MTD Mem. at 6; Raizada Group MTD Mem. at 6.)

Assuming, without deciding, the legal veracity of Defendants' contention that "Plaintiff's

RICO conspiracy claims are tethered to the substantive RICO violations they allege under

§§ 1962(a), (b), and (c)," Defendants' argument that Plaintiffs' § 1962(d) claims fail for lack of

an adequately-pled RICO violation under one of those three subsections nevertheless fails,

because, as discussed *supra*, this Court in fact finds that Plaintiffs' claims under § 1962(a)–(c) all

stand adequately alleged.  The essential premise of Defendants' first argument thus proves

invalid, and the Court need address that argument no further.

Moving to Defendants' second argument, which only the LP Investor Defendants assert,

the Court finds that application of the intracorporate immunity doctrine here would make little

sense.  Under the intracorporate immunity doctrine, "a conspiracy between a corporation and its

agents, acting within the scope of employment, is a legal impossibility." *Marmott v. Md. Lumber

Co.*, 807 F.2d 1180, 1184 (4th Cir.1986).  This conclusion follows from the twofold premise that

"[a] parent and its wholly owned subsidiary have a complete unity of interest," and thus, their

"coordinated activity . . . must be viewed as that of a single enterprise." *Copperweld Corp. v.

Indep. Tube Corp.*, 467 U.S. 752, 771 (1984).  Whether the intracorporate immunity doctrine

applies to civil RICO claims under § 1962(d) remains an open question in the Fourth Circuit.

*See Mitchell Tracey*, 935 F. Supp. 2d at 846 (citing *Walters v. McMahen*, 795 F. Supp. 2d 350,

358–59 (D. Md. 2011) (noting that the Fourth Circuit has yet to pass on the applicability of the

intracorporate immunity doctrine in § 1962(d) actions)).

Again assuming, without deciding, that the intracorporate immunity doctrine applies to

RICO claims under § 1962(d), Defendants' argument nonetheless fails for want of a plausible

premise. *Am. Honda Motor Co.*, 958 F. Supp. at 1056.  Puzzlingly, the LP Investor Defendants

contend that Plaintiffs fail to allege an agreement "independent from the NPA Investors Limited

Partnership Agreement itself."  (LP Investors MTD Mem. at 19.)  Yet the Amended Complaint

unequivocally belies this assertion, as Plaintiffs allege a conspiracy that reaches far beyond NPA and its affiliated entities. (*See generally* Am. Compl.) Plaintiffs allege a conspiracy involving not just NPA and its investors, but also the Tribe, Asner, Landy, SBV, and the Signal Light and Kellner Defendants, among others. (*Id.*) If Plaintiffs had merely alleged that the LP Investor Defendants conspired with the NPA Limited Partnership or NPA, Defendants' argument "*might have merit.*" *Am. Honda Motor Co.*, 958 F. Supp. at 1056 (emphasis added). Such is not, however, the state of affairs as alleged. The LP Investor Defendants' reliance on the intracorporate immunity doctrine therefore fails. *Id.*

Finally, Defendants' assertion that Plaintiffs have not alleged an agreement to further an endeavor constituting a substantive RICO offense runs contrary to the allegations on the face of the Amended Complaint. (Am. Compl. ¶¶ 37–207.) Plaintiffs set forth detailed and thorough allegations related to Defendants' respective roles in the unlawful tribal lending operation at the center of the RICO claims. (*Id.*) The Amended Complaint describes, at length, the formation of the de facto enterprise, negotiations between co-conspirators, shared decisions to modify the enterprise's legal and economic relationship with the Tribe, coordinated responses to regulatory pressures, and the sharing of resources across multiple co-conspirators. (*Id.*) Because these allegations sufficiently allege a RICO conspiracy under § 1962(d), the Court will deny Defendants' Motions to Dismiss the § 1962(d) claims. *See Gibbs I*, 368 F. Supp. 3d at 933 (finding § 1962(d) claim adequately pled where Plaintiffs "describe[d] the formation of the so-called enterprise, detailed negotiations between co-conspirators, and the development and growth of the Tribal lending businesses over time, including subsequent related agreements").

**D.    Plaintiffs' State Law Claims Survive the Rule 12(b)(6) Motions to Dismiss**

Plaintiffs plead two state law causes of action against all Defendants: Unjust Enrichment

(Count Five) and Common Law Civil Conspiracy (Count Six).  (Am. Compl. ¶¶ 323–52.)

Defendants attack both of these claims as insufficiently pled.  As to the former cause of action,

Defendants contend that (1) Plaintiffs fail to allege that they conferred a benefit on Defendants

and (2) Plaintiffs fail to allege that Defendants proximately caused Plaintiffs' injuries.  (LP

Investors MTD Mem. at 24–26; Signal Light MTD Mem. at 15; Kellner MTD Mem. at 18–19;

SBV MTD Mem. at 7; Raizada MTD Mem. at 7; Raizada Group MTD Mem. at 7.)  As to the

latter cause of action, Defendants assert that, like Plaintiffs' RICO conspiracy claims, Plaintiffs

common law conspiracy claims fail under the intracorporate immunity doctrine.  Moreover,

Defendants argue, Plaintiffs fail to allege a specific agreement to accomplish an underlying

unlawful act as the object of the conspiracy.  (LP Investors MTD Mem. at 23–24; Signal Light

MTD Mem. at 15; Kellner MTD Mem. at 18–19; SBV MTD Mem. at 7; Raizada MTD Mem. at

7; Raizada Group MTD Mem. at 7.)  Because the Court finds that Plaintiffs in fact plead

sufficient factual material to make out claims for both unjust enrichment and common law

conspiracy, the Court will deny Defendants' 12(b)(6) motions with respect to Plaintiffs' state law

claims.

### 1.    Plaintiffs Adequately Plead a Claim for Unjust Enrichment

Unjust enrichment "rests upon the doctrine that a man shall not be allowed to enrich

himself unjustly at the expense of another." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144,

165 (4th Cir. 2012) (quoting *Kern v. Freed*, 299 S.E.2d 363, 365 (Va. 1983)).  To state a claim

for unjust enrichment under Virginia law, a plaintiff must allege that: "(1) she conferred a

benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have

expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without

paying for its value." *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008)

(cleaned up).  The Court finds that, here, Plaintiffs state a plausible claim for relief under these

elements against all Defendants.

Defendants first argue that Plaintiffs, in repaying their loans, "conferred a benefit only to the tribal entities, the collectors of the loans." (LP Investors MTD Mem. at 25.)[31] Thus, "Plaintiffs can allege no set of facts establishing that they conferred a benefit on [Defendants]." (*Id.*) To that point, Defendants contend that the instant case proves analogous to *Hyundai Emigration Corporation v. Empower-Visa, Inc.*, in which a court in this District dismissed the plaintiff's unjust enrichment claim against a defendant, because the plaintiff "fail[ed] to allege that it paid [the defendant] directly or that [the defendant] received any portion of the payments [that the plaintiff] made to Empower." 2009 WL 10687986, at *7 (E.D. Va. June 17, 2009). Defendants further invite comparison to *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565 (E.D. Va. 2004), wherein the plaintiff technology firm brought an unjust enrichment claim against its competitor after the competitor obtained a government contract by misappropriating the plaintiff's trade secrets. *Id.* at 569. There, the court deemed the unjust enrichment claim insufficiently pled where the plaintiff, who sought to recover funds that the defendant received from the government, could not "demonstrate that he had a preexisting right" to "monies received by the defendant from a third party." *Id* at 576.

---

[31]      Though the Court quotes only the LP Investor Defendants' Memorandum in Support, it underscores that the Signal Light and Kellner Defendants explicitly incorporate the arguments made in that memorandum in their own pleadings. (Signal Light MTD Mem. at 15; Kellner MTD Mem. at 18.) The Kellner Defendants make no effort to meaningfully expand upon those arguments, while the Signal Light Defendants add to them only by pointing out that the Signal Light Defendants did not invest in NPA. (Signal Light MTD Reply Mem. at 16–17; Kellner MTD Mem. at 18.) Moreover, the Raizada Defendants all contend that Plaintiffs' unjust enrichment claims fail because "[SBV/Raizada/Raizada Group] did not received [sic] proceeds from Plaintiffs' loans." (SBV MTD Mem. at 7; Raizada MTD Mem. at 7; Raizada Group MTD Mem. at 7.) Thus, the Raizada Defendants similarly add nothing substantive to the LP Investor Defendants' arguments. Given the foregoing, and because the substantive allegations in the Amended Complaint provide a basis for doing so, the Court treats all Defendants together in discussing Plaintiffs' unjust enrichment claims. Because SBV's argument carries some water, however, the Court will briefly discuss Plaintiffs' allegations against SBV separately.

Both of these cases prove distinguishable, and Defendants' argument therefore fails. Unlike *Hyundai*, Plaintiffs here allege that Defendants received a substantial portion of the monies that Plaintiffs paid to the TLEs. 2009 WL, 10687986, at *7–8. In fact, Plaintiffs allege that "nearly all of the revenue" from the usurious lending scheme "went to non-tribal outsiders, such as the Defendants . . . ." (Am. Compl. ¶ 123.) Plaintiffs describe, in detail, the mechanism through which the revenues generated by the TLEs' usurious loans were first upstreamed to NPA and Signal Light through the use of participation agreements. (Am. Compl. ¶¶ 30, 123–25.) At that juncture, Plaintiffs allege, Raizada (through the Raizada Group) and Gravley received their cut of the scheme's profits via their ownership interests in NPA and Signal Light, respectively. (Am. Compl. ¶¶ 34, 127, 132, 183, 202.) Plaintiffs then describe how the scheme's revenues traveled further upstream to NPA Limited Partnership and HYMKEN, where funds were doled out to Defendants based on their substantial investments in those two entities. (Am. Compl. ¶¶ 134, 138, 141, 143, 144, 202.)

The *Tao* case proves equally, if not more, inapposite to the current suit. 299 F. Supp. 2d at 576. There, the funds that the plaintiff sought to recover came not from the plaintiff's checking account, but rather from the Government's purse. *Id.* Thus, the plaintiff could not plausibly allege that he conferred a benefit on the defendant with funds that were never his. *Id.* Here, in contrast, Plaintiffs allege that the funds that Defendants received via their indirect ownership interests in the TLEs are the very funds that Plaintiffs used to make payments on their usurious loans. (Am. Compl. ¶¶ 134, 138, 141, 143, 144, 202.) With respect to the LP Investor Defendants specifically, Plaintiffs allege that those Defendants' investment returns were "paid via the illegal amounts collected from consumers." (Am. Compl. ¶¶ 134, 138, 141, 143, 144.) Similarly, Plaintiffs allege that Raizada's interest in NPA, held via the Raizada Group, "was the

vehicle through which [he] received . . . proceeds generated by the usurious loans." (Am. Compl. ¶ 98.)  Signal Light, too, "received the gross profit from loans" in which it held participation interests, which "include[ed] the usurious interest." (Am. Compl. ¶ 202.)  Portions of those profits were then "distributed to . . . HYMKEN's other partners, including [the Kellner Defendants]." (Am. Compl. ¶ 202.)  Defendants' suggestion that Plaintiffs never had a preexisting right to funds which came straight out of their pocketbooks simply strains credulity.  Taken as true, Plaintiffs' allegations more than adequately show that Plaintiffs conferred a benefit on Defendants.  *See Gibbs I*, 368 F. Supp. 3d at 933–34 (finding unjust enrichment claim adequately pled against investors in tribal lending scheme where "Defendants benefitted from Plaintiffs' payments on their loans because . . . Defendants derived income from the enterprise"); *see also Solomon*, 2019 WL 1320790, at *16 (finding unjust enrichment claim adequately pled against investor in tribal loan scheme where "Plaintiffs . . . conferred a benefit onto [the investor] by enriching assets over which [the investor] retains controls").

The only Defendant for whom Defendants' first argument holds any water is Spectrum Business Ventures.  (SBV MTD Mem. at 7.)  As SBV correctly points out, the Amended Complaint contains no explicit allegation that SBV received any revenues or profits generated by the usurious lending scheme.  (*Id.*)  Plaintiffs allege only that (1) SBV received a finder's fee equal to five percent of the capital it raised on NPA's behalf and (2) SBV received fees from NPA for operational assistance performed by Raizada and SBV employees.  (Am. Compl. ¶¶ 35, 130.)  Nonetheless, because the latter of these two allegations suffice to show that SBV "derived income from the enterprise based on borrowers entering into loan [c]ontracts with [the tribal lending entities]," Plaintiffs have plausibly alleged that their loan payments conferred a benefit, albeit indirectly, on SBV.  *Gibbs I*, 368 F. Supp. 3d at 933–34.  At the motion to dismiss stage,

such an allegation proves adequate to state an unjust enrichment claim. *See Borg v. Warren*, 545 F. Supp. 3d 291, 328 (E.D. Va. 2021) (noting that to maintain an unjust enrichment claim under Virginia law, "the plaintiff need not *directly* confer the benefit on the defendant").

Repeating an earlier contention, Defendants next argue that Plaintiffs' unjust enrichment claims fail where Plaintiffs cannot demonstrate that Defendants proximately caused their injuries. (LP Investors MTD Mem. at 25.) Because the Court has already found that Plaintiffs adequately allege that Defendants' participation in the usurious lending enterprise proximately led to Plaintiffs' injuries,[32] this argument also fails.

Moving beyond Defendants' arguments, the Court observes that Plaintiffs adequately allege the second and third elements of their unjust enrichment claims as well. *Schmidt*, 661 S.E.2d at 838. Plaintiffs repeatedly allege that Defendants fully understood, and indeed intended, that their investments would go towards funding the TLEs' usurious loans. (Am. Compl. ¶¶ 16, 18, 20–32, 33–34, 36.) Furthermore, Plaintiffs allege that Defendants expected that the revenues from those usurious loans would in turn make their way back into Defendants' hands. (*Id.*) This suffices to demonstrate that Defendants knew of the benefit that they received. *Gibbs I*, 368 F. Supp. 3d at 933–34.

Plaintiffs' plausible factual allegations regarding the illegality of the loans under state usury laws also support a finding, at this stage, that "circumstances . . . render it inequitable for the defendant[s] to retain the benefit without paying for its value." *Integrated Direct Mktg., LLC v. May*, 129 F. Supp. 3d 336, 374 (E.D. Va. 2015). Given that the interest rates at issue exceed the relevant state usury laws by factors of forty or more, Plaintiffs satisfy their burden to demonstrate that circumstances render it inequitable for Defendants to retain the benefit they

---

[32]     *See supra* Section II.C.3.

72

received from collection on Plaintiffs' loans. *Id.*

Given the foregoing, the Court will deny Defendants' Motions to Dismiss with respect to Plaintiffs' unjust enrichment claims.

### 2. Plaintiffs Adequately Plead a Claim for Civil Conspiracy

To plead a common law conspiracy claim under Virginia law, a plaintiff must allege "(i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff." *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007) (citing *Glass v. Glass*, 321 S.E.2d 69, 74 (Va. 1984)). Moreover, a common law conspiracy claim "generally requires proof that the underlying tort was committed." *Mician v. Catanzaro*, 2018 WL 2977398, at *5 (E.D. Va. June 13, 2018) (quoting *Gelber v. Glock*, 293 Va. 497, 534 (2017)).

Defendants first contend that Plaintiffs' common law conspiracy claims fail where Plaintiffs neglect to describe, in adequate detail, the nature or circumstances of the supposed conspiracy. (LP Investors MTD Mem. at 23–24; Signal Light MTD Mem. at 15; Kellner MTD Mem. at 18–19; SBV MTD Mem. at 7; Raizada MTD Mem. at 7; Raizada Group MTD Mem. at 7.) As discussed in Section II.C.7., this contention contradicts the Amended Complaint's detailed factual allegations concerning each Defendant's role in funding and facilitating the alleged conspiracy. It equally contradicts the Amended Complaint's detailed factual allegations surrounding Defendants' participation in both the initial design and subsequent re-design of the scheme. In brief, the Court has already rejected Defendants' first argument; for the same reasons, the Court again rejects it here.

The Signal Light Defendants next argue that, at least with respect to them, the Amended Complaint "fails to show that a specific tort was committed." (SL MTD Mem. at 15.) This

contention runs afoul, however, of the Court's finding that Plaintiffs' allegations suffice to allege RICO claims against the Signal Light Defendants under §§ 1962(b), (c) and (d). *See Buchanan Cnty., Virginia v. Blankenship*, 496 F. Supp. 2d 715, 718 (W.D. Va. 2007) ("Civil RICO is a statutory tort remedy . . . ."). Accordingly, the Court rejects this argument as well.

Finally, the LP Investor Defendants argue that Plaintiffs' state law conspiracy claims, like their RICO conspiracy claims, fail under the intracorporate immunity doctrine. (LP Investors MTD Mem. at 23–24.) Again, the Court has already found this argument wanting.[33] For the same reasons that the intracorporate immunity doctrine presents no obstacle to Plaintiffs' § 1962(d) RICO claims, it presents no obstacle to Plaintiffs' common law conspiracy claims.

Given the foregoing, the Court will allow Plaintiffs' common law civil conspiracy claims to proceed against all Defendants.

## III.   ANALYSIS:  RULE 12(b)(2) MOTIONS TO DISMISS

Finally, the Court addresses the four[34] Motions to Dismiss pursuant to Rule 12(b)(2). For the reasons articulated below, the Court will deny the motions.

### A.   Legal Standard

"Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citation omitted). If the district court reviews "only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint," then the plaintiff need only make a *prima facie* showing of personal jurisdiction to survive a motion to dismiss under Rule 12(b)(2). *Id.* at 268 (citations omitted). "[T]he court must construe all relevant

---

[33]   *See* Section II.C.7.
[34]   *See supra* note 22.

pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction," *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989), but the district court need not consider only the plaintiff's proof of personal jurisdiction when deciding which inferences it will make, *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993). Rather, "where the defendant has provided evidence which denies facts essential for jurisdiction, the plaintiff must, under threat of dismissal, present sufficient evidence to create a factual dispute on each jurisdictional element which has been denied by the defendant and on which the defendant has presented evidence." *Indus. Carbon Corp. v. Equity Auto & Equip. Leasing Corp.*, 737 F. Supp. 925, 926 (W.D. Va. 1990) (citation omitted).

### B.     Plaintiffs Adequately Plead this Court's Personal Jurisdiction Over Defendants

Upon consideration of the allegations in the Amended Complaint, alongside the parties' motions and memoranda in support, the Court finds that Plaintiffs make an adequate *prima facie* showing of this Court's personal jurisdiction over Defendants. Because the Court adjudicates the instant motions on the papers, this *prima facie* showing suffices to survive Defendants' Rule 12(b)(2) motions. *Grayson*, 816 F.3d at 267. The Court explains its rationale in detail below.

### 1.     Service of Process, Personal Jurisdiction and RICO

"[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) (quoting *Mississippi Publ'g Corp. v. Murphree*, 326 U.S. 438, 444–445 (1946)). Thus, "a federal court's exercise of jurisdiction over a person is closely linked to effective service of process." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997).

Fed. R. Civ. P. 4(k)(1)(C) provides that "[s]erving a summons or filing a waiver of

service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." *Id.* To that point, the RICO statute provides that service may be made "on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). Interpreting these provisions together in *ESAB v. Centricut*, the Fourth Circuit held that § 1965(d) authorizes nationwide service of process in civil RICO suits. 126 F.3d at 626–28. "As a result, personal jurisdiction over a defendant with respect to RICO claims may be exercised anywhere in the United States," *Hengle v. Curry*, 2018 WL 3016289, at *8 (E.D. Va. June 15, 2018), so long as (1) the defendant was properly served (or waived service), (2) the plaintiff's RICO claim proves "colorable," and (3) the exercise of personal jurisdiction comports with the Fifth Amendment's Due Process Clause. *Doe 8 v. Varsity Brands*, 2023 WL 4161913, at *7 (D.S.C. June 23, 2023) (citing *ESAB*, 126 F.3d at 627–29 and *Nunes*, 531 F. Supp. 3d at 1003–04).

RICO claims prove colorable where they are "arguable and nonfrivolous, whether or not they would succeed on the merits." *Curry*, 2018 WL 3016289, at *9 (cleaned up) (citing *D'Addario v. Geller*, 264 F. Supp. 2d 367, 388 (E.D. Va. 2003)). And "[t]o make out a Fifth Amendment challenge to personal jurisdiction," a defendant must show "that the district court's assertion of personal jurisdiction over them would result in such extreme inconvenience or unfairness as would outweigh the congressionally articulated policy evidenced by a nationwide service of process provision." *Trustees of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 443–44 (4th Cir. 2015). "Normally, when a defendant is a United States resident, it is highly unusual . . . that inconvenience will rise to the level of a constitutional concern." *Id.*

76

> **2.    Plaintiffs Adequately Plead Personal Jurisdiction, and Defendants' Challenges Fail**

The Court finds that (1) Plaintiffs make an adequate *prima facie* showing of this Court's personal jurisdiction over Defendants and, moreover, that (2) Defendants' arguments in opposition to this Court's jurisdiction wholly lack merit.

As to Plaintiffs' *prima facie* showing, the record reflects that Plaintiffs either served process on or submitted waiver of service from all Defendants. (ECF Nos. 4, 16, 17, 21, 24, 34, 33, 35.) Moreover, no Defendant has objected to the propriety of service of process under Rule 12(b)(5). As Plaintiffs correctly highlight in both the Amended Complaint and their responsive briefing, and as the Court noted above, the civil RICO statute's nationwide service-of-process provision "allows for personal jurisdiction in any federal court that properly effectuates service." *Galloway*, 2022 WL 17325982, at \*2. The record evidence of proper service on all Defendants thus suffices for purposes of this Court's exercise of personal jurisdiction. *Id.* at 3.

As this Court discusses at length in the preceding pages, Plaintiffs also state colorable RICO claims against all Defendants. *Id.* ("The Rule 12(b)(6) standard for sufficiency is more exacting than the sufficiency standard under Rule 12(b)(2). Because Plaintiffs have met the 12(b)(6) standard, they have, of necessity, met the 12(b)(2) standard.") (citing *Nunes*, 531 F. Supp. at 1004).

Finally, Defendants fail to show that litigating in this Court would impose "such extreme inconvenience or unfairness" as to "outweigh the congressionally articulated policy" in RICO's nationwide service of process provision. *Gibbs III*, 2021 WL 4851066, at \*12 (quoting *Plumbing Servs.*, 791 F.3d at 443–44). Defendants offer no argument on this point, instead limiting their discussion of constitutional "reasonableness" to the Supreme Court's Fourteenth Amendment jurisprudence. (LP Investor/Signal Light 12(b)(2) MTD Mem. (ECF No. 100) at 6–

9; Kellner 12(b)(2) MTD Mem. (ECF No. 105) at 6.)  This argument does little to advance

Defendants' cause where the Fifth Amendment's "national contacts" test — the applicable

standard here — proves far broader than the Fourteenth Amendment's requirement that a

defendant have some minimum contacts with the forum state in particular.  *Bd. of Trs. Sheet*

*Metal Workers' Nat. Pension Fund v. McD Metals, Inc.*, 964 F. Supp. 1040, 1044 (E.D. Va.

1997).  Plaintiff alleges that Defendants all reside in the United States, and Defendants offer no

facts suggesting that this is one of the "highly unusual cases" in which inconvenience "rise[s] to

a level of constitutional concern" under the Fifth Amendment's "national contacts" test.  *Panama*

*v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997).  Thus, the Fifth

Amendment's Due Process Clause likewise presents no barrier to this Court's jurisdiction.  *Id.*

Together, the foregoing constitutes a sufficient *prima facie* showing of this Court's

personal jurisdiction over Defendants.  *Nunes*, 531 F. Supp. at 1002–04.[35]

By the same token, the logic advanced in Defendants' various 12(b)(2) motions fails to

refute Plaintiffs' *prima facie* case.  Briefly stated, Defendants argue that this Court lacks personal

jurisdiction over them because (1) the Fourth Circuit's decision in *ESAB* was wrongly decided

and (2) Plaintiffs' RICO claims are "wholly immaterial and insubstantial."  (Kellner 12(b)(2)

MTD Mem. at 5–6; LP Investor/Signal Light 12(b)(2) MTD Mem. at 2–5; Raizada Defs.'

12(b)(2) MTD Mem. (ECF No. 146) at 1–3.)  Arguing from the premise that the Court will

accept one of those two arguments, Defendants then assert that (3) Defendants' allegations with

---

[35]     The Court's exercise of personal jurisdiction pursuant to § 1965(d) also confers pendent personal jurisdiction over Plaintiff's state-law claims, as those claims arise out of a common nucleus of operative fact with Plaintiffs' RICO claims. *See ESAB*, 126 F.3d at 628 ("When a federal statute authorizes a federal district court to exercise personal jurisdiction over a defendant beyond the borders of the district and the defendant is effectively brought before the court, we can find little reason not to authorize the court to adjudicate a state claim properly within the court's subject matter jurisdiction so long as the facts of the federal and state claims arise from a common nucleus of operative fact.").

respect to their state law claims fail to establish this Court's personal jurisdiction over Defendants under Virginia's long-arm statute and the Fourteenth Amendment's analytically coextensive "minimum contacts" standard. (Kellner 12(b)(2) MTD Mem. at 5–6; LP Investor/Signal Light 12(b)(2) MTD Mem. at 6–9; Raizada Def.'s 12(b)(2) MTD Mem. at 3–7.) If the Court accepts either of the first two arguments and then further accepts the third, Defendants maintain, dismissal of the Amended Complaint under Rule 12(b)(2) proves warranted. (Kellner 12(b)(2) MTD Mem. at 5–6; LP Investor/Signal Light 12(b)(2) MTD Mem. at 6–9; Raizada Def.'s 12(b)(2) MTD Mem. at 3–7.)

Defendants' arguments, however, fail to pass "Go." Though true that the Fourth Circuit's holding in *ESAB* places that Court "in the clear minority," *Gibbs II*, 421 F. Supp. 3d at 306 n.59, this Court will not stray from binding precedent. *See Sadighi*, 36 F. Supp. 2d at 288 n.9 ("When presented with binding Fourth Circuit precedent, district courts, like obedient children, should be seen and not heard."). Section 1965(d) authorizes nationwide service of process, and the record here contains evidence of proper service. Moreover, this Court has already found that Plaintiffs adequately plead their RICO claims under the 12(b)(6) standard, which exceeds the 12(b)(2) "colorable" claim standard they must clear to plead personal jurisdiction. *Galloway*, 2022 WL 17325982, at *3. Because the Court rejects both of the alternative premises from which Defendants argue their third point, the Court need not run Defendants' logic to its terminus. Defendants' Motions to Dismiss for lack of personal jurisdiction prove equally as flawed as their Rule 12(b)(6) motions, and the Court will deny them in their entirety.

## IV.    CONCLUSION

For the aforementioned reasons, the Court will DENY Defendants' Motions to Dismiss

(ECF Nos. 95, 96, 98, 101, 116, 145, 147, 149, 150).

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

_____/s/_____

David J.  Novak
United States District Judge

Richmond, Virginia
Dated:  July 24, 2023