**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

SHERRY BLACKBURN, *et al., on behalf of themselves and all others similarly situated,*

                Plaintiffs,

      v.                            Case No: 3:22-cv-146-DJN

A.C. ISRAEL ENTERPRISES, INC. d/b/a
INGLESIDE INVESTORS, *et al,*

                Defendants.

## MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT AND FOR SERVICE AWARDS AND ATTORNEYS' FEES

Plaintiffs Sherry Blackburn, Willie Rose, Elwood Bumbray, George Hengle, Regina Nolte, Jo Ann Falash, John Tucker, and Emily Murphy ("Plaintiffs"), on behalf of themselves and the Settlement Class Members, by counsel, submit this Memorandum in Support of Motion for Final Approval of Class Settlement. Along with final approval of the class settlement, Plaintiffs ask the Court to enter an order for reasonable service awards and attorneys' fees, as requested below.

## INTRODUCTION

This case arises from the making and collection of high-interest loans from online lending companies named Golden Valley Lending, Silver Cloud Financial, Majestic Lake Financial, and Mountain Summit Financial (the "Tribal Lending Entities" or "TLEs"). The TLEs were formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe. Six of the Plaintiffs here and four other consumers previously filed class action litigation against the Tribe's Executive Council and two non-tribal business partners, Scott Asner and Joshua Landy, behind the TLEs' operations. *See Hengle v. Asner*, No. 3:19-cv-250-DJN (E.D. Va.). Following an appeal to the Fourth Circuit that affirmed this Court's denial of the *Hengle* defendants' motions

to compel arbitration and motions to dismiss, as well as a certiorari petition to the Supreme Court, the *Hengle* litigation culminated in a nationwide class action settlement that included, among other relief: (1) $450 million of debt cancellation; and (2) creation of a $39 million common fund to be distributed to consumers who repaid unlawful amounts. *Id.*, ECF No. 185-1. The Court approved the *Hengle* settlement on October 25, 2022. *Id.*, ECF No. 230.

During the *Hengle* litigation, Plaintiffs discovered that several other non-tribal individuals and entities were involved in establishing, financing, supporting, and continuing the TLEs' lending enterprise. In return for their support, these individuals and entities reaped significant financial benefits. Thus, while the *Hengle* litigation remained pending, on March 15, 2022, Plaintiffs brought the instant action on behalf of themselves as individuals and all others similarly situated against Defendants, raising claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.*, and state law. (Compl., ECF No. 1.) Specifically, Plaintiffs brought claims against eight groups of Defendants: (1) A.C. Israel Enterprises LLC d/b/a Ingleside Investors, Richard Investors, and Greg Warner (the "A.C. Israel Defendants"); (2) Ferrell Capital, LLC and Seville LTD (the "Seville Defendants"); (3) Monu Joseph, Joseph Investment, LLC, Joseph NPA Investment, LLC, and E Opportunities, LLC (the "Joseph Defendants"); (4) Skye, LLC ("Skye"); (5) Cabbage City, LLC ("Cabbage City"); (6) Benjamin Gravley, Signal Light, LLC, and Hvmken, LP (the "Gravley Defendants"); (7) George Kellner and Kellner Capital, LP (the "Kellner Defendants"); and (8) Amit Raizada, Spectrum Business Ventures, Inc., and Raizada Group, LLP (the "Raizada Defendants"). (Am. Compl., ECF No. 79.)

As soon as Plaintiffs filed this case, Defendants vigorously defended against it, including by filing nine motions to dismiss that challenged Plaintiffs' claims on statute of limitations grounds and for failure to state a claim. (ECF Nos. 95-96, 98, 101, 116, 145, 147, 149-150.) The Court

denied those motions on July 24, 2023, finding that Plaintiffs had sufficiently alleged facts to survive a limitations defense at this stage and that the allegations supported RICO and state law liability against all Defendants. (ECF No. 177.)

After over a year of litigation and over three years of litigation in the parallel *Hengle* case, which included decisions on significant questions of tribal sovereign immunity, the enforceability of state consumer protections, and RICO liability, Plaintiffs and Defendants entered into a Stipulation and Agreement of Settlement (ECF No. 212-1) (the "Settlement"). The Settlement affords significant, additional relief to the same class members from the *Hengle* litigation, namely: (1) the creation of a $25,535,929.00 common fund to be distributed to consumers who repaid unlawful amounts; and (2) Defendants' agreement not to support the TLEs for at least three (3) years or to aide in the collection of any unlawful debts from the TLEs. (Settlement §§ 3.3.a-c.) This relief further builds on the significant, trailblazing relief approved by this Court for the same consumer class in *Hengle*, and it follows a recent trend of similar relief approved in this District.[1] Indeed, on November 1, 2023, the Court preliminarily approved the Settlement, certified the Settlement Class, and ordered notice of the Settlement to the Class Members. (ECF No. 216.)

For these reasons and the others explained below, the proposed settlement satisfies Rule 23(e)(2)'s requirements that a class settlement be fair, reasonable, and adequate, and Plaintiffs respectfully request that the Court approve the Settlement. Plaintiffs and Class Counsel further request that the Court approve service awards of $15,000.00 per named plaintiff and attorneys'

---

[1] *See Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement resulting in: (1) the creation of a settlement fund in the amount of $50,050,000.00; and (2) cancellation of approximately $383,000,000.00 in debt); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement resulting in: (1) the creation of a settlement fund in the amount of $53,000,000; and (2) cancellation of approximately $380,000,000.00 in debt).

fees of $8,511,967.00 (*i.e.*, one third of the cash consideration created by the settlement). This Court has routinely granted similar service awards and attorneys' fees, and they are warranted here given the extraordinary efforts and results of this case, which builds on the success of the approved settlement in *Hengle*. Indeed, when comparing the fees requested in this case and those awarded in *Hengle* ($13 million) to the total value of the settlements in both cases—which amount to over $514 million when including the $450 million in debt cancellation—the combined requested fee award is approximately 4% of the settlements' overall value. And, like the settlement itself, no class member or regulator has filed objections to the requested fee or service awards. Accordingly, Plaintiffs and Class Counsel respectfully request that the Court award these amounts.

## THE CLASS ACTION SETTLEMENT AND NOTICE PROGRAM

### A.    The Settlement Class

Under the Settlement Agreement, the parties agreed to resolve the claims of a nationwide class ("Settlement Class") defined as:

> All consumers residing within the United States who executed loan agreements with Golden Valley Lending, Inc., Silver Cloud Financial, Inc., Majestic Lake Financial, Inc., or prior to February 1, 2021, with Mountain Summit Financial, Inc.

(Settlement § 3.2.) These individuals were identified through records of the TLEs, which confirmed that there were 547,074 Settlement Class Members. (Ex. 1, ALCS Decl. ¶ 4.)

### B.    The Settlement Provides Significant and Meaningful Relief to Consumers.

The proposed class action settlement provides significant, additional cash payments to consumers nationwide. Plaintiffs achieved the proposed settlement even though several Defendants moved to dismiss the case and have continued to deny sufficient involvement in the alleged unlawful lending enterprise to be found liable. Plaintiffs also recognized that Defendants are mostly individuals and entities formed by those individuals, whose financial situations threaten the options and resources available for class settlement, as well as the collection of any ultimate

judgment. Despite this obstacle, Plaintiffs negotiated a settlement that will provide a substantial, multi-million-dollar financial benefit to consumers nationwide, in addition to the significant benefits afforded to those consumers by the *Hengle* settlement.

Specifically, Defendants will make monetary payments collectively totaling $25,535,929.00, which will be distributed to the Settlement Class Members. (Settlement § 3.3.a.) Of this total amount, the A.C. Israel Defendants will contribute $6 million; the Seville Defendants will contribute $1.6 million; the Joseph Defendants will pay $3 million; Skye will pay $150,000; Cabbage City will pay $1,524,724.00; the Gravley Defendants will pay $60,000; the Kellner Defendants will pay $4,269,293.00; Unnamed Hvmken Limited Partners agree to pay $5,156,878 and $275,034 respectively for a total of $5,431,912, which Kellner Capital, LLC will have the legal obligation to pay; and the Raizada Defendants will pay a total of $3.5 million.

As outlined in the Settlement Agreement, payments from the Fund will be allocated using a tiered formula after payment of service awards to Plaintiffs,[2] attorneys' fees, and costs, as approved by this Court:

> Tier 1: The dollar amount of all payments made by each Settlement Class Member in Arizona, Arkansas, Colorado, Connecticut, Idaho, Illinois, Indiana, Kansas, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, South Dakota, Vermont, Virginia, and Wisconsin so long as the Settlement Class Member paid the principal amount of his or her loan.

> Tier 2: The dollar amount of payments made above the legal interest limits if the original principal amount was repaid and if the Settlement Class Member resided in Alabama, Alaska, California, Delaware, Florida, Georgia, Hawaii, Iowa, Louisiana, Maine, Maryland, Michigan, Mississippi, Missouri, Nebraska, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina,

---

[2] The Court approved this same tiered formula in *Hengle*. No. 3:19-cv-250-DJN, ECF No. 230 (E.D. Va. Oct. 25, 2022). Other courts in this District have also approved similar formulas. *See, e.g.*, *Gibbs v. TCV, V, LLP*, No. 3:19-cv-789, Dkt. 95 (E.D. Va. Mar. 29, 2021); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Dkt. 141 (E.D. Va. Dec. 13, 2019); *see also generally Turner v. ZestFinance, Inc.,* No. 3:19-cv-293 (E.D. Va.)*.*

Tennessee, Texas, Washington, Washington D.C., West Virginia, or Wyoming at the time the Settlement Class Member took out the loan; and

Tier 3: Settlement Class Members in Nevada and Utah will not receive cash payments.

Settlement Class Members in Tier 1 or Tier 2 who repaid the principal amount borrowed will receive a cash award based on a *pro rata* calculation rounded down to the nearest cent. (*Id.* § 3.4.b.iii.1.) In the event any Settlement Class Member took out more than one loan during the class period, his or her claim amount will be calculated by determining the claim amount for each loan and adding them together. (*Id.* § 3.3.b.ii.)

The relief provided by the proposed class action settlement is significant. Most consumers will receive a cash payment in addition to the cash payments and debt cancellation made pursuant to the *Hengle* settlement, and many will benefit from Defendants' agreement to halt their support of the TLEs and the collection of any of the unlawful debts. Importantly, Class Members will receive payments without needing to submit a claim form, prove any harm, or take any affirmative action. For example, the named Plaintiffs will receive the following additional payments without having to submit a claim form (Ex. 2, Kelly Decl. ¶ 19):

| Plaintiff Name | Estimated Payment in *Hengle* | Actual Payment in *Hengle*[3] | Debt Cancelled in *Hengle* | Estimated Payment under the Settlement |
|---|---|---|---|---|
| Sherry Blackburn | $119.88 | $156.38 | $0 | $75.94 |
| Willie Rose | $143.05 | $186.61 | $325.00 | $90.63 |
| Elwood Bumbray | $54.32 | $70.86 | $184.50 | $34.41 |
| George Hengle | $30.92 | $32.23 | $690.00 | $19.59 |
| Regina Nolte | $781.65 | $1,019.65 | $0 | $495.18 |
| Jo Ann Falash | $928.80 | $1,211.61 | $1,050.00 | $588.40 |
| John Tucker | $171.22 | $223.36 | $0 | $108.47 |
| Emily Murphy | $68.61 | $89.50 | $0 | $43.47 |

---

[3] As in this case, the *Hengle* settlement provided for a second distribution of payments to the Class if funds remained after the first distribution. This column accounts for the second distributions.

**C.** **The Settlement Administrator Provided Direct Notice to Settlement Class Members.**

In its Preliminary Approval Order, the Court approved the proposed notice plan and ordered that the Class Notice be sent to Settlement Class Members by American Legal Claim Services, LLC (ALCS). (ECF No. 216 ¶¶ 9-15.) Consistent with the Court's Preliminary Approval Order, ALCS used the class list provided by the Tribal defendants in *Hengle*. (Ex. 1, ALCS Decl. ¶ 4.) Among other things, this data included the borrowers' "name, mailing address, email address," as well as "other pertinent loan data" such as the "original principal amount, total amount paid, loan origination date and date of last payment." (*Id*.) Through these records, ALCS identified and compiled a final class list comprising "547,074 individual class members." (*Id*.)

Beginning on November 22, 2023, "ALCS emailed the Notice of Class Action . . . to 451,838 class members," whose emails were initially verified. (*Id*. ¶ 5.) This process was completed on December 1, 2023. (*Id*.) "Of the 451,838 attempted emails, 22,256 were identified as undeliverable email addresses." (*Id*. ¶ 6.) ALCS then mailed the Class Notice to these class members on December 14, 2023. (*Id*.) On December 1, 2023, ALCS also mailed the Class Notice "to 95,236 class members" without verified emails, for a total mailing of 117,492 notices. (*Id*. ¶ 5.) ALCS "utilized several means of ensuring the most accurate mailing addressing for class members," including identifying addresses through the "National Change of Address through USPS, skip-tracing, and manual updates from class members." (*Id*. ¶ 4.)

ALCS "processed all Class Notices returned by USPS" from the initial mailing in December through the objection and opt-out deadline of January 22, 2024. (*Id*. ¶ 7.) If the mail returned by USPS did not contain an updated address, "ALCS conducted address searches using a national recognized location service to attempt to locate new address for these class members." (*Id*.) "Of the 117,492 mailed Notices, 14,057 were returned by USPS" as of February 2, 2024.

(*Id.*)  Of those returned, "7,117 were remailed to updated addresses" and "6,940 Notices were deemed undeliverable."  (*Id.*)  In sum, 540,134 notices (*i.e.*, 98.73%) are presumed delivered and only 6,940 notices remain undelivered.  (*Id.* ¶ 8.)

**D.    There Have Been No Objections and Minimal Opt-Outs.**

None of the 547,074 class members have objected to the Settlement, and only fifteen (15) consumers have opted out.  (*Id.* ¶¶ 9–10.)  Similarly, Defendants also worked with ALCS to timely serve the required Class Action Fairness Act notices to 57 federal and state officials, including the attorneys general of each of the 50 states, the District of Columbia, and the United States Territories.  (*Id.* ¶ 3.)  No attorney general's office or government agency has filed an objection to the proposed settlement.

**E.    The Settlement Provides Releases to Defendants.**

In return for the consideration above, Settlement Class Members will provide releases that are tailored to each defendant group's individual circumstances and those parties who specifically contributed to each group's portion of the common fund.  (*See* Settlement § 4.1.)

<u>**ARGUMENT**</u>

**A.    The Notice Program Satisfied the Requirements of Rule 23(c)(2)(B).**

When a class is "certified for purposes of settlement under Rule 23(b)(3)," a district court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B). This notice may be provided by "United States mail, electronic means, or other appropriate means."  *Id*.  The Rule also requires that the notice inform potential class members that: (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel.  *Id.*  In

assessing the sufficiency of notice, the Court considers both the delivery method and the notice's content. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.312 (4th ed. 2004).

In this case, as in *Hengle*, Class Members were identified from the loan records, which contained the class members' names, addresses, and email addresses. (Ex. 1, ALCS Decl. ¶ 4.) Using this information, ALCS identified and compiled a final class list comprising "547,074 individual class members." (*Id.*) After ALCS identified Class Members, reasonable measures were taken to provide individual notice to those Members through the Notice Program previously approved by the Court. As detailed above, this Notice Program, which included both emailed and mailed notices, resulted in a 98.73% delivery success rate to the Class, which is on-par with the success rate in *Hengle*. (*Id.* ¶ 8); *Hengle*, ECF No. 222-1, ¶ 8 (success rate of 99.27%).

As Judge Payne has previously explained, "[w]hat amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.'" *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted). Here, 540,134 notices (*i.e.*, 98.73%) are presumed delivered and only 6,940 notices remain undelivered. (Ex. 1, ALCS Dec. ¶ 8.) Courts—including this one and others within the Fourth Circuit—have approved mailed-notice programs that reached a much smaller percentage of class members than the success rate here. *See In re Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, No. 3:05cv143 (E.D. Va. Aug. 29, 2006) (granting final approval where class notice had approximately 85% delivery success). And as noted above, this success rate is only 0.54% lower than the rate in *Hengle*, in which this Court found that the same notice program was "the best notice practicable to the

Settlement Class under the circumstances" and was "reasonably calculated . . . to apprise the Settlement Class of the pendency of this Action and the terms of the Settlement Agreement," as well as the class members' rights to exclude themselves and object. *Hengle*, ECF No. 230, ¶ 7.

In sum, as in *Hengle*, the parties here have complied fully with the Court's Preliminary Approval Order and have taken reasonable steps to ensure that the Class Members were notified— in the best and most direct manner possible—of the Settlement's terms and significant benefits, as well as their right to exclude themselves or object.

### B. The Settlement Satisfies the Requirements of Rule 23(e)(2).

"Rule 23(e) of the Federal Rules of Civil Procedure obliges parties to seek approval from the district court before settling a class-action lawsuit." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 952 F.3d 471, 483 (4th Cir. 2020) (citing Fed. R. Civ. P. 23(e)). When a court "reviews a proposed class-action settlement, it acts as a fiduciary for the class." *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 525 (4th Cir. 2022). "In fulfilling this role, the district court must conclude that a proposed settlement is 'fair, reasonable, and adequate.'" *Id.* (quoting Fed. R. Civ. P. 23(e)(2)). "In determining whether a settlement is fair, reasonable, and adequate," Rule 23(e)(2) requires the court to consider whether:

> (A)    the class representatives and class counsel have adequately represented the class;
>
> (B)    the proposal was negotiated at arm's length;
>
> (C)    the relief provided for the class is adequate, taking into account:
>
>     (i)    the costs, risks, and delay of trial and appeal;
>
>     (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

<div style="margin-left: 2em;">

(iii)    the terms of any proposed award of attorneys' fees, including timing of payments; and

(iv)    any agreement required to be identified under Rule 23(e)(3);

(D)    the proposal treats class members equitably relative to each other.

</div>

*Galloway v. Williams*, No. 3:19-cv-470, 2020 WL 7482191, at \*4 (E.D. Va. Dec. 18, 2020) (Payne, J.) (quoting Fed. R. Civ. P. 23(e)(2)).  In making this assessment, district courts are provided with "considerable deference" because "the court 'is exposed to the litigants, and their strategies, position[s], and proofs, and is on the firing line and can evaluate the action accordingly.'" *Lumber Liquidators*, 952 F.3d at 484 (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000)).[4]

### 1.    *Plaintiffs and Class Counsel have adequately represented the Class.*

Rule 23(e)(2)'s first factor examines whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A).  This assessment is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *In re Flint Water Cases*, 571 F. Supp. 3d 746, 780 (E.D. Mich. 2021) (quoting Albert Conte & Herbert Newberg, *Newberg on Class Actions* § 13:48 (5th ed. June 2021 update)).  Rule 23's adequacy requirements are met if: "(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class's interests; and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the litigation." *Gibbs v. Stinson*, No. 3:18-cv-676, 2021 WL 4812451, at \*16 (E.D. Va. Oct. 14,

---

[4] On December 1, 2018, "Rule 23(e)(2) was amended to specify factors for assessing the 'fairness, reasonableness, and adequacy' of a class-action settlement." *Lumber Liquidators*, 952 F.3d at 484, n.8.  Prior to this, the Fourth Circuit developed and applied its "own multifactor standards" for fairness and adequacy.  *See, e.g.*, *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991).  Because the Fourth Circuit's prior considerations "almost completely overlap with the new Rule 23(e)(2) factors," *Lumber Liquidators*, 952 F.3d at 484, n.8, decisions prior to the amendment to Rule 23(e)(2) continue to be relevant.

2021) (Lauck, J.) (quoting *Milbourne v. JRK Residential Am., LLC*, No. 3:12-cv-861, 2014 WL 5529731, at *8 (E.D. Va. Oct. 31, 2014)).

This first factor is easily satisfied here. As to the named Plaintiffs, their interests and those of members of the proposed class are fully aligned, as they are all victims of the same alleged usurious lending scheme. *See, e.g.*, *Stinson*, 2021 WL 4812451, at *16 (finding that the plaintiffs were adequate in a comparable case because they had "no interests antagonistic to the class's interest" and shared "identical interest of establishing Defendants' liability based on the same questions of law and fact"); *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 59 (E.D. Va. 2021) (finding that the plaintiffs were adequate in a comparable case because the "Plaintiffs' interests are in line with those of the broader classes"); *MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331, 345 (D.N.J. 2019) ("There is nothing in the record to suggest that either proposed class representative has a claim or interest antagonistic to the remainder of the class: both MacDonald and Spearman took out loans from Western Sky allegedly at usurious interest rates."); *Brice v. Haynes Invs., LLC.*, 2021 WL 1916466, at *6 (N.D. Cal. Apr. 23, 2021) (same). Indeed, in its Preliminary Approval Order, the Court already found that "Plaintiffs have fairly and adequately represented the interest of the Settlement Class." (ECF No. 216 ¶ 4.) The Court also found that a largely overlapping set of named plaintiffs provided adequate representation of the same class in *Hengle*. *See Hengle*, ECF No. 230 ¶ 5. Nothing has changed since the Court's Preliminary Approval Order or its findings in *Hengle* to warrant revisiting these conclusions.

As to Class Counsel, this Court and others have repeatedly found them to be qualified, experienced, and adequate under Rule 23, including in tribal lending cases. *See, e.g.*, *Hengle*, ECF No. 230 ¶ 6 (finding on final approval that "Class Counsel have and continue to adequately and fairly represent Settlement Class Members"); *Galloway v. Williams*, No. 3:19-cv-470, 2020 WL

7482191, at *8 (E.D. Va. Dec. 18, 2020) (finding that "Class Counsel and their firms have extensive backgrounds in complex and class action litigation and consumer protection litigation" and further noting that counsel "have significant experience in litigating class action lawsuits against tribal lenders" (*citing, e.g.*, *Hayes v. Delbert Servs. Corp.*, No. 3:14-cv-258, ECF No. 193 ¶¶ 4, 14 (E.D. Va. Jan. 20, 2017)); *Turner v. Zestfinance, Inc.*, No. 3:19-cv-293 (E.D. Va.) ("[W]e have Ms. Kelly and Mr. Bennett here, who are well known to me as being experts in this field, but it looks like the other class counsel is like the all-star team of consumer litigation."); *Stinson*, 2021 WL 4812451, at *16 (finding that Class Counsel were adequate and noting that they had been involved for four years and "already obtained substantial relief for borrowers by securing two courts' approval of a class action settlement").  Indeed, when recently assessing this factor in a comparable case, Judge Lauck noted that the "experience of the counsel in the specific area of litigation I think also pretty much goes without saying on all sides. This is a group of lawyers who have developed a level of expertise that I think is unsurpassed in the country."  *Gibbs v. Stinson*, No. 3:18-cv-676, Tr. of Final Approval Hr'g at 25:19-23 (E.D. Va. Aug. 16, 2022).

## 2. *Negotiations were arm's length and involved Judge Colombell.*

The second factor examines whether the settlement "was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(B); *see also Flint Water Cases*, 571 F. Supp. 3d at 780 (explaining that the second factor requires courts to "consider whether the negotiations were conducted at arm's length with no evidence of collusion or fraud").  "Courts presume the absence of fraud or collusion unless there is evidence to the contrary."  *Id.* (quoting *UAW v. Gen. Motors, Corp.*, 2006 WL 891151, at *21 (E.D. Mich. Mar. 31, 2006)).  Here, there is no evidence suggesting the presence of collusion or fraud between the parties.

To help confirm that the negotiations were arm's length, courts have looked at several other factors, including the presence of a mediator.  As the leading class action treatise explains: "There appears to be no better evidence of [a truly adversarial bargaining process] than the presence of a third-party mediator."  Conte & Newberg, *supra*, § 13:48; *see also Flint Water Cases*, 571 F. Supp. 3d at 780 ("highly experienced mediators" provided "ample protections in their roles").  Here, Plaintiffs and Defendants had lengthy negotiations and used United States Magistrate Judge Mark Colombell to help finalize the terms of their agreement through multiple rounds of negotiations. (*See* Ex. 2, Kelly Decl. ¶ 23.)  Judge Colombell has extensive experience in settling cases, and his involvement in this settlement further establishes that there was no collusion among the parties.

Additionally, "[c]onsidering the posture of the case at the time of settlement allows the Court to determine whether the case has progressed far enough to dispel any wariness of 'possible collusion among the settling parties.'"  *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 571 (E.D. Va. 2016).  Here, there should be no concerns that the case did not progress far enough because this litigation, which itself spanned well over a year, followed the litigation in *Hengle* that spanned more than three years and included a high-stakes appeal revolving around multiple core issues at stake in this litigation.  This case also involved its own significant disputes concerning the liability of investors in a RICO enterprise and the statute of limitations, to name a few.  If Defendants succeeded on any of the issues, they could have disposed of the entire litigation.  It was only following Plaintiffs' successful litigation in *Hengle* and opposition to Defendants' motions to dismiss here that Plaintiffs and Defendants reached this settlement.  And before the Settlement, Plaintiffs conducted substantial discovery into the Defendants' roles in the lending enterprises, as well as the benefits they received from the loans and their available assets.  (Ex. 2, Kelly Decl. ¶ 23.)  This litigation history reaffirms that there was no possible collusion among the parties.

### 3.    *The relief provided to the Settlement Class is adequate.*

Rule 23(e)(2)(C) requires the Court to consider whether the relief is adequate, considering:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

Fed. R. Civ. P. 23(e)(2)(C).  These subfactors overlap with the factors that the Fourth Circuit has held are required to evaluate a class settlement's fairness, reasonableness, and adequacy.  *Lumber Liquidators*, 952 F.3d at 484 n.8 (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159).  An analysis of each subfactor shows that this settlement is fair, reasonable, and adequate here.

First, the costs, risks, and delay of trial and appeal support approval of the Settlement.  While Class Counsel strongly believes in the strength of this case, they also acknowledge that there are substantial risks associated with continued litigation.  Defendants have disputed Plaintiffs' claims since the inception of this case and have raised several defenses, including thorny factual disputes over the degree and nature of their alleged involvement in the lending enterprise.  Were the litigation to continue, Defendants would no doubt rely heavily on their defenses, which are largely subject to jury determination, to avoid liability.  The Settlement avoids these significant costs and risks, and further delay, by providing settlement benefits to the Class Members now.

Second, the effectiveness of the proposed method of distributing relief to the Class, including the method of processing class-member claims, likewise supports approval.  Here, just as with the prior settlement (any multiple other similar settlements approved by this Court), Class Members will receive the cash benefits based on the unlawful amount repaid on their loans without having to submit a claim form or any proof of their damages.  Cash payments will thus be automatically distributed.  This is important because "[t]he use of objective criteria to determine

settlement distribution is a hallmark of fairness." *Flint Water Cases*, 571 F. Supp. 3d at 781. Because an automatic cash payment is based on objective criteria and does not require any action by Class Members, this factor weighs strongly in favor of approving the Settlement.

Third, the request for attorneys' fees and the timing of the request do not suggest that "counsel sold out the class's claims at a low value in return for [a] high fee." Conte & Newberg, *supra*, § 13:54. As outlined above, there is no sign that Class Counsel left any money on the negotiating table. Instead, they have obtained over $25.5 million for automatic payments to Class Members who meet objective criteria, which is in addition to the $39 million in payments and $450 million in cancelled debt obtained for the same Class Members in *Hengle*. The requested attorneys' fees award also comprises the usual percentage of the settlement fund—one third of the cash value—and when measured against the Settlement's total value in this case and the *Hengle* litigation, Class Counsel is seeking only a 4% fee, even when including the fees awarded in *Hengle*. Moreover, the attorneys' fee component of the settlement was discussed only after all other material settlement terms had been finalized, and they were negotiated under the supervision of Judge Colombell, who is experienced enough to notice if Class Counsel were compromising the class members' claims for their own benefit. *Flint Water Cases*, 571 F. Supp. 3d at 782. Nor is the timing of the request such that the "attorney fees is unknown and could upset the compensation to claimants at the time of final approval." *Id.* The proposed fee award was included in the class notice, and no class member or regulator has filed an objection to the proposed amount.

Finally, there are no agreements that need to be identified under Rule 23(e)(3).

### 4. The Settlement treats Class Members equitably relative to each other.

The final factor under Rule 23(e)(2) requires a court to consider whether "the proposal treats class members *equitably* relative to each other." Fed. R. Civ. P. 23(e)(2)(D) (emphasis

added).  This factor considers whether class members have been treated in a fair and impartial manner, but "[t]here is no requirement that all class members in a settlement be treated *equally*." *Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 876 (S.D. Iowa 2020) (emphasis in original) (citation omitted).  And when considering this factor, a court "must balance the claims of those with potentially substantial damages with those with potentially minimal or insignificant damages."  *Id*. (citation omitted).

The settlement here achieves this balance.  As in *Hengle*, the Settlement distributes more to individuals who suffered more substantial damages—*i.e.*, those who repaid more unlawful amounts on their loans.  This structure not only considers the total dollars paid by each borrower, but also accounts for the strength of each state's usury laws because some states allow for recovery of both principal and interest.  *Compare, e.g.*, Va. Code § 6.2-1541 (declaring a loan void and providing recovery of "any principal or interest paid on the loan"); *with* 41 P.S. § 502 (allowing Pennsylvania borrowers to recover excess interest paid, but not principal).

Because of the difference in potential remedies, monetary payments will be distributed using a tiered formula that has been approved by this Court in *Hengle* and by several other courts, as well.  (*See* Settlement § 3.3.b); *see also Hengle*, ECF No. 230 (E.D. Va. Oct. 25, 2022); *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, ECF No. 114 (E.D. Va. July 9, 2020); *Gibbs v. TCV V, L.P.*, No. 3:19-cv-789, ECF No. 95 (E.D. Va. Mar. 29, 2021).  Settlement Class Members in Tier 1 or Tier 2 who repaid the principal amount borrowed will receive a cash award based on a *pro rata* calculation rounded down to the nearest cent.  (Settlement § 3.3.b.)  The Settlement thus maximizes the possible payout for Class Members who have suffered actual monetary harm, while preserving the class-wide cancellation of debt from *Hengle*.  Moreover, all Class Members will obtain the benefit of Defendants' agreement to refrain from supporting the collection of the

unlawful debts, regardless of whether any payments have been made on those debts. Class Members, therefore, will be treated equitably relative to each other.

<p style="text-align:center">* * *</p>

Because all the Rule 23(e)(2) factors confirm that the Settlement is fair, reasonable, and adequate, Plaintiffs and Class Counsel respectfully request that the Court approve the Settlement.

### C. The Requested Service Awards Are Reasonable.

Plaintiffs further request—and none of the Defendants oppose—a modest award of $15,000 for each of the eight Plaintiffs' participation and service to the Class. If approved, this award would reduce each class member's potential settlement amount by fewer than 25 cents. This amount is reasonable because Plaintiffs took an active role in this case, and, for six of them, the *Hengle* litigation as well.[5] They also stuck their neck out for other class members and pursued the claims despite the embarrassing nature of the events—being financially vulnerable enough to take out a loan with an interest rate of more than 600% APR.

In comparable cases, this and other Courts have awarded similar—and sometimes higher—amounts. *See Hengle*, ECF No. 230 ¶¶ 21-22 (awarding $10,000 per named plaintiff); *Gibbs v. Stinson*, No. 3:18-cv-676, ECF No. 346 ¶ 20 (E.D. Va. Aug. 16, 2022) (awarding $20,000 service awards to each of the 13 class representatives); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-789, ECF No. 95 (E.D. Va. Mar. 29, 2021) (approving a $7,500 service award)[6]; *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, ECF No. 114 (E.D. Va. July 9, 2020) (awarding $5,000 service awards to the 25 class

---

[5] Sherry Blackburn, George Hengle, Willie Rose, Elwood Bumbray, Regina Nolte, and Jo Ann Falash were also named plaintiffs in *Hengle*.

[6] As part of the same global settlement, the Court approved an additional $7,500 to each of the named plaintiffs for service awards related to another defendant. *Gibbs v. Rees*, No. 3:20-cv-717, ECF No. 68 ¶ 21 (E.D. Va. Mar. 26, 2021). When considered together, the service awards for the plaintiffs in that settlement were $15,000, which are equal the amount requested here.

representatives). A similar result is warranted here because Plaintiffs participated in years of litigation and were vital to achieving this excellent result. (Ex. 2, Kelly Decl. ¶¶ 26-30; Ex. 3, Bennett Decl. ¶ 32.) If they were unwilling to step up or gave up at any point, none of this would have been possible.

### D. The Requested Attorneys' Fees Are Reasonable.

The multi-firm team of Class Counsel collectively seek an award of $8,511,967 for their attorneys' fees and costs. This request represents one third of the Settlement Fund in this case, which is standard for these types of cases. Moreover, when coupled with the overall value of the settlements obtained for the Class, which total approximately $514 million, the requested fee award here and the fees already awarded in *Hengle* ($13 million) are approximately 4% of the settlements' combined total value. This award is reasonable under the relevant factors.

#### 1. *Awarding a percentage fee is appropriate and reasonable.*

Rule 23(h) gives the Court authority to "award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement" in class actions. Fed. R. Civ. P. 23(h). If the case results in a common fund for the class, the Court may award fees as a percentage of that common fund. This doctrine originates from the equitable principles of quantum meruit and unjust enrichment and aims to shift the expense of litigation from named plaintiffs, who obtained the fund's benefits, to the absent class members, who benefit from the fund but likely contributed little, or nothing, to the process. *Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 785 (4th Cir. 2019), *as amended* (Mar. 22, 2019). As the Fourth Circuit has explained, awarding fees as a percentage of the common fund "hold[s] the

beneficiaries of a judgment or settlement responsible for compensating the counsel who obtained the judgment or settlement for them." *Id.* at 786.[7]

The collective preference of courts for the percentage method is common sense. It is easily administered and saves valuable court and party resources, which heeds the Supreme Court's mandate that a "request for attorney's fees . . . not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The percentage method also aligns the interests of class counsel and the class members because it both motivates class counsel to generate the largest possible recovery for the class and rewards efficient litigation. This is because their fee increases with the class's take, removing any incentive to run up hours to obtain a higher fee.

Furthermore, a percentage fee encourages early settlements because class counsel will not receive additional fees for unnecessary motions practice or discovery. *See Johnson v. Metro-Goldwyn-Mayer Studios, Inc.*, No. C17-541, 2018 WL 5013764, at *11 (W.D. Wash. Oct. 16, 2018) ("[T]he percentage-of-recovery method plays an important role in aligning the interests of the class and class counsel" and "[i]n such situations, class counsel is motivated to obtain the largest tangible benefit possible, to provide for the best possible notice to the class, and to assure that the claims process is not overly burdensome"); *In re Anthem, Inc. Data Breach Litigation*, No. 15-md-2617, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018) ("By tying the award to the recovery of the Class, Class Counsel's interests are aligned with the Class, and Class Counsel is incentivized to achieve the best possible result."); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("The

---

[7] Most circuits either permit or require the percentage method. Conte & Newberg, *supra*, § 15:66. For example, the Eleventh and the District of Columbia Circuits require the use of the percentage method. *Id.* at n.6 (citing cases). The Third Circuit prefers the percentage method. *Id.* at n.7. And the First, Second, Fifth, Sixth, Eight, Ninth, and Tenth Circuits allow district courts to use either method. *Id.* at n.5 (citing cases).

percentage method better aligns the incentives of plaintiffs' counsel with those of the class members because it bases the attorneys' fees on the results they achieve for their clients, rather than on the number of motions they file, documents they review, or hours they work."); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1268–69 (D.C. Cir. 1993) ("using the lodestar approach in common fund cases encourages significant elements of inefficiency," while "if a percentage-of-the-fund calculation controls, inefficiently expended hours only serve to reduce the per hour compensation of the attorney expending them").

On the other hand, the lodestar method is time consuming and requires lawyers to submit voluminous records that courts must then review and scrutinize in detail. Furthermore, a lodestar fee motivates class counsel to increase the number of hours they spend on a case to maximize their fees, no matter if that time advances the case or class members' interests. *See In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 821 (3d Cir. 1995) ("[T]he lodestar method has been criticized as giving class counsel the incentive to delay settlement in order to run up fees while still failing to align the interests of the class"). Indeed, the lodestar method is used in only some class-action cases, usually those involving fee-shifting statutes or where the settlement provides injunctive relief that cannot be reliably quantified. *See, e.g.*, Theodore Eisenberg, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. Law Review 937, 945 (2017) (finding that the lodestar method used only 6.29% of the time from 2009–2013, down from 13.6% from 1993–2002 and 9.6% from 2003–2008); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 832 (2010) (finding that the lodestar method used in only 12% of settlements).

Although the Fourth Circuit has not explicitly required its use in class actions, the percentage method is overwhelmingly preferred by the district courts in this circuit, including by

this Court in *Hengle*. *See Hengle*, ECF No. 230 ¶ 18 ("Because this is a common-fund case, it is appropriate to employ a percentage of the fund method for calculating a proper fee award."); *Galloway v. Williams*, No. 3:19-cv-470, 2020 WL 7482191, at *5 (E.D. Va. Dec. 18, 2020) (Payne, J.) (noting in a comparable tribal-lending case that, "over time, certain customs have developed, both in the Fourth Circuit and across the country; for example, the favored method for calculating attorneys' fees in common fund cases is the percentage of the fund method."); *Thomas v. FTS USA, LLC*, No. 3:13-cv-825, 2017 WL 1148283, at *3 (E.D. Va. Jan. 9, 2017) (Novak, M.J.) ("District Courts within this Circuit have also favored the percentage of the fund method." (collecting cases)), *R&R adopted,* 2017 WL 1147460 (E.D. Va. Mar. 27, 2017).[8]  "In sum, there is a clear consensus among the federal and state courts, consistent with Supreme Court precedent, that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery."  *Cox v. Branch Banking & Tr. Co.*, No. 5:16-cv-10501, 2019 WL 164814, at *5 (S.D. W. Va. Jan. 10, 2019).

### 2. *An award of one-third of the common fund is reasonable based on the factors typically considered by courts.*

Unlike other circuits, the Fourth Circuit has not established a benchmark for fee awards in common-fund cases.  However, district courts in this Circuit typically consider the following factors: (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys involved; (3) the risk of nonpayment and the duration and complexity of the case; (4) objections

---

[8] *See also Kelly v. Johns Hopkins Univ.*, No. 1:16-cv-2835, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020); *Seaman v. Duke Univ.*, No. 1:15-cv-462, 2019 WL 4674758, at *2 (M.D.N.C. Sept. 25, 2019); *Krakauer v. Dish Network, LLC*, No. 14-333, 2018 WL 6305785, at *2 (M.D.N.C. Dec. 3, 2018); *Phillips v. Triad Guar. Inc.*, No. 1:09-cv-71, 2016 WL 2636289, at *2 (M.D.N.C. May 9, 2016); *Archbold v. Wells Fargo Bank, N.A.*, No. 13-24599, 2015 WL 4276295, at *5 (S.D. W. Va. July 14, 2015) ("[T]he Court concludes that there is a clear consensus . . . that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery.").

by members of the class to the settlement terms or fees requested by counsel; (5) awards in similar cases; and (6) public policy. *Fangman v. Genuine Title, LLC,* No. CV RDB-14-0081, 2017 WL 86010, at *3-4 (D. Md. Jan. 10, 2017). Here, each of these factors supports the requested fee of one third of the common fund.

> ### i. The Settlement achieves significant, additional relief for the Class.

In the Fourth Circuit, "the most critical factor in calculating a reasonable fee award is the degree of success obtained." *McDonnell v. Miller Oil Co*., 134 F.3d 638, 641 (4th Cir. 1998) (citation and internal quotation omitted). Here, there is no question that the Settlement achieves significant results for the Class that builds on the trailblazing relief approved by the Court in *Hengle*. As outlined above, in addition to the complete debt cancellation and payments in *Hengle*, Class Members will receive automatic payments from the Defendants in this case that they otherwise would not have been able to obtain without piecing together the vast webs of investors involved in the underlying lending scheme and undertaking the significant risk of suing those investors under RICO.

Indeed, this Settlement will result in estimated payments of between $19.59 and $588.40 to the named plaintiffs based on the amounts they paid on their usurious loans and the applicable state law, which are representative of the payments to the Class. These amounts track the payments to representative class members in similar tribal lending cases, including *Hengle*. *See, e.g.*, *Hengle*, ECF No. 222-2 ¶ 20 (noting that settlement would provide payments between $0 and $928.0 to the named plaintiffs based on payments and applicable statutes); *Gibbs v. Plain Green*, *LLC*, No. 3:17-cv-495, ECF No. 135 at 23 n.10 (E.D. Va.) (noting that settlement would provide payments between $3.80 and $382.73 to the named plaintiffs based on same factors); *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, ECF No. 101 at 19 (E.D. Va.) (payments between $0 and

$295.98 based on same factors). To remove any doubt, Dale Pittman, a consumer lawyer who has been practicing for nearly 48 years, has reviewed the Settlement and opines that the Settlement is an extraordinary result for consumers. (Ex. 4, Pittman Decl. ¶¶ 19-21.) It is also important to consider that these payments will be in addition to the payments and debt cancellation obtained for the same class members in *Hengle*. In short, the fees request is more than reasonable considering the relief obtained for the Settlement Class.

ii.       ***Class Counsel are highly experienced in tribal lending cases.***

The quality and skill of Class Counsel in this case also supports an award of one-third of the common fund in this case. As outlined above, courts, including this Court, have repeatedly found Class Counsel to be among the most experienced lawyers in tribal lending cases and consumer class actions. *See, e.g.*, *Galloway*, 2020 WL 7482191, at *8 (finding that "Class Counsel and their firms have extensive backgrounds in complex and class action litigation and consumer protection litigation" and further noting that counsel "have significant experience in litigating class action lawsuits against tribal lenders" (*citing, e.g.*, *Hayes v. Delbert Servs. Corp.*, No. 3:14-cv-258, ECF No. 193 ¶¶ 4, 14 (E.D. Va. Jan. 20, 2017)); *Turner*, No. 3:19-cv-293 (E.D. Va.) ("[W]e have Ms. Kelly and Mr. Bennett here, who are well known to me as being experts in this field, but it looks like the other class counsel is like the all-star team of consumer litigation."); *Stinson*, 2021 WL 4812451, at *16 (finding that Class Counsel were adequate and noting that they had been involved for four years and "already obtained substantial relief for borrowers by securing two courts' approval of a class action settlement").

Class Counsel leveraged this depth of experience to achieve the significant relief in this case. Indeed, Class Counsel was able to achieve favorable precedents in *Hengle*, including this Court's well-reasoned opinion regarding the interplay of tribal sovereign immunity and state usury

laws, that laid the foundation for this case, which Class Counsel then successfully defended on appeal. *Hengle v. Asner*, 433 F. Supp. 825 (E.D. Va. 2020), *aff'd*, 19 F.4th 324 (4th Cir. 2021), *cert denied*, 142 S. Ct. 2093 (2022). Without this controlling precedent, this and other tribal lending cases would be substantially more difficult for consumer plaintiffs. Class Counsel were also able to identify the Defendants in this case from the discovery in *Hengle* and, through their knowledge and experience, established a novel and plausible theory for holding Defendants liable under RICO. *See Blackburn v. A.C. Israel Enters.*, No. 3:22-cv-146, 2023 WL 4710884 (E.D. Va. July 24, 2023). Without this theory, Defendants would have avoided responsibility for supporting the usurious lending scheme. And Class Counsel did all of this as efficiently as possible, as reflected by the lack of motions practice in this case following the Court's ruling on Defendants' motions to dismiss and the significant efforts invested by Counsel in settlement.

Class Counsel's knowledge and experience therefore also supports the award of one-third of the common fund in this case.

### iii. The risk of non-payment and complexity of this case favor the requested percentage.

Class Counsel's success was not without risk, however. As with nearly all their cases, Class Counsel litigated this case on a contingency basis, fronting all the resources and costs. They did so based on a theory that Defendants, as knowing investors in the lending scheme, should be held liable under RICO to the same extent as the managers of the scheme. This theory carried inherent risk, as Defendants continue to dispute that they were sufficiently involved to be found liable and the decision on their culpability likely would be left to a jury. *See Blackburn*, 2023 WL 4710884, at *21-32 (discussing the facts that would need to be found to hold Defendants liable under RICO). Defendants were also willing to appeal any adverse decisions against them.

In addition to the risk of achieving a judgment on the merits, there was also the issue of how much the Class could collect from Defendants in the event they succeeded. Discovery in this case revealed that Defendants had either disbursed the profits or already used many of the profits from the lending scheme for other purposes, and their assets would be further depleted through continued litigation and likely appeals. Even if Plaintiffs and the Class obtained a judgment, therefore, there was significant risk that they would be unable to collect the same or more relief than achieved through the Settlement.

Accordingly, Class Counsel assumed a very real risk in taking on this complex case. Class Counsel took the case on a contingency basis based on an inherently risky and complex theory of liability. Despite these risks, Counsel has obtained significant relief for the Settlement Class, which justifies the award of one third of the monetary value of the Settlement.

### iv. There has been no objection to the Settlement or fees.

As detailed above, ALCS sent Class Notice to all the Settlement Class Members. Of the 547,074 class members, 540,134 notices (*i.e.*, 98.73%) are presumed delivered and only 6,940 notices remain undelivered. (Ex. 1 ¶ 8.) It is now several weeks after the objection deadline and neither Class Counsel nor ALCS have received any objection to the proposed settlement or the proposed service awards and attorneys' fees, which were listed in the class notice. Defendants also worked with ALCS to timely serve the required Class Action Fairness Act notices to 57 federal and state officials, including the attorneys general of each U.S. state and territory and the District of Columbia. None have filed an objection to the Settlement, including the requested fees.

As the Fourth Circuit has explained, an "almost complete lack of objection to the fee request provides additional support for the district court's decision to approve it." *Berry*, 807 F.3d at 619 (noting that only two of 300,000 class members objecting to fee request is a "rare

phenomenon" and evidence that the district court did not abuse its discretion in awarding fees). Here, the lack of *any* objection—from more than half a million people—demonstrates the reasonableness of the service awards and attorneys' fees.

> **v.** **The award of one-third of the common fund is on-par with other tribal lending cases.**

Class Counsel's request for one third of the monetary value of the Settlement also tracks with other tribal lending cases. Indeed, several courts in this District approving tribal lending settlements, including this Court in *Hengle*, have approved fees constituting one-third of the cash value of the settlement fund. *See Hengle*, ECF No. 230 ¶ 20 (approving $13 million in fees, representing one third of the settlement's $39 million cash value); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, ECF No. 141 ¶ 24 (E.D. Va. Dec. 13, 2019) (awarding $5,248,227.93 in fees, representing one-third of fund value); *Gibbs v. TCV V, L.P.*, No. 3:19-cv-789, ECF No. 95 ¶ 19 (E.D. Va. Mar. 29, 2021) (awarding $11,677,165.50, representing one-third of fund value); *Gibbs v. Rees*, No. 3:20-cv-717, ECF No. 68 at 9–11 (E.D. Va. Mar. 26, 2021) (same); *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, ECF No. 114 (E.D. Va. July 9, 2020) (same); *Gibbs v. Stinson*, No. 3:18-cv-676, ECF No. 346 ¶ 20 (E.D. Va. Aug. 16, 2022) (same).

The same percentage is appropriate here. Even standing alone, Class Counsel's request for one-third of the monetary value of the Settlement is well within the 25-to-40-percent range that courts within the Fourth Circuit have found appropriate.[9] But when considered together with the

---

[9] Indeed, "empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in the class actions average around one-third of the recovery." 4 Newberg *on Class Actions* § 14:6 (4th ed.); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 class action settlements shows "average attorney's fees percentage [of] 31.31%" with a median value that "turns out to be one-third."). In an analysis of such historic patterns, Silber and Goodrich explained that empirical evidence does not necessarily establish what a court should do in any given case, but it does provide guidance to the court in determining whether a fee is reasonable. Reagan W. Silber & Frank E. Goodrick, *Common*

*Hengle* settlement that provided relief to the same class for the same lending scheme, the total combined fees awarded to counsel in both cases would amount to less than 4% of the value of the settlements. This is before considering the additional value of Defendants' agreement not to support the TLEs for three (3) years from the Effective Date of the Settlement, and to refrain indefinitely from assisting with the collection of any loans. (Settlement § 3.3.c.) Compared to the overall relief obtained for the Class in this case and *Hengle*, therefore, the fees request is patently reasonable, and it is also below the appropriate range found by a comprehensive study of attorneys' fees in class action cases. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27, 31, 33 (2004) (noting "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount").

### vi. *Public policy favors the requested percentage.*

Finally, public policy favors an award of one-third of the Settlement's monetary value. When assessing the reasonableness of a class-action fee award, the "court must strike the appropriate balance between promoting the important public policy that attorneys continue litigating class action cases that 'vindicate rights that might otherwise go unprotected,' and perpetuating the public perception that 'class action plaintiffs' lawyers are overcompensated for the work that they do.'" *Fangman*, 2017 WL 86010, at *6 (quoting *Singleton*, 976 F. Supp. 2d at 687). This case provides a quintessential example of the public policy justifications behind class actions, as it obtains relief from participants in a lending scheme who would otherwise go undiscovered and against whom it would be difficult for any individual consumer to obtain relief without significant resources.

---

*Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 Rev. Litig. 525, 545–46 (1998).

Nor are there concerns that Class Counsel is seeking overpayment. For one, compared to the overall value of the relief obtained for the Settlement Class in this case and *Hengle*, the requested fees are well below the typical fee award for similar class actions. Moreover, as with any class case that they agree to take on, Class Counsel lives by the results that they obtain for the classes they represent. Although the fee here is in the millions, Class Counsel has consistently advocated for fees based on the percentage method, even when it results in a small fee relative to counsel's investment of time and resources. *See, e.g.*, *Mayfield v. Memberstrust Credit Union*, No. 3:07-cv-506 (E.D. Va.) (fee of $8,300); *Thomas v. FTS USA, LLC*, No. 3:13-cv-825, 2017 WL 1148283, at *3 (E.D. Va. Jan. 9, 2017) (fee of $400,000, representing 30% of the settlement fund), *R&R adopted,* No. 3:13-cv-825, 2017 WL 1147460 (E.D. Va. Mar. 27, 2017); *Conley v. First Tennessee*, No. 1:10-cv-1247 (E.D. Va.) (300 consumers and fee of $20,000); *Lengrand v. Wellpoint*, No. 3:11-cv-333, ECF No. 42 (E.D. Va.) (counsel requested only 20% of the class recovery, $8,550, because of the small class size). In each case, the standards of Rule 23 demanded that Class Counsel represent the interests of the class with the same attention, zeal, and competence whether the class is in the millions or not. In this case, where Class Counsel bore the risk of the litigation and invested significant funds to advance the litigation, the requested fee is reasonable.

Moreover, where, as here, there is no meaningful role of a lodestar "cross-check" to ensure that the settlement was not a sham or entered before sufficient work was performed to determine the real value of a claim, courts generally have rejected its usefulness. *See, e.g.*, *Voulgaris v. Array Biopharma, Inc.*, 60 F.4th 1259, 1265–66 (10th Cir. 2023) ("[T]he district court was not required to perform a lodestar cross-check. In *Brown*, we held that 'in awarding attorneys' fees in a common fund case, the 'time and labor involved' factor need not be evaluated using the lodestar formulation when, in the judgment of the trial court, a reasonable fee is derived by giving greater weight to

other factors, the basis of which is clearly reflected in the record.'" (citation omitted)).  Here, the record clearly reflects that Counsel obtained significant, additional relief for the Class through diligent, creative, and novel efforts, and their ability to do so efficiently should not prevent an award of fees commensurate with that relief.

Finally, in consumer class actions generally, and in tribal-lending cases specifically, there is extensive work necessary post-approval.  This case is no exception.  After Final Approval, Class Counsel will implement the settlement with help from the Administrator, ALCS, and assist class members with any remaining issues they have with the debts.  This will require significant time that would otherwise go uncompensated, militating against concerns of overpayment.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court grant this Motion for Final Approval of the Class Action Settlement, as well as their request for reasonable service awards and attorneys' fees.

Respectfully submitted,

**PLAINTIFFS**

*/s/ Kristi C. Kelly*
Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Matthew G. Rosendahl, VSB #93738
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7570
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com

Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com

*Class Counsel*